

Lindsay M. Nelson, Esq.
Nelson@ASNALaw.com

**CONFIDENTIAL SETTLEMENT COMMUNICATION**
**SUBJECT TO EVIDENCE RULE 408**

December 11, 2024

***Via Certified Mail***

Magnolia Soap & Bath Holding Co., LLC
Magnolia Soap and Bath Co. FRCH, LLC
c/o Magen Bynum
119 West Bankhead Street
New Albany, Mississippi 38652

      **Re:**    ***Array of Soap LLC Franchise Agreement***

Dear Ms. Bynum,

      Array of Soap LLC ("Array of Soap" or "Franchisee") and Lindsay Williams retained Allen Stovall Neuman & Ashton LLP to represent them in connection with their claims against Emily Burriss, Magnolia Soap and Bath Co. FRCH, LLC, and/or Magnolia Soap & Bath Holding Co., LLC (collectively referred to herein as "Magnolia").

## I.   Background Facts

      In or around December of 2022, intrigued by the origin story Magnolia shares on its website, Ms. Williams contacted Magnolia to learn more about its franchising opportunities. In or around January of 2023, Magnolia provided Ms. Williams with the Franchise Disclosure Document ("FDD") attached hereto at Exhibit A, dated May 25, 2022.

### A.   Representations Magnolia Made to Ms. Williams.

The FDD makes the following representations:

- Franchisor is required to purchase "all proprietary ingredients and raw materials, facial products, packaging and supplies from our Parent, and our Parent is the only approved supplier of these items…In our last fiscal year ended December 31, 2021, our Parent did not earn revenue on the sale of these items to our franchisees." (Exhibit A at Item 8, p. 13.)

- "We estimate that your purchase or lease of products, supplies and services from approved suppliers (or those that meet our specifications) will

represent...approximately 25% of your costs for ongoing operation. (Exhibit A at Item 8, p. 14.)

- "Before you open your Franchised Business, we will:...(f) provide a trainer at your premises for on-site training, supervision and assistance for two days upon the opening of your Franchise Business...(i) through our Parent, create a grand opening advertising campaign to promote the opening of the Franchised Business." (Exhibit A at Item 11, p. 16-17.)

- The Location Revenue for Corporate5 and Corporate4 for 2021 was $758,037 and $752,126, respectively. "'Location Revenue' includes all revenues generated onsite at the location. Online revenue is collected by us and a percentage of sales in each territory is distributed to the locations, but this amount is not included in Location Revenue." (Exhibit A at Item 19, p. 32.)

On January 3, 2023, Magnolia held a video conference with Ms. Williams. During this video call, Magnolia represented that the net profits for the locations disclosed in the FDD were between 30-40%.

Additionally, on January 17, 2023, Magnolia represented the following: "COGS: Ceiling of 30% as it fluctuates with national and global supply chain, inflation, etc., currently 25%, but working on getting it to 20%." (Magnolia's January 17, 2023 email attached hereto at Exhibit B.)

### B. Ms. Williams Opened a Magnolia Soap Franchise.

On or about April 23, 2023, in reliance on the representations in the FDD, Magnolia and Array of Soap entered into a Franchise Agreement. Magnolia never provided Ms. Williams with any updates to the FDD prior to entering into the Franchise Agreement. Ms. Williams opened her franchise on or about September 28, 2023. Magnolia did not provide two days of on-site training upon the opening of the store, nor did Magnolia create a grand opening advertising campaign for the franchise. However, these shortcomings are merely the beginning.

#### i. *Up charging ingredients and materials*

Magnolia is currently charging Array of Soap anywhere from 8%-402% above retail for ingredients and materials that Ms. Williams is required to purchase from Magnolia. By way of example, Magnolia charges Ms. Williams $9.75/lb. for arrowroot and retailers charge $3.13/lb.; Magnolia charges Ms. Williams $19.00/lb. for white mica and retailers charge $8.75/lb.; Magnolia charges Ms. Williams $8/oz. for Vitamin E oil and retailers charge $1.99/oz; and Magnolia charges $40.00/lb. for menthol crystals and retailers charge $15.50 for menthol crystals.

Ms. Williams' cost of goods sold for her franchise between January 1, 2024 and today represents approximately 39% of her costs of operation.

### ii. *Ordering issues*

To date, 90% of the orders Ms. Williams placed with Magnolia have had discrepancies. On many of these occasions, Ms. Williams did not learn that a product was out of stock or there was an issue fulfilling the order until after the order was delivered.

Core items, such as shampoo and conditioner bars, charcoal masks, exfoliating face scrub and Vitamin C are regularly out of stock in Magnolia's warehouse. White mica, Ms. Williams' most used mica, has been out of stock for weeks at a time. White mica is currently unavailable for purchase through Magnolia (for the third time) while bulk suppliers have it readily available. Dryer balls, a staple product that can be procured from multiple sources, were out of stock for 3-4 months over the 2023 holiday season. Magnolia, however, has been unrelenting on its requirement that Ms. Williams procure all raw ingredients, products, and supplies directly from Magnolia.

### iii. *Revenue misrepresentations*

Since Ms. Williams opened her franchise, Magnolia disclosed that the Corporate5 and Corporate4 figures in the FDD included online revenue and corporate wholesale accounts, despite the express representation in the FDD that these figures exclude all online revenue.

Magnolia currently discloses on its website that its top 20% of franchise owners make $616,252 in revenue. This number, however, is in direct conflict with revenues included at the January 9, 2024 Town Hall Presentation. During the Town Hall Presentation, Magnolia represented that its top three stores for 2023 earned revenues of $646,940.18, $601,187.96 and $586,750.84. Based on these figures alone, the top 20% of franchise owners could not possibly make $616,252 in revenue.

## II. Legal Claims and Damages

### A. FTC Franchise Requirements

Pursuant to the Federal Trade Commission's ("FTC") Franchise Rule, franchisors are required to fully update the FDD once a year. 16 C.F.R. § 436.7(a). Additionally, franchisors must "within a reasonable time after the close of each quarter of the fiscal year, prepare revisions to be attached to the disclosure document to reflect any material change to the disclosures included." 16 C.F.R. §436.7(b). Once such a revised document is made, potential franchisees should receive an FDD that reflects any revisions as of the "most recent period available at the time of disclosure." *Id.* Information on the number of franchise units open and closed at any given time is a material fact about the franchise opportunity. *See, e.g., Cluck-U Chicken, Inc. v. Cluck-U Corp.*, 358 F.

Supp. 3d 1295, 1313 (M.D. Fla. 2017) (finding an actionable claim when franchisor failed to provide franchisee with updated disclosure document showing closures from that year).

Franchisors are also required to disclose in the FDD the precise basis that they will derive revenue from required purchases by franchisees by stating: (i) the franchisor's total revenue; (ii) the franchisor's total revenue from all required purchases of products; (iii) the percentage of the franchisor's total revenues that are from required purchases; (iv) if the franchisor's affiliates also sell products to franchisees, the affiliates' revenues from those sales. 16 C.F.R. § 436.5(h)(6).

Although it is optional whether a franchisor makes financial performance representations, if a franchisor makes any financial performance representations, they must be included in Item 19 of the FDD. 16 C.F.R. § 436.5(s). The Franchise Rule defines "financial performance representation" as "any representation, including any oral, written, or visual representation, to a prospective franchisee...that states, expressly or by implication, a specific level or range of actual or potential sales, income, gross profits, or net profits." 16 C.F.R. § 436.1(e).

### B. Relevant Ohio Law

As both Ms. Williams and her franchise are located in Ohio, Ohio has a materially greater interest than Mississippi in the resolution of this case and it "is beyond the power of the parties to contract for application of the other's state's law." *Zounds Hearing Franchising, LLC v. Bower*, 2017 WL 4399487, *2 (Ohio is "the franchisee protection state on steroids"). Ohio law applies to the issues between Array of Soap and Magnolia.

Under Ohio's Business Opportunity Act ("BOA"), franchise sellers are prohibited from making any false or misleading statements or engaging in any deceptive or unconscionable act or practices. R.C. 1334.03(B). Disclosure documents for a franchise business opportunity must contain, among other things, the number of business opportunity plans sold by the seller which were operating in all states at the end of the previous year and which were terminated, refused renewal, or repurchased by the seller during the previous year. R.C. 1334.02. Franchise agreements must contain a notice of the franchisee's right to cancel the agreement within five days and a notice of cancellation form is required to be attached to the agreement. R.C. 1334.06(A)(7), (B).

For any violation of R.C. 1334 *et seq.*, a purchaser may (a) rescind the agreement and recover all sums paid to the seller (less the fair market value of any goods supplied by the seller that are not returned to the seller); and (b) if the purchaser is found to have been damaged, the purchaser is entitled to recover three times the amount of actual damages or $10,000, whichever is greater. R.C. 1334.09(A). The purchaser may also recover its reasonable attorneys' fees. R.C. 1334.09(B).

"[T]he purpose of the Ohio [BOA]... is to provide an adequate remedy to those who have been misled by dishonest or negligent franchisors. Accordingly, its provisions should be read so

as to encourage compliance by franchisors and to provide an available remedy to franchisees in the event of noncompliance." *RY/EH, Inc. v. Arthur Treachers, Inc.*, 115 Ohio App.3d 332, 335, 685 N.E.2d 316, 318 (7th Dist.1996) (*citing Peltier v. Spaghetti Tree, Inc.* (1983), 6 Ohio St.3d 194, 196, 6 OBR 249, 251–252, 451 N.E.2d 1219, 1221).

### C. Magnolia's Violations of Law

Magnolia violated Ohio's BOA by making false and misleading statements and engaging in deceptive and unconscionable practices. Specifically, Magnolia (a) failed to revise the FDD to reflect material changes to the disclosure between May 22, 2022 and April 23, 2023 such as, the precise basis that it will derive revenue from required purchases by franchisees and the number of franchise units open, closed, refused renewal or repurchased by Magnolia; (b) unlawfully provided a financial performance representation, outside of those reflected in Item 19, when it represented that the net profit for the locations disclosed in the FDD were between 30-40%; (c) misrepresented the revenues of Corporate5 and Corporate 4 in the FDD; (d) misrepresented (and continues to misrepresent) the revenue of its top 20% of franchises; (e) failed to include a notice of cancellation in the Franchise Agreement; (f) charged (and continues to charge) an exorbitant amount for required purchases; (g) consistently failed (and continues to fail) to fulfill orders; (h) failed to provide two days of on-site training upon the opening of the store as promised; and (i) failed to create a grand opening advertising campaign for the franchise as promised.

Ms. Williams relied on Magnolia's representation that it was not earning revenue on ingredients, materials, products, packaging and supplies and, had Magnolia disclosed the precise basis for this revenue (i.e. up charging franchisees), Ms. Williams would not have entered into the Franchise Agreement. Likewise, Ms. Williams relied on Magnolia's representation that the net profits for the locations disclosed in the FDD were between 30-40% and the revenues for Corporate5 and Corporate4 exceeded $750,000 when she entered into the Franchise Agreement. Magnolia knew these representations were false at the time it made them, giving rise to a claim of fraud under Ohio law in addition to a claim for violation of Ohio's BOA. *Cohen v. Lamko, Inc.*, 10 Ohio St. 3d 167, 169, 462 N.E.2d 407, 409 (1984).

As a direct and proximate result of these claims, Ms. Williams has suffered damages in excess of ▮▮▮▮.

### III. Conclusion

Ms. Williams is willing to forgo filing a lawsuit against Magnolia seeking monetary, treble, punitive and/or statutory damages and attorneys' fees in exchange for rescission of the Franchise Agreement and payment in the amount of ▮▮▮▮▮

Please respond to this letter no later than Monday, December 23, 2024. If we do not hear from you by that time, we will have no choice but to initiate legal action against you to recover what is owed.

Sincerely,

Lindsay M. Nelson

cc: Lindsay & Ben Williams