**MAGNOLIA SOAP AND BATH CO. FRCH, LLC**

<u>**FRANCHISE AGREEMENT**</u>

**ARRAY OF SOAP LLC**
<u>**LINDSAY ARRAY WILLIAMS**</u>
**FRANCHISEE**

April 29, 2023 | 10:07 AM PDT

**DATE OF AGREEMENT**



# MAGNOLIA SOAP AND BATH CO. FRCH, LLC
## FRANCHISE AGREEMENT
## TABLE OF CONTENTS

| | | |
|---|---|---|
| 1. | RECITATIONS | 3 |
| 2. | GRANT OF FRANCHISE | 3 |
| 3. | TERRITORY | 4 |
| 4. | TERM | 4 |
| 5. | SUCCESSOR AGREEMENT OPTIONS | 4 |
| 6. | FEES | 6 |
| 7. | TRAINING | 8 |
| 8. | FRANCHISED LOCATION REQUIREMENTS | 9 |
| 9. | MAINTENANCE AND IMPROVEMENT OF THE FRANCHISED LOCATION AND SYSTEM | 11 |
| 10. | FRANCHISOR'S OBLIGATIONS | 12 |
| 11. | FRANCHISEE'S REPRESENTATIONS, WARRANTIES AND COVENANTS | 13 |
| 12. | FRANCHISEE'S OPERATIONS | 15 |
| 13. | ADVERTISING, PROMOTIONS AND RELATED FEES | 19 |
| 14. | INTELLECTUAL PROPERTY | 21 |
| 15. | INSURANCE AND INDEMNIFICATION | 23 |
| 16. | TRANSFERS | 25 |
| 17. | DEFAULTS | 29 |
| 18. | POST-TERMINATION | 32 |
| 19. | NON-DISCLOSURE AND NON-COMPETITION COVENANTS | 34 |
| 20. | DISPUTE RESOLUTION | 37 |
| 21. | GENERAL | 38 |
| 22. | ACKNOWLEDGEMENTS | 40 |

Attachments
1 - Acknowledgements
2 - Trademarks
3 - Territory
4 - Release
5 - ACH Authorization
6 - Collateral Assignment of Lease
7 - Statement of Ownership Interests in Franchisee
8 - Spousal Guaranty
9 - Internet Advertising, Social Media, Software, and Telephone Listing Agreement
10 - Confidentiality and Non-Compete Agreement

THIS FRANCHISE AGREEMENT (the "Agreement") is being entered into this day of _____ _____ April 29, 2023 | 10:07 AM PDT (the "Effective Date"), by and between Magnolia Soap and Bath Co. FRCH, LLC, a Mississippi limited liability company, with its principal place of business at 119 West Bankhead Street, New Albany, Mississippi, 38652 (herein "Franchisor"), and Array of Soap LLC, an Ohio limited liability company, with its principal place of business located at 2493 Long Bow Avenue, Lancaster, Ohio, 43130, and Array of Soap LLC's principal, Lindsay Array Williams, an individual, residing at 2493 Long Bow Avenue, Lancaster, Ohio, 43130 ("Principal"). Array of Soap LLC and Principal shall be jointly referred to in this Agreement as the "Franchisee".

## RECITATIONS

Through the expenditure of considerable time, effort and money, Franchisor has developed and established a high quality retail shop selling personal care products, including soap and bath products, under the Magnolia Soap and Bath Co trademarks, and using Franchisor's confidential operations manual ("Manual") of business practices and policies, and Franchisor's distinctive, décor, fixtures and furnishings, operations methods, sales techniques, inventory, procedures for management control and training, assistance, advertising, and promotional programs, all of which may be changed, improved or further developed by Franchisor at any time (taken together herein the "System").

The System is identified by certain trade names, service marks**,** trademarks, logos, emblems and indicia of origin, including but not limited to the marks Magnolia Soap and Bath Co service mark, as set forth in Attachment 2, and such other trade names, service marks, and trademarks as are now designated and may hereafter be designated or substituted by Franchisor for use in connection with the System (the "Marks").

Franchisor continues to develop, use, and control the use of such Marks in order to identify for the public the source of services and products marketed under the Marks and the System and to represent the System's high standards of quality, appearance, and service.

Franchisee understands and acknowledges the importance of Franchisor's high and uniform standards of quality, service, and appearance, and the necessity of operating the business franchised hereunder in conformity with Franchisor's standards and specifications.

NOW, THEREFORE, the parties, in consideration of the promises, undertakings and commitments of each party to the other set forth herein, and intending to be legally bound hereby, mutually agree as follows:

1.      **RECITATIONS**

The Recitations set out above form part of this Agreement.

2.      **GRANT OF FRANCHISE**

Franchisor hereby grants to Franchisee and Franchisee accepts, upon the terms and conditions contained in this Agreement, the license to operate a Magnolia Soap and Bath Co franchise (the "Franchise" or "Franchised Business"), using only the Marks licensed hereunder, in strict conformity with the System, which may be changed, improved and further developed by Franchisor from time to time. This grant applies only to a single location within a territory that is designated in Attachment 3 attached hereto and incorporated herein (the "Territory").

## 3.     TERRITORY

3.1     Territory.  This Agreement grants Franchisee the right to operate the Franchised Business at a single location within the Territory.  Subject to Section 3.2 below, Franchisor agrees that during the Term of this Agreement, Franchisor will not operate, and will not authorize any other franchisees to operate, a Magnolia Soap and Bath Co outlet in the Territory using the same Marks as licensed to Franchisee in this Agreement so long as Franchisee is not in default under this Agreement or this Agreement has not expired or been terminated.  Except as otherwise specified in this Agreement, Franchisor reserves the right to open, operate or franchise Magnolia Soap and Bath Co franchises bordering and adjacent to the Territory. Franchisee will be selling its products and services from a single location that will be determined by Franchisee with Franchisor's prior written approval, which may be withheld or denied in Franchisor's sole discretion.  Franchisee is prohibited from selling to and soliciting customers through alternative distribution channels as more fully specified herein.

3.2     Reservation of Rights. Franchisee understands and agrees that all rights to any businesses, other than as specified in this Agreement, are fully reserved to Franchisor within or outside of the Territory. By way of example only, Franchisor reserves the rights to offer (i) other products or services not offered under the Marks, (ii) other personal care product concepts under the Marks or other trademarks, and (iii) products or services through any channel in the Territory other than a dedicated Magnolia Soap and Bath Co outlet, such as distribution through retail outlets, including but not limited to, salons, spas, and department stores; and the internet ("Alternate Distribution Channels").  Franchisee will receive no compensation for Franchisor's sales through Alternate Distribution Channels made within the Territory, except as may be set forth in the Manual.  Franchisee agrees that such implementation of Franchisor's rights pursuant to this Section 3.2 is deemed not to impair or injure Franchisee's rights pursuant to Section 2 hereof.

## 4.     TERM

Unless terminated earlier in accordance with the terms set forth in this Agreement, this Agreement and the Franchise granted hereunder shall commence upon the Effective Date set forth above, and terminate on the date that is ten (10) years following the Opening Date, as defined in Section 8 hereof (the "Term").

## 5.     SUCCESSOR AGREEMENT OPTIONS

Subject to the terms and conditions of this Agreement, Franchisee shall have the right, following the expiration of the Term hereof, to enter into a new franchise agreement and other agreements then customarily employed by Franchisor and in the form then generally being offered to prospective franchisees in the state in which the Territory is located (the "Successor Franchise Agreement") for one (1) additional ten (10) year term.  The term of such Successor Franchise Agreement shall commence upon the date of expiration of the immediately preceding term.  Franchisee shall be charged a successor agreement fee of twenty-five percent (25%) of the then-current initial franchise fee charged to new franchisees, plus our legal costs.

5.1     Form and Manner of Successor Agreement.  If Franchisee desires to exercise Franchisee's option to enter into a Successor Franchise Agreement, it shall be done in the following manner:

5.1.1     Not less than six (6) months prior to the expiration of the Term of this Agreement, Franchisee shall request from Franchisor in writing, a copy of Franchisor's then-current Disclosure Document (including Franchisor's then-current franchise agreement).

DocuSign Envelope ID: 6693B1631-8644-46D8-A329-29RB12267B3D

5.1.2    Franchisee must execute and return to Franchisor all required documents, including any and all ancillary documents, within thirty (30) days after receipt by Franchisee of a copy of Franchisor's then-current Disclosure Document.

5.1.3    The Successor Franchise Agreement shall supersede this Agreement in all respects, and Franchisee understands and acknowledges that the terms of such new agreement may differ from the terms of this Agreement, including, without limitation, higher or lower royalty and other fees.

5.1.4    If Franchisee fails to perform any of the acts, or deliver any of the notices required pursuant to this Paragraph 5 in a timely fashion, such failure shall be deemed an election by Franchisee not to exercise Franchisee's option to enter into the Successor Franchise Agreement, and such failure shall cause Franchisee's right and option to automatically lapse and expire, without further notice by Franchisor.

5.1.4.1  Franchisee acknowledges that the initial Term of this Agreement provides Franchisee more than a sufficient opportunity to recoup Franchisee's investment in the Franchise, as well as a reasonable return on such investment.

5.2    <u>Conditions of Successor Agreement</u>. Franchisee's right to enter into a Successor Franchise Agreement is conditioned upon the following:

5.2.1    Franchisee shall be in full compliance with this Agreement and shall have materially performed Franchisee's obligations under this Agreement, the Manual and under all other agreements that may be in effect between Franchisee and Franchisor, including but not limited to all monetary obligations.

5.2.2    Franchisee shall not have committed three (3) or more events constituting default during the then-current Term of this Agreement, whether or not such defaults were cured.

5.2.3    Franchisee will have completed any required additional training to Franchisor's reasonable satisfaction.

5.2.4    Franchisee shall have obtained the right to continue to occupy the premises of the Franchised Business following the expiration of the Term hereof for the full term of the Successor Franchise Agreement and/or have received Franchisor's approval regarding locating the Franchised Business at a new location.

5.2.5    Franchisee shall execute a general release of all claims Franchisee may have against Magnolia Soap and Bath Co. FRCH, LLC, its parent, subsidiaries and affiliates, its officers, directors, shareholders, agents, and employees, whether in their corporate and/or individual capacities, in the form attached hereto as Attachment 4. This release will include all claims arising under any federal, state, or local law, rule, or ordinance.

5.2.6    Franchisee performs such remodeling, repairs, replacements and redecoration as Franchisor may require in order to cause the Franchised Business premises, equipment, fixtures, furnishings and furniture to conform to the plans and specifications being used for new or remodeled franchised businesses at the time of the successor term.

5.2.7    Franchisee shall pay the required successor agreement fee and sign the Successor Franchise Agreement.

DocuSign Envelope ID: 66C9B1631-8644-46D8-A329-29RP12267B3D

5.3     Notice Required by Law. If applicable law requires Franchisor to give notice to Franchisee prior to the expiration of the Term, this Agreement shall remain in effect on a month-to-month basis until Franchisor has given the notice required by such applicable law.  If Franchisor is not offering new Magnolia Soap and Bath Co franchises, is in the process of revising, amending or renewing Franchisor's form of franchise agreement or disclosure document, or Franchisor is not lawfully able to offer Franchisee the then-current form of Successor Franchise Agreement at the time Franchisee advises Franchisor pursuant to Paragraph 5.2 hereof that Franchisee desires to exercise Franchisee's option to enter into a Successor Franchise Agreement, Franchisor may, in Franchisor's sole discretion, (i) offer to renew this Agreement upon the same terms set forth herein for the appropriate successor term or (ii) offer to extend the Term hereof on a month-to-month basis following the expiration of the Term for as long as Franchisor deems necessary or appropriate so that Franchisor may lawfully offer the then-current form of Successor Franchise Agreement.  Any timeframes specified in this Paragraph 5 shall be inclusive of any state mandated notice periods.

5.4     Additional Reservation of Rights. Notwithstanding anything herein to the contrary, Franchisor reserves the right not to enter into a Successor Franchise Agreement for this Franchise as a result of a decision to withdraw from a marketing area or the Territory in which Franchisee's Franchised Business is located.

## 6.     FEES

6.1     Initial Franchise and Royalty Fee.  As part of the consideration for the right to operate the Franchise granted herein, Franchisee shall pay to Franchisor the following fees:

6.1.1     Initial Franchise Fee.  Franchisee acknowledges and agrees that the grant of this Franchise and the rights and obligations of the parties under this Agreement constitute the sole and only consideration for the initial franchise fee of Forty-Nine Thousand Five Hundred Dollars ($49,500) (the "Initial Fee").  **The Initial Fee is fully earned at the time this Franchise Agreement is signed and is not refundable under any circumstances.**  Franchisee shall pay the full amount of the Initial Fee to Franchisor upon Franchisee's execution of this Agreement.

6.1.2     Royalty Fee.  Franchisee agrees to pay Franchisor, throughout the Term, a royalty fee equal to six percent (6%) of the Gross Sales, as hereinafter defined, realized from the Franchised Business and from any other revenues received using Franchisor's methods, operations and/or trade secrets (the "Royalty Fee"). The term "Gross Sales" means the aggregate of all revenues, sales and other incomes of Franchisee from whatever source derived, regardless of whether collected by Franchisee or collected in the form of check, cash, credit or otherwise, arising out of, in connection with or relating to the Franchised Business, including, without limitation, (a) income from the sale of any products or other items, including gift cards; (b) income from any services provided; (c) all proceeds from any business interruption insurance, but excluding (i) all refunds and discounts made in good faith to a customer; (ii) any sales, use retail sales and equivalent taxes which are collected by Franchisee for on behalf of any governmental or other public body and actually remitted to such body; and (iii) the value of any coupon, voucher or other allowance authorized by Franchisor and issued or granted to customers of Franchised Business which is received or credited by Franchisee in full or partial satisfaction of the price of any product or service offered in connection with the Franchised Business. In Franchisor's discretion, upon notice to Franchisee, Gross Sales may be revised to exclude gift card purchases at the time of purchase, and instead include the redemption amount of purchases made by gift card as part of Gross Sales.

6.1.3     Gross Sales Reports.  Franchisee shall, on the fifth (5th) day following the close of each calendar month, furnish Franchisor with a report verifying Franchisee's Gross Sales at or from the Franchised Business and/or made pursuant to the rights granted hereunder during the preceding month (the

DocuSign Envelope ID: 6698B1631-8644-46D8-A329-29RB12267B3D

"Gross Sales Report"). The Gross Sales Report shall be in such form and shall contain such information as Franchisor may from time to time prescribe. Franchisor reserves the right to establish point-of-sale systems ("POS System") that Franchisor may require Franchisee to use from time to time in the operation of the Franchised Business. At Franchisor's option, Franchisee shall submit, or grant Franchisor access to, the Gross Sales Report by an electronic transfer of data via the POS System at the times and interims then specified by Franchisor.

       6.1.4   <u>Method of Payment</u>. Franchisee shall, together with the submission of the Gross Sales Report, pay Franchisor the Royalty Fee and the Brand Fund Contribution, as defined and more particularly described in Article 13, then due. At Franchisor's request, Franchisee must execute documents, including but not limited to, the ACH Authorization attached as Attachment 5, that allow Franchisor to automatically take the Royalty Fee and Brand Fund Contribution due as well as other sums due Franchisor, from business bank accounts via electronic funds transfers or Automated Clearing House ("ACH") payments. Franchisee's failure to allow electronic funds transfers or ACH payments on an ongoing basis is a material breach of this Agreement. If Franchisee fails to timely report Gross Sales, then, in addition to a late fee and interest pursuant to Sections 6.2 and 6.3 hereof, Franchisor shall collect one hundred twenty percent (120%) of the last Royalty Fee payable. Franchisor shall reconcile amounts when Gross Sales are reported. Franchisor reserves the right to modify the method and frequency of collection of the Royalty Fee and Brand Fund Contribution upon forty-five (45) days' prior notice to Franchisee.

       6.2   <u>Late Fee</u>. If the Royalty Fee, Brand Fund Contribution, or any Gross Sales Reports are not received by Franchisor as required by this Agreement, Franchisee shall pay to Franchisor, in addition to the overdue amount, a late fee of Seventy-Five Dollars ($75.00). This late fee is reasonably related to Franchisor's costs resulting from the delay in payment and/or receipt of any report, is not a penalty, and is in addition to any other remedy available to Franchisor under this Agreement for Franchisee's failure to pay the Royalty Fee, the Brand Fund Contribution, and/or submit Gross Sales Reports in accordance with the terms of this Agreement.

       6.3   <u>Interest</u>. Any and all amounts that shall become due and owing from Franchisee to Franchisor under the terms hereof shall bear interest from the date due until paid at the rate of eighteen percent (18%) per annum or at the highest rate permitted by law, whichever is lower.

       6.4   <u>Technology Fee</u>. Franchisor reserves the right to impose a technology fee upon Franchisee, in an amount that Franchisor reasonably determines, for the development, adoption and/or use of new or improved technology for the benefit of the System and Franchised Business, including but not limited to, assigned phone numbers and email addresses required for use in the Franchised Business, a franchise portal, benchmarking platform or other operations or communications systems ("Technology Fee"). In Franchisor's sole discretion, Franchisor may (i) increase the amount of the technology fees or (ii) replace the technology with different technology, developed by Franchisor or a third-party, and Franchisee shall pay the then-current fees for the replacement technology and for continuous access thereto. Franchisee shall pay the Technology Fee in the manner and frequency as reasonably determined by Franchisor.

       6.5   <u>Non-Sufficient Funds Fee</u>. In the event any of Franchisee's checks are returned, or an electronic funds transfer from Franchisee's bank account is denied, for insufficient funds, Franchisee shall pay Franchisor, in addition to the amount due, a non-sufficient funds fee of Twenty-Five Dollars ($25.00) per occurrence. This non-sufficient funds fee is reasonably related to Franchisor's costs resulting from the delayed and declined payment, is not a penalty, and is in addition to any other remedy available to Franchisor under this Agreement.

       6.6   <u>Taxes</u>. If any sales, excise, use or privilege tax is imposed or levied by any government or governmental agency on Franchisor for any Royalty Fee, Brand Fund Contribution or other fees due and

payable to Franchisor under this Agreement, Franchisee shall pay Franchisor a sum equal to the amount of such tax.

## 7. TRAINING.

7.1 <u>Initial Management Training Program</u>. Franchisee (specifically including all Franchisee's principals) and Franchisee's general manager shall attend and complete to Franchisor's sole and absolute satisfaction, Franchisor's initial management training program ("Initial Management Training Program") at least two (2) weeks (but no more than six (6) weeks, prior to the opening of the Franchised Business. The Initial Management Training Program consists of a course conducted remotely through virtual platforms and at Franchisor's headquarters and/or an affiliate-owned or franchised outlet. Franchisor reserves the right to designate an alternate location for the any component of the Initial Management Training Program. Franchisee must at all times during the term of this Agreement have principals who have successfully completed the Initial Management Training Program to Franchisor's sole and complete satisfaction. No charge will be made for up to two (2) individuals to attend the Initial Management Training Program prior to opening the Franchised Business ("Initial Trainees"). Notwithstanding the foregoing, Franchisee shall be required to pay all of the expenses of the Initial Trainees, including, without limitation, costs of travel, lodging, meals and wages.

7.2 <u>Satisfactory Completion</u>. Franchisor shall determine, in Franchisor's sole discretion, whether the Initial Trainees have satisfactorily completed the Initial Management Training Program. If the Initial Management Training Program is not satisfactorily completed or if Franchisor, in Franchisor's reasonable business judgment based upon the performance of the Initial Trainees, determines that the Initial Management Training Program cannot be satisfactorily completed by Franchisee and Franchisee's Principal(s), Franchisor may terminate this Agreement.

7.3 <u>Opening Assistance</u>. Immediately prior to the opening of the Franchised Business, Franchisor shall provide Franchisee with opening assistance by a trained representative of Franchisor. The trainer will provide on-site opening training, supervision, and assistance to Franchisee for two (2) days at no charge to Franchisee.

7.4 <u>Additional Training</u>. Franchisor may offer mandatory and/or optional additional training programs from time to time. If required by Franchisor, Franchisee, or Franchisee's Principals shall participate in the following additional training:

> (i) on-going training for up to twelve (12) days per year at a location designated by Franchisor; and

> (ii) an annual national business meeting or convention for up to five (5) days at a location designated by Franchisor.

Franchisor reserves the right to impose its then-current fee for all additional training programs. Franchisee shall be responsible for any and all incidental expenses incurred by Franchisee or Franchisee's personnel in connection with additional training or attendance at Franchisor's national business meeting or annual convention, including, without limitation, costs of travel, lodging, meals and wages. Franchisee's failure to attend and/or complete mandatory additional training or failure to attend Franchisor's national business meeting or annual convention is a default of this Agreement. Franchisee or Franchisee's principal(s) shall be required to attend any missed mandatory additional training at a location Franchisor designates. Franchisee shall pay all costs and expenses for such additional training, including but not limited to, tuition at the then-current rate and any and all transportation, meals and lodging of Franchisee, Franchisee's principal and Franchisor's training personnel. Franchisee shall pay to Franchisor any incurred

DocuSign Envelope ID: 6G9B1631-8644-46D8-A329-29RB12367B3D

expenses by Franchisor's training personnel within ten (10) days of Franchisor's billing thereof to Franchisee.

7.5    <u>On-Site Remedial Training</u>.  Upon Franchisee's reasonable request or as Franchisor shall deem appropriate, Franchisor shall, during the term hereof, subject to the availability of personnel, provide Franchisee with additional trained representatives who shall provide on-site remedial training and assistance to Franchisee's personnel at the Franchised Business location.  For any additional on-site training and assistance, Franchisee shall pay the per diem fee then being charged to franchisees under the System for the services of such trained representatives, plus their costs of travel, lodging, and meals.

7.6    <u>Counseling and Assistance</u>.  In addition to visits by Franchisor's field representatives, as Franchisor deems appropriate, Franchisor shall, within reasonable limits and subject to the availability of Franchisor's personnel, upon Franchisee's request and at no charge, unless such assistance is provided at the Franchised Business pursuant to Section 7.5, furnish consultation and assistance to Franchisee, either in person or by telephone, video conferencing, electronic communications, mail or postal service, as determined by Franchisor, in Franchisor's sole discretion, with respect to the operation of the Franchised Business, including consultation and advice regarding training, marketing, operation issues, purchasing and inventory control, bookkeeping and System improvements.

## 8.    FRANCHISED LOCATION REQUIREMENTS

8.1    <u>Site Selection</u>.

8.1.1    Franchisee assumes all cost, liability, expense and responsibility for obtaining and developing a site for the Franchised Business within the Territory and for constructing and equipping the Franchised Business at such site.  Franchisee shall not make any binding commitment to a prospective vendor or lessor of real estate with respect to a site for the Franchised Business unless the site location is approved by Franchisor. While Franchisor may render assistance to Franchisee in the selection of a site, as set forth in Section 8.1.2 below, Franchisee has sole responsibility for procuring and developing a site for the Franchised Business and Franchisee may and is encouraged to consult with professionals of Franchisee's choosing in discharging such responsibility.  Franchisee acknowledges that Franchisor's approval of a prospective site location is permission only, does not constitute a representation, promise, warranty or guarantee, express or implied, by Franchisor that the Franchised Business operated at that site will be profitable or otherwise successful, and cannot, and does not, create a liability for Franchisor.  Franchisee releases Franchisor from any claims over the site location selection and evaluation by Franchisor, and Franchisee shall hold Franchisor harmless with respect to Franchisee's selection of the site for the Franchisee's Franchised Business.

8.1.2    Franchisee shall locate a site that satisfies the site selection guidelines provided to Franchisee by Franchisor and shall submit to Franchisor, in writing, a description of the site, together with written certification the site complies with Franchisor's site selection guidelines, and such other information and materials as Franchisor may reasonably require. Recognizing that time is of the essence, Franchisee shall submit such information and materials for a proposed site to Franchisor for its consent no later than sixty (60) days after the execution of this Agreement.  Franchisor shall have thirty (30) business days after receipt of this information and materials to consent, in its sole and absolute discretion, to the proposed site as the location for the Franchised Business.  No site may be used for the location of the Franchised Business unless it is consented to in writing by Franchisor.

8.1.3    Within one hundred twenty (120) days after Franchisor has consented to the site for the Franchised Business (or such longer period as Franchisor consents to in writing), Franchisee shall execute a lease therefor, as applicable, and obtain physical possession of the premises. Any lease must

include Franchisor's Collateral Assignment of Lease Agreement, a copy of which is attached hereto as Attachment 6. Failure by Franchisee to acquire the site for the Franchised Business within the time and in the manner required herein shall constitute a material event of default under this Agreement.

       8.1.4    Upon consent by Franchisor to the location for the Franchised Business, Franchisor shall set forth the location and Territory in Attachment 3 of this Agreement and shall provide a copy thereof to Franchisee. Attachment 3, as completed by Franchisor, shall be incorporated herein and made a part hereof. Franchisee shall notify Franchisor within fifteen (15) days of any error or rejection of Attachment 3; otherwise, the Attachment 3 provided to Franchisee shall be deemed final.

     8.2    <u>Construction</u>.

       8.2.1    Franchisee shall be responsible for obtaining clearances that may be required by state or local laws, ordinances or regulations or that may be necessary as a result of any restrictive covenants or regulations relating to the Franchised Business premises; including but not necessarily limited to restrictions on manufacturing; cross-ventilation; storage, use, and disposal of soap-making ingredients, and signage. Prior to beginning the construction of the Franchised Business, Franchisee shall (a) obtain all permits, licenses, insurance and certifications required for the lawful construction or remodeling and operation of the Franchised Business, including, but not limited to, permits for the installation of signage, and (b) certify in writing to Franchisor that all required approvals, clearances, permits, insurance and certifications have been obtained.

       8.2.2    During the time of construction or remodeling, Franchisee shall provide Franchisor, or its designated representative, with such periodic reports regarding the progress in obtaining all licenses and permits; and of the construction or remodeling as may be reasonably requested by Franchisor or its representative. In addition, Franchisor or its representative may make such on-site inspections as it may deem reasonably necessary to evaluate such progress. At least thirty (30) days prior to completion of the construction or remodeling, Franchisee shall notify Franchisor of the scheduled date for completion of construction or remodeling. Within a reasonable time after the date of completion of construction or remodeling, Franchisor or its representative may, at its option, conduct a virtual or in-person inspection of the completed Franchised Business.

       8.2.3    Franchisee acknowledges and agrees that it will not open the Franchised Business for business without the written authorization of Franchisor and that authorization to open shall be conditioned upon Franchisee's strict compliance with this Agreement.

     8.3    <u>Time to Open</u>. Franchisee acknowledges that time is of the essence in this Agreement. Subject to Franchisee's compliance with the conditions stated below, Franchisee shall open the Franchised Business and commence business within three (3) months after Franchisee has obtain possession of the Franchised Business premises, unless Franchisee obtains a written extension of such time period from Franchisor. The date the Franchised Business opens for business to the public shall be defined herein as the "Opening Date". Prior to the Opening Date, Franchisee shall (i) complete all exterior and interior preparations for the Franchised Business, including installation and cleaning of equipment, fixtures, furnishings and signs, in accordance with System requirements and the plans and specifications consented to by Franchisor, (ii) satisfactorily complete Franchisor's Initial Management Training Program, as further set forth in Article 7, (iii) hire and train staff, as required, (iv) purchase and stock initial inventory, and (v) obtain all required licenses to operate the Franchised Business. If Franchisee fails to comply with any of such obligations, Franchisor shall have the right to prohibit Franchisee from opening for business. Franchisee's failure to open the Franchised Business and commence business (i) in accordance with the foregoing and (ii) within three hundred sixty-five (365) days following the date of this Agreement shall be deemed a material event of default under this Agreement.

8.4     No Relocation.  Franchisee's rights to operate the Franchised Business shall be limited to the Territory set forth in Attachment 3, and no other. Franchisee shall not relocate the premises of the Franchised Business at any time without Franchisor's written approval, which approval shall be granted only in the sole and complete discretion of Franchisor, and, if permitted, shall be at Franchisee's sole expense. In the event such permission is granted, Franchisee shall (i) pay a relocation fee equal to Three Thousand Dollars ($3,000) or Franchisor's actual costs, whichever is greater, (ii) secure and outfit the replacement premises in accordance with Sections 8.1and 8.2 within one hundred twenty (120) days of Franchisor's consent, (iii) if feasible, continue to operate at the original premises during the construction of the replacement premises, and (iv) upon relocation, remove any signs or other property from the original Franchised Business premises which identified the original Franchised Business premises as part of the System. Failure to comply with the foregoing requirements shall be a default of this Agreement. Franchisor shall issue a revised Attachment 3, in accordance with Section 8.1.4, to reflect the address of the new Franchised Business location and, in Franchisor's sole discretion, any adjustment to the Territory.

## 9.     MAINTENANCE AND IMPROVEMENT OF THE FRANCHISED LOCATION AND SYSTEM

9.1     Maintenance of Franchised Business Location.  Franchisee shall equip and maintain the Franchised Business location to the standards of décor, air quality, sanitation, repair and condition required by Franchisor, which standards are specified in the Manual and other written directives, standards and specifications. Franchisee, at Franchisee's expense, shall make such additions, alterations, repairs, refurbishing and replacements as may be required to comply with Franchisor's standards, including, without limitation, periodic repainting and repairs or replacement of worn or impaired décor, materials, furniture, fixtures, equipment, and signage as Franchisor may direct.

9.2     Inspections.  Franchisee shall operate and maintain the Franchised Business and Franchised Business location in conformance with all regulations and best practices for handling and disposal of soap-making ingredients, and in a manner that will ensure the highest rating possible for businesses of like kind from the governmental authorities that may inspect such businesses in the Territory.  Franchisee shall submit to Franchisor a copy of any inspection reports.  It shall be a default of this Agreement if, upon inspection, Franchisee does not obtain such rating or if Franchisee fails to operate in accordance with the general standards of quality, maintenance, repairs and sanitation required by the System, and Franchisor may, at its option, terminate this Agreement.

9.3     Equipment and Technology Updates.  Franchisee shall make any and all upgrades to equipment, including but not limited to, design, display and storage equipment, POS Systems, and computer hardware and software, and any technology used in conjunction therewith, as Franchisor requires in its sole and absolute discretion.

9.4     Trade Dress Modifications.

9.4.1     Franchisee is aware that to maintain and improve the image and reputation of the System, Franchisor, in its sole and absolute discretion, may change and modify identifying elements of the System, including but not limited to, the adoption and use of new exterior building designs, new interior decors, new color schemes, new or modified marks, and new furnishings (collectively, "Trade Dress Modifications").

9.4.2     No more than once in a five (5)-year period, at Franchisor's request, Franchisee shall refurbish the Franchised Business location at Franchisee's sole expense, as required by Franchisor, to conform to Trade Dress Modifications.  This includes, without limitation, structural changes, remodeling, redecoration, and modifications to existing improvements.  Notwithstanding the foregoing restriction on the frequency of

DocuSign Envelope ID: 6C9B1631-8644-4DD8-A339-29BB12667B3D

Trade Dress Modifications, Franchisee, upon notice by Franchisor and in accordance with Section 14.6 hereof, shall immediately discontinue the use of any Mark that is no longer desirable or available to Franchisor and substitute a different Mark or Marks as Franchisor directs.

        9.4.3    Franchisee will accept, use and display any such Trade Dress Modifications as if they were a part of this Franchise Agreement at the time of execution hereof.

        9.5    <u>No Liability/Waiver of Claims</u>. Franchisor shall not be liable to Franchisee for any expenses, losses or damages sustained by Franchisee as a result of any of the modifications, including Trade Dress Modifications, required by this Article 9. Franchisee hereby covenants not to commence or join in any litigation or other proceeding against Franchisor or any third party, complaining of any such or seeking expenses, losses or damages caused thereby. Further, Franchisee expressly waives any claims, demands or damages arising from or related to the modifications contemplated by this Article 9, including, without limitation, any claim of breach of contract, breach of fiduciary duty, fraud, and/or breach of the implied covenant of good faith and fair dealing.

        9.6    <u>Franchisee Advisory Council</u>. Franchisor reserves the right to create (and if created, the right to change or dissolve) a franchisee advisory council as a formal means for System franchisees to communicate ideas. In the event a franchisee advisory council is created, Franchisor may invite Franchisee to participate in council-related activities and meetings, which invitation may be based on factors, including but not necessarily limited to, a franchisee's level of success, superior performance and outlet profitability.

**10.    FRANCHISOR'S OBLIGATIONS.**

        Franchisor and/or its designated representative will provide the services described below:

        10.1    <u>Site Selection Guidelines</u>. Site selection criteria, as Franchisor may deem advisable. Franchisor shall also approve the site in accordance with Section 8.1.2.

        10.2    <u>Construction</u>. Provide to Franchisee criteria and specifications for a Magnolia Soap and Bath Co outlet. Such criteria and specifications include, but are not necessarily limited to, criteria with respect to requirements for product manufacturing and ventilation systems. Franchisee shall independently, and at Franchisee's expense, have such criteria and specifications incorporated into the construction of the Franchised Business in accordance with Article 8.

        10.3    <u>Manual</u>. Provide Franchisee access to the Confidential Operations Manual and such other manuals and written materials as Franchisor may hereafter develop for use by franchisees, as the same may be revised by Franchisor from time to time. Such documents may be provided electronically or via the internet, at Franchisor's sole and absolute discretion.

        10.4    <u>Inspection</u>. Inspection of the Franchised Business and evaluations of the products sold and services rendered therein whenever reasonably determined by Franchisor.

        10.5    <u>Pre-Opening Requirements</u>. Provide a written list of equipment, fixtures, furnishings, signage, supplies and products that will be required and/or recommended to open the Franchised Business for business.

        10.6    <u>Advertising Materials</u>. Provide samples of certain advertising and promotional materials and information developed by Franchisor from time to time for use by Franchisee in marketing and conducting local advertising for the Franchised Business.

10.7    List of Suppliers.  Make available from time to time, and amend as deemed appropriate by Franchisor, required products and services and a list of approved and/or recommended suppliers therefor.

10.8    Training.  The training programs specified in Article 7 herein.

10.9    On-Site Assistance.  On-site post-opening assistance at the Franchised Business location in accordance with the provisions of Article 7.

10.10   Brand Fund.  Administer a Brand Fund in accordance with Section 13.3.

## 11.    FRANCHISEE'S REPRESENTATIONS, WARRANTIES AND COVENANTS

11.1    Best Efforts.  Franchisee, including each of Franchisee's Principals covenants and agrees that he or she shall make all commercially reasonable efforts to operate the Franchised Business so as to achieve optimum sales.

11.2    Corporate Representations.  If Franchisee is a corporation, partnership, limited liability company, or other legal entity, Franchisee and each Principal represent, warrant and covenant that:

11.2.1   Franchisee is duly organized and validly existing under the state law of its formation;

11.2.2   Franchisee is duly qualified and is authorized to do business in the jurisdiction of the Franchised Business location and the Territory;

11.2.3   Franchisee's organizational documents shall at all times provide that the activities of Franchisee are confined exclusively to the operation of the Franchise granted herein, unless otherwise consented to in writing by Franchisor, which consent may be withheld by Franchisor in Franchisor's sole discretion;

11.2.4   The execution of this Agreement and the consummation of the transactions contemplated hereby are within Franchisee's power and have been duly authorized by Franchisee; and

11.2.5   Any financial statements and tax returns provided to Franchisor shall be certified as true, complete and correct and shall have been prepared in conformity with generally accepted accounting principles applicable to the respective periods involved and, except as expressly described in the applicable notes, applied on a consistent basis.  No material liabilities, adverse claims, commitments or obligations of any nature exist as of the date of the statements or returns, whether accrued, unliquidated, absolute, contingent or otherwise, that are not reflected as liabilities.

11.3    Spousal Guaranty. If any Franchisee Principal is a married individual and the Principal's spouse has not executed this Agreement, such Principal shall cause his or her spouse to personally execute and bind himself or herself to the terms of a Guaranty, in the form attached as Attachment 8 hereof.

11.4    Appointment of Manager.

11.4.1   Franchisee shall designate and retain at all times a general manager ("General Manager") to direct the operation and management of the Franchised Business outlet.  Franchisee shall designate its General Manager prior to attending the Initial Management Training Program.  The General Manager shall be responsible for the daily operation of the Franchised Business outlet.  Unless otherwise

DocuSign Envelope ID: 6C9B1631-8644-4BD8-A239-29BB1267B3D...

permitted by Franchisor, the General Manager shall be, Franchisee, if Franchisee is an individual, or a Principal.

       11.4.2   The General Manager shall, during the entire period he or she serves as General Manager, meet the following qualifications:

       11.4.2.1 The General Manager shall meet Franchisor's standards and criteria for such individual, as set forth in the Manual or otherwise in writing by Franchisor and shall be an individual otherwise acceptable to Franchisor in its sole discretion.

       11.4.2.2 The General Manager shall devote his or her full time and best efforts to the supervision and management of the Franchised Business and may not engage in any other business activity without the Franchisor's consent, which may be withheld in Franchisor's sole discretion.

       11.4.2.3 The General Manager shall satisfy the training requirements set forth in Article 7.

       11.4.3   If the General Manager is not able to continue to serve in such capacity, or no longer qualifies to act as such in accordance with this Agreement, Franchisee shall promptly notify Franchisor and designate a replacement within thirty (30) days after the General Manager ceases to serve, such replacement being subject to the same qualifications required by this Agreement (including, but not limited to, completing all training and obtaining all certifications required by Franchisor).  Until such replacement is designated, Franchisee shall provide interim management of the Franchised Business, who shall act in accordance with the terms of this Agreement.  Any failure to comply with the requirements of this Section shall be deemed a material event of default under this Agreement.  Franchisor, in its sole discretion, may provide interim management at Franchisor's then-current interim management support fee, plus any and all costs of travel, lodging, meals and other expenses reasonably incurred by Franchisor, and shall be withdrawn from Franchisee's designated bank account in accordance with Section 6.1.4.

       11.5    <u>Legal Compliance</u>.  Franchisee shall comply with all federal, state and local laws, rules and regulations and shall timely obtain any and all permits, certificates or licenses necessary for the full and proper conduct of the Franchised Business. Such laws, rules and regulations shall include, without limitation, licenses to do business, health and sanitation inspections, if required, fictitious name registrations, sales and other tax permits, fire and police department clearances, Americans With Disability Act compliance, certificates of occupancy, any permits, certificates or licenses required by any environmental federal, state or local law, rule or regulation and any other requirement, rule, law or regulation of any federal, state or local jurisdiction.

       11.6    <u>Claims and Potential Claims</u>.  Franchisee shall notify Franchisor in writing within three (3) days of any incident or injury that could lead to, or the actual commencement of any action, suit or proceeding and of the issuance of any order, writ, injunction, award or decree of any court, agency or other governmental instrumentality, which in any way relating to or affecting the operation or financial condition of the Franchised Business.  Any and all media inquiries concerning the Franchised Business or Franchised Business location, including, but not limited to, the business operation and incidents and occurrences related to a customer or employee, shall be referred to Franchisor. Neither Franchisee, Franchisee's employees nor anyone on Franchisee's behalf may comment to any broadcast medium, except as directed by Franchisor.

       11.7    <u>Assignment of Numbers and Listings</u>.  At Franchisor's request, Franchisee shall execute such forms and documents as Franchisor deems necessary to appoint Franchisor its true and lawful attorney-in-fact, with full power and authority, for the sole purpose of assigning to Franchisor, Franchisee's telephone numbers and listings, and provide Franchisor with passwords and administrator rights for all

email, software, social media or other such accounts used or created by Franchisee in order to operate the Franchised Business. Upon the expiration or termination of this Agreement, Franchisor may exercise its authority, pursuant to such documents, to obtain any and all of Franchisee's rights to the telephone numbers of the Franchised Business and all related telephone directory listings and other business listings, and all internet listings, domain names, internet advertising, websites, listings with search engines, electronic mail addresses, social media, or any other similar listing or usages related to the Franchised Business.

11.8    Access to Tax Filings. Upon execution of this Agreement, and at any time thereafter upon Franchisor's request, Franchisee shall execute such forms and documents as Franchisor deems necessary, to appoint Franchisor its true and lawful attorney-in-fact with full power and authority, for the sole purpose of obtaining any and all tax returns and reports related to the Franchised Business filed by Franchisee with any state or federal taxing authority.

11.9    Continuing Obligation. Franchisee and each Principal acknowledge and agree that the representations, warranties and covenants set forth in this Article 11 are continuing obligations of Franchisee and each Principal, as applicable, and that any failure to comply with such representations, warranties and covenants shall constitute a material event of default under this Agreement. Franchisee and each Principal shall cooperate with Franchisor in any efforts made by Franchisor to verify compliance with such representations, warranties and covenants.

## 12.    FRANCHISEE'S OPERATIONS

12.1    Operation of Franchised Business Location. In order to maintain the highest degree of quality and service on a uniform System-wide basis, Franchisee shall operate the Franchised Business in conformity with the methods, standards and specifications prescribed by Franchisor. Franchisee agrees to comply with the Manual, as it is modified from time to time, and all directives, rules and procedures specified by Franchisor, and will, among other things:

12.1.1   Use only those furnishings, fixtures, décor, equipment, supplies, and signage that conform with Franchisor's specifications and/or which shall be purchased from only those vendors designated and approved by Franchisor;

12.1.2   Maintain and operate the Franchised Business location in attractive condition and good repair, using Franchisee's best efforts to maintain a clean, enjoyable and inviting atmosphere therein in accordance with System standards, the Manual and all other directives and requirements of Franchisor, and do such redecoration, repairing, refurbishing and restoration as from time to time may be reasonably required to meet System standards and Franchisor's requirements as they may be modified from time to time;

12.1.3   Procure and hold all necessary licenses or permits to allow the operation of a soap-making and retail shop business, including but not limited to, all licenses required for product manufacturing, and otherwise comply with all applicable governmental laws, ordinances, rules and regulations including those related to health and safety;

12.1.4   Maintain sufficient inventories of merchandise and supplies, as prescribed by Franchisor;

12.1.5   Conduct sales in accordance with Franchisor's standards and specifications. Franchisee acknowledges and accepts that, unless expressly permitted in writing by Franchisor, Franchisee may only engage in providing personal care products, including, soap and bath products. Franchisee is expressly prohibited from selling products outside of the Franchised Business outlet, on the internet, to

dealers and/or distributors for subsequent re-sale, and engaging in such sales shall be a material default of this Agreement;

12.1.6 Employ only engaging, outgoing and qualified individuals who are trained in accordance with Franchisor's standards, including but not limited to the protection of Franchisor's confidential and proprietary information. Franchisee and its employees will at all times enhance Franchisor's brand and conduct themselves in a competent and courteous manner in accordance with this Agreement and the image and reputation of the System. Franchisee shall use its best efforts to ensure that Franchisee's employees maintain a neat and clean appearance and render competent and courteous service to patrons of the Franchised Business. Franchisee acknowledges and agrees that poorly trained employees, sloppy or unclean appearances and incompetent or discourteous service by Franchisee or its employees are extremely damaging to the goodwill of the System and the Marks and are a material default of this Agreement;

12.1.7 Permit Franchisor or its agents, to inspect the Franchised Business location and any services, products or equipment, to determine whether they meet Franchisor's then-current standards, specifications and requirements. In addition to any other remedies Franchisor may have, Franchisee shall reimburse Franchisor for Franchisor's inspection costs of any item that does not conform to the System standards and specifications;

12.1.8 Prominently display signs in and upon the Franchised Business location using the Marks and/or other advertising and/or signs of such nature, form, color, number, location and size, and containing such material, as Franchisor may from time to time reasonably direct or approve in writing; and to not display in or upon the Franchised Business location or elsewhere any sign or advertising media of any kind to which Franchisor reasonably objects, including signs and advertising media which have not been approved by Franchisor, or which have been improperly made or are outdated. Upon giving Franchisee notice of its objection to same or upon termination hereof, Franchisor may at any time enter upon the Franchised Business location or elsewhere and remove any objectionable or non-approved signs or advertising media and keep or destroy same without paying therefor or without being deemed guilty of trespass or any other tort;

12.1.9 Conduct all advertising programs in a manner consistent with Franchisor's standards and specifications, in a manner satisfactory to Franchisor and that will not detract from the reputation of the System or the Marks.

12.2 <u>Bookkeeping and Reports</u>.

12.2.1 Franchisee agrees to keep and maintain complete and accurate books and records of its transactions and business operations using the accounting procedures specified by Franchisor. Franchisee agrees to purchase the computer systems specified in Section 12.3 to maintain the records and accounts of the Franchisee to the standards of the Franchisor. Franchisee acknowledges and agrees that the financial performance of Franchisee's Franchised Business may be published in franchise disclosure document(s) issued by Franchisor following the Effective Date hereof.

12.2.2 Within thirty (30) days after the close of each calendar quarter and within ninety (90) days after the close of each fiscal year, Franchisee will furnish Franchisor a full and complete written statement of income and expense and a profit and loss statement for the operation of the Franchised Business during said period, together with a balance sheet for the Franchised Business, all of which shall be prepared in accordance with generally accepted accounting principles and practice. Franchisee's annual statements and balance sheets shall be prepared by an independent certified public accountant and certified to be correct.

DocuSign Envelope ID: 6C9B1631-8644-4BD8-A239-29BB12667B3D

12.2.3   The financial statements required hereunder shall be in such form and contain such information as Franchisor may from time to time reasonably designate.

12.2.4   Franchisor reserves the right to require Franchisee to engage the services of a third-party accounting services firm, designated and approved by Franchisor, in the event that (i) Franchisee fails to keep books and records in accordance with Franchisor's standards or (ii) Franchisor, in its sole discretion, determines that use of a third-party accounting services firm by all System franchisees is beneficial to the System.

12.2.5   Franchisor shall have the right at all reasonable times to examine, at its expense, Franchisee's books, records, and tax returns.  If Franchisor's examination finds an understatement of any Gross Sales Report, Franchisee shall pay Franchisor the amounts due together with interest thereon at the rate provided herein, and if understated by five percent (5%) or more, Franchisee shall reimburse Franchisor for the cost of such examination.  Such understatement may be considered a material default hereunder.  Two (2) such understatements during the term of this Agreement may, at the option of Franchisor, be considered an incurable default and thereby subject to termination as provided herein.

12.3   <u>Computer Systems</u>.

12.3.1   Franchisee, at Franchisee's sole expense, shall install and maintain the POS System and computer hardware and software Franchisor requires for the operation of the Franchised Business and shall follow the procedures related thereto that Franchisor specifies in the Manual or otherwise in writing.

12.3.2   Franchisor may require Franchisee, at Franchisee's sole expense, to install and maintain systems and web-based payment processing accounts that permit Franchisor to independently and electronically access and retrieve any information stored in Franchisee's POS System, other computer systems and web-based payment processing accounts, including, without limitation, information concerning Gross Sales.  Upon Franchisor's request, Franchisee shall execute such documents as Franchisor deems necessary to permit Franchisor to independently and electronically access and retrieve all information stored on Franchisee's POS System, other computer systems and web-based payment processing accounts.

12.3.3   Any and all customer data collected or provided by Franchisee, retrieved from Franchisee's POS System, or otherwise collected from Franchisee by Franchisor or provided to Franchisor, is and will be owned exclusively by Franchisor and will be considered to be Franchisor's proprietary and Confidential Information.  Franchisor has the right to use such data in any manner without compensation to Franchisee. Franchisor licenses to Franchisee the use of such data solely for the purpose of operating the Franchised Business; provided that, this license shall automatically and irrevocably terminate, without any additional action or notice required by Franchisor, upon the expiration or earlier termination of this Agreement.

12.3.4   Franchisor may require Franchisee, at Franchisee's sole expense, to enter into software license agreements in the form that Franchisor requires for software Franchisor develops or acquires for use in the System, or for security purposes to protect the operation and integrity of Franchisor's systems.

12.3.5   Franchisee shall have and maintain adequate hardware and software in order to access the internet at the speed required by Franchisor from time to time. Franchisee shall utilize the electronic mail account provided by Franchisor.  Franchisee shall promptly read and respond to all electronic mail related to the Franchised Business no less often than on a daily basis and shall accept and

acknowledge receipt of all electronic mail sent by Franchisor. Franchisee shall not establish any website or other listing on the internet except as provided and specifically permitted herein.

12.3.6 Franchisor has established a website that provides information about the System and the products and services offered by the Magnolia Soap and Bath Co System (the "Website"). Franchisor has sole discretion and control over the Website. Franchisor shall include a listing on its Website linking Franchisee's Franchised Business location and calendar. Franchisee has no ownership or other proprietary rights to Franchisor's website and Franchisee will lose all rights to such link to Franchisee's location upon expiration or termination of this Agreement for any reason.

12.3.7 In addition to the requirements of Section 6.4, Franchisee shall pay all fees, whether to Franchisor or to third party vendor(s), and expenses for technology required by this Agreement for operation of the Franchised Business, including but not limited to, the costs of computer hardware and software and applications, installation costs and regularly recurring fees for software, internet access, license fees, help desk fees, and licensing or user-based fees.

12.4     Safety and Security of Premises. Franchisee is solely responsible for the safety and security of the Franchised Business outlet for Franchisee, Franchisee's personnel, agents, customers, and the general public. Any suggestions by Franchisor on such matters are for guidance only and not binding on Franchisee. All matters of safety and security are within Franchisee's discretion and control, and Franchisee's indemnification obligations set forth in Section 15.6 hereof shall apply to any claims made against Franchisor regarding safety or security.

12.5     Prices. Subject to applicable law, Franchisor may recommend or set maximum prices for services and products offered by Franchisee, which may vary depending on geographic and other market conditions. Franchisee acknowledges that Franchisor has made no guarantee or warranty that offering services or products at any particular price will enhance Franchisee's sales or profits.

12.6     Unapproved Item/Suppliers. If Franchisee desires to purchase, lease or use any unapproved equipment, product, or service or to purchase, lease or use any equipment, product or service from an unapproved supplier, Franchisee shall submit to Franchisor a written request for such approval prior to utilizing such product, service or supplier. Franchisee shall not purchase or lease any item or use any supplier until and unless such item or supplier has been approved in writing by Franchisor. Franchisor shall have the right to require that its representatives be permitted to inspect the supplier's facilities and to test or otherwise evaluate samples from the supplier. Franchisor reserves the right to charge its then-current fee to Franchisee for such inspection and testing. Franchisor shall notify Franchisee whether Franchisor approves or disapproves of the proposed item or supplier within thirty (30) days after Franchisor receives all required information to evaluate the product, service or supplier. If Franchisor fails to respond to Franchisee's submission within said thirty (30) days, such item or supplier shall be deemed "disapproved." Franchisor reserves the right, at its option, to re-inspect from time to time the facilities and products of any such approved supplier and to revoke its approval upon the supplier's failure to continue to meet any of Franchisor's then-current criteria. Nothing in the foregoing shall be construed to require Franchisor to approve any particular item or supplier.

12.7     External Quality Assurance Services. Franchisor reserves the right to establish quality assurance programs conducted by third-party providers, including, but not limited to, mystery shop programs and periodic quality assurance audits ("Quality Review Services"). Upon Franchisor's request and at Franchisee's sole cost and expense, Franchisee shall subscribe to any such third-party provider for Quality Review Services to monitor the operations of the Franchised Business as directed by Franchisor.

12.8    Variations in Standards.  Notwithstanding anything to the contrary contained in this Agreement and this Section 12 in particular, Franchisee acknowledges and agrees that because complete and detailed uniformity under many varying conditions may not be possible or practical, Franchisor specifically reserves the right and privilege, at its sole discretion and as it may deem in the best interests of all concerned in any specific instance, to vary performance standards for some franchisees based upon the peculiarities and characteristics of the particular site or circumstance, business potential, existing business practices or any other condition which Franchisor deems to be of importance to the successful operation of such particular franchise business.  Franchisor has full rights to vary standard specifications and practices for any other franchisee at any time without giving Franchisee comparable rights. Franchisee shall not be entitled to require Franchisor to disclose or grant to Franchisee a like or similar variation.

## 13.    ADVERTISING, PROMOTIONS AND RELATED FEES

13.1    Advertising Programs.  Franchisor may from time to time develop and administer advertising and sales promotion programs designed to promote and enhance the collective success of all Franchised Businesses operating under the System.  Franchisee shall participate in all such advertising and sales promotion programs in accordance with the terms and conditions established by Franchisor from time to time for each program.  In all aspects of these programs, including, without limitation, the type, quantity, timing, placement and choice of media, market areas and advertising agencies, the standards and specifications established by Franchisor, as modified from time to time, shall be final and binding upon Franchisee.

13.2    Local Advertising.

13.2.1   In addition to the ongoing advertising contributions set forth herein, and following the expenditures set forth in Section 13.2.3 below, Franchisee shall spend monthly, throughout the term of this Agreement, not less than two percent (2%) of Gross Sales per month on advertising for the Franchised Business in the Territory ("Local Advertising").  Franchisor may require Franchisee to allocate to a regional advertising cooperative, as described in Section 13.4, up to one-half of Franchisee's required Local Advertising expenditures.

13.2.2   Within ten (10) business days of Franchisor's request, Franchisee shall provide a quarterly expenditure report accurately reflecting Franchisee's Local Advertising expenditures for the preceding quarterly period.  The following costs and expenditures incurred by Franchisee shall *not* be included in Franchisee's expenditures on Local Advertising for purposes of this Section, unless approved in advance by Franchisor in writing: (i) incentive programs for employees or agents of Franchisee; (ii) research expenditures; (iii) salaries and expenses of any of Franchisee's personnel to attend advertising meetings, workshops or other marketing activities; (iv) charitable, political or other contributions or donations.

13.2.3   Franchisee shall pay Nine Thousand Dollars ($9,000) to Franchisor's affiliate for creation of a grand opening advertising campaign to promote the opening of the Franchised Business, which shall include advertising, marketing, social media and promotional elements.  The grand opening advertising campaign shall be conducted in the Territory thirty (30) days prior to and within the first thirty (30) days after the opening of the Franchised Business.

13.3    Brand Fund.

13.3.1   Franchisor has established a national fund on behalf of the System for national advertising, marketing, and brand development (the "Brand Fund").  Franchisee is required to contribute an amount equal to one percent (1%) of the Gross Sales generated monthly by Franchisee's Franchised

Business to the Brand Fund ("Brand Fund Contribution"). Franchisor reserves the right, in Franchisor's sole discretion and at any time and from time to time, to increase the amount of the Brand Fund Contribution to any amount not to exceed to three percent (3%) of the Gross Sales. Payments will be made in the same manner and time as the Royalty Fees. If Franchisee fails to timely report Gross Sales, then, in addition to a late fee and interest pursuant to Sections 6.2 and 6.3 hereof, Franchisor shall collect one hundred twenty percent (120%) of the last Brand Fund Contribution payable. Franchisor shall reconcile amounts when Gross Sales are reported.

13.3.2   Franchisor shall direct the Brand Fund and shall have sole discretion to approve or disapprove the creative concepts, materials and media used in such programs and the placement and allocation thereof. Franchisee agrees and acknowledges that the Brand Fund is intended to maximize general public recognition and acceptance of the Marks and enhance the collective success of all Franchised Businesses operating under the System.

13.3.3   Franchisor may, but has no obligation to, contribute to the Brand Fund on the same basis as Franchisee with respect to Magnolia Soap and Bath Co outlets operated by Franchisor or Franchisor's affiliates.

13.3.4   Franchisor may use the Brand Fund to satisfy any and all costs of developing, preparing, producing, directing, administering, conducting, maintaining and disseminating advertising, marketing, promotional and public relations materials, programs, campaigns, sales and marketing seminars and training programs of every kind and nature, through media now existing or hereafter developed (including, without limitation, the cost of television, radio, magazine, social media, newspaper and electronic advertising campaigns; direct mail and outdoor billboard advertising; public relations activities; conducting marketing research, employing advertising agencies to assist therein; developing, enhancing and maintaining the Website; and staff salaries and other personnel and departmental costs for advertising that Franchisor internally administers or prepares). While Franchisor does not intend that any part of the Brand Fund will be used for advertising which is principally a solicitation for franchisees, Franchisor reserves the right to use the Brand Fund for public relations, to explain the franchise system, and/or to include a notation in any advertisement indicating "Franchises Available."

13.3.5   The Brand Fund will not be used to defray any of Franchisor's general operating expenses, except for reasonable administrative costs and overhead that Franchisor may incur in activities related to the administration and direction of the Brand Fund and such costs and expenses pursuant Section 13.3.4. The Brand Fund and its earnings shall not otherwise inure to Franchisor's benefit except that any resulting technology and intellectual property shall be deemed the property of Franchisor.

13.3.6   Franchisor will prepare an unaudited annual statement of the Brand Fund's operations and will make it available to Franchisee upon request. In administering the Brand Fund, Franchisor undertakes no obligation to make expenditures for Franchisee that are equivalent or proportionate to Franchisee's contribution or to ensure that any particular franchisee benefits directly or pro rata from the production or placement of advertising.

13.3.7   Although the Brand Fund is intended to be of perpetual duration, Franchisor may terminate it at any time and for any reason or no reason. Franchisor will not terminate the Brand Fund, however, until all monies in the Brand Fund have been spent for advertising or promotional purposes or returned to contributors, without interest, on the basis of their respective contributions.

13.4   Regional Advertising.   Franchisor reserves the right to establish, in Franchisor's sole discretion, a regional advertising cooperative. If a regional cooperative is established during the term of this Agreement, Franchisee agrees to sign all documents Franchisor requests to become a member of the

DocuSign Envelope ID: 6C9B1631-8644-4BD8-A239-29BB12667B3D

cooperative according to the terms of the documents. If Franchisor establishes a regional cooperative, Franchisee agrees to contribute amounts equal to Franchisee's share of the total cost of cooperative advertising, in addition to required Brand Fund Contributions.

13.5 <u>Directory Listings</u>. At Franchisee's sole cost and expense, Franchisee must list the Franchised Business in local business directories, including, but not limited to, listings on internet search engines. If feasible, and with Franchisor's prior written approval, Franchisee may do cooperative listings with other System franchisees. Notwithstanding the foregoing, Franchisee may not maintain any business profile on Facebook, Instagram, Twitter, LinkedIn, YouTube or any other social media and/or networking site without Franchisor's prior written approval and use of any social media accounts shall be in strict accordance with Franchisor's requirements. Franchisee shall provide Franchisor with all passwords and administrative rights to any and all social media accounts for the Franchised Business, and Franchisee hereby appoints Franchisor its true and lawful agent and attorney-in-fact with full power and authority, for the sole purpose of taking whatever action as is necessary for the best interest of the System, if Franchisee fails to maintain such accounts in accordance with Franchisor's standards.

13.6 <u>Approval of Advertising</u>. All advertising and promotion by Franchisee, in any medium, shall be conducted in a professional manner and shall conform to the standards and requirements of Franchisor as set forth in the Manual or otherwise. Franchisee shall submit to Franchisor for its approval samples of all advertising, press releases, promotional plans and materials and public relations programs that Franchisee desires to use, including, without limitation, any materials in digital, electronic or computerized form, or in any form of media now or hereafter developed that have not been either provided or previously approved by Franchisor. Franchisor shall approve or disapprove such plans and materials within ten (10) business days of Franchisor's receipt thereof. If Franchisor fails to respond to Franchisee's submission within ten (10) business days, such plans and materials shall be deemed "disapproved". Franchisee shall not use such unapproved plans or materials until they have been approved by Franchisor in writing and shall promptly discontinue use of any advertising or promotional plans or materials, whether or not previously approved, upon notice from Franchisor. Any advertising, marketing or sales concepts, programs or materials proposed or developed by Franchisee for the Magnolia Soap and Bath Co brand and approved by Franchisor may be used by other System franchisees without any compensation to Franchisee.

## 14. INTELLECTUAL PROPERTY

14.1 <u>Ownership</u>.

14.1.1 Franchisee expressly understands and acknowledges that Franchisor and/or Franchisor's affiliate(s) are the record owner of the Marks. Franchisor holds the exclusive right to license the Marks to franchisees of the System for use pursuant to the System. Franchisee further expressly understands and acknowledges that Franchisor and/or Franchisor's affiliate(s) claim copyrights on certain material used in the System, including but not limited to its website, documents, recipes, advertisements, promotional materials and the Manual, whether or not Franchisor and/or Franchisor's affiliate(s) have filed for copyrights thereto with the U.S. Copyright Office. The Marks and copyrights, along with Franchisor's trade secrets, service marks, trade dress and proprietary systems are hereafter collectively referred to as the "Intellectual Property".

14.1.2 As between Franchisor and Franchisee, Franchisor and/or Franchisor's affiliate(s) are the owner of all right, title and interest in and to the Intellectual Property and the goodwill associated with and symbolized by them.

14.2 <u>No Interference</u>. Neither Franchisee nor any Principal shall take any action that would prejudice or interfere with the validity of Franchisor's and/or Franchisor's affiliate(s)'s rights with respect

to the Intellectual Property. Nothing in this Agreement shall give the Franchisee any right, title, or interest in or to any of the Intellectual Property or any of Franchisor's and/or Franchisor's affiliate(s)'s service marks, trademarks, trade names, trade dress, logos, copyrights or proprietary materials, except the right to use the Intellectual Property and the System in accordance with the terms and conditions of this Agreement for the operation of a Franchised Business and only at or from the Franchised Business location or in approved advertising related to the Franchised Business.

14.3    Goodwill.    Franchisee understands and agrees that any and all goodwill arising from Franchisee's use of the Intellectual Property and the System shall inure solely and exclusively to the benefit of Franchisor and/or Franchisor's affiliate(s), and upon expiration or termination of this Agreement and the license herein granted, no monetary amount shall be assigned as attributable to any goodwill associated with Franchisee's use of the Intellectual Property.

14.4    Validity.    Franchisee shall not contest the validity of, or Franchisor's and/or Franchisor's affiliate(s)'s interest in, the Intellectual Property or assist others to contest the validity of, or Franchisor's and/or Franchisor's affiliate(s)'s interest in, the Intellectual Property.

14.5    Infringement.    Franchisee acknowledges that any unauthorized use of the Intellectual Property shall constitute an infringement of Franchisor's and/or Franchisor's affiliate(s)'s rights in the Intellectual Property and a material event of default hereunder. Franchisee shall provide Franchisor and/or Franchisor's affiliate(s) with all assignments, affidavits, documents, information and assistance Franchisor and/or Franchisor's affiliate(s) reasonably request to fully vest in Franchisor and/or Franchisor's affiliate(s) all such rights, title and interest in and to the Intellectual Property, including all such items as are reasonably requested by Franchisor and/or Franchisor's affiliate(s) to register, maintain and enforce such rights in the Intellectual Property.

14.6    Substitution.    Franchisor reserves the right to substitute different Marks for use in identifying the System and the Franchised Business, if it in its sole discretion, determines that substitution of different Marks will be beneficial to the System. Franchisor will not be liable to Franchisee for any expenses, losses or damages sustained by Franchisee as a result of any additions, modifications, substitutions or discontinuation of the Marks. Franchisee covenants not to commence or join in any litigation or other proceeding against Franchisor for any of these expenses, losses or damages.

14.7    Franchisee's Use of the Intellectual Property. With respect to Franchisee's use of the Intellectual Property pursuant to this Agreement, Franchisee further agrees that:

14.7.1    Unless otherwise authorized or required by Franchisor, Franchisee shall advertise the Franchised Business only under the Marks "Magnolia Soap and Bath Co" and design. Franchisee shall not use the Marks, or any portions, variations, or derivatives thereof, as part of its corporate or other legal name. All fictitious names used by Franchisee shall bear the designation "a franchisee of Magnolia Soap and Bath Co. FRCH, LLC".

14.7.2    Franchisee shall identify itself as the owner of the Franchised Business and as an independent Magnolia Soap and Bath Co franchisee in conjunction with any use of the Intellectual Property, including, but not limited to, uses on invoices, order forms, receipts, and contracts, as well as the display of a notice in such content and form and at such conspicuous locations on the premises of the Franchised Business as Franchisor may designate in writing.

14.7.3    Franchisee shall not use the Intellectual Property to incur any obligation or indebtedness on behalf of Franchisor.

DocuSign Envelope ID: 6C9B1631-8644-4BD8-A239-29BB12667B3D

14.7.4 Any item offered by Franchisee that contains the Marks, must be approved by Franchisor in writing prior to being distributed or sold by Franchisee and such approval may be granted or denied in Franchisor's sole and absolute discretion.

14.8 <u>Claims</u>. Franchisee shall notify Franchisor immediately via both email and telephone, of any apparent infringement of or challenge to Franchisee's use of any Intellectual Property and of any claim by any person of any rights in any Intellectual Property. Franchisee shall not communicate with any person other than Franchisor or any designated affiliate thereof, their counsel and Franchisee's counsel in connection with any such infringement, challenge or claim. Franchisor shall have complete discretion to take such action as it deems appropriate in connection with the foregoing, and the right to control exclusively, or to delegate control to any of its affiliates of, any settlement, litigation or other proceeding arising out of any such alleged infringement, challenge or claim or otherwise relating to any Intellectual Property. Franchisee agrees to execute any and all instruments and documents, render such assistance, and do such acts or things as may, in the opinion of Franchisor, reasonably be necessary or advisable to protect and maintain the interests of Franchisor or any other person or entity in any litigation or other proceeding or to otherwise protect and maintain the interests of Franchisor or any other interested party in the Intellectual Property. Franchisor will indemnify and defend Franchisee against and reimburse Franchisee for actual damages (including settlement amounts) for which Franchisee is held liable in any proceeding arising out of Franchisee's use of any of the Intellectual Property that infringes on the rights of any other party, provided that the conduct of Franchisee with respect to such proceeding and use of the Intellectual Property is in full compliance with the terms of this Agreement.

14.9 Franchisor may use and grant franchises and licenses to others to use the Intellectual Property and the System and to establish, develop and franchise other systems, different from the System licensed to Franchisee herein, without offering or providing Franchisee any rights in, to or under such other systems and Franchisor may modify or change, in whole or in part, any aspect of the Intellectual Property or the System, so long as Franchisee's rights thereto are in no way materially harmed thereby.

14.10 Franchisee shall not register or attempt to register the Intellectual Property in Franchisee's name or that of any other person, firm, entity or corporation.

## 15. INSURANCE CO AND INDEMNIFICATION

15.1 <u>Procurement</u>. Franchisee shall procure, prior to the commencement of any operations under this Agreement, and thereafter maintain in full force and effect during the term of this Agreement at Franchisee's sole cost and expense and to Franchisor's sole satisfaction, insurance policies, which shall be primary and non-contributory to any insurance that Franchisor may carry. Franchisee's insurance shall be provided by insurance companies with an A.M. Best rating of not less than A-VII, protecting Franchisee and Franchisor, and naming Franchisor, its officers, directors, partners, owners, employees and affiliates as additional insureds as their interests may appear, in the following minimum limits (except as additional coverage and higher policy limits may reasonably be specified from time to time in the Manual or otherwise in writing):

15.1.1 <u>Liability</u>. Commercial general liability insurance, including public liability, personal injury, advertising injury, and products liability coverage in the amount of at least One Million Dollars ($1,000,000) per occurrence and Two Million Dollars ($2,000,000) aggregate;

15.1.2 <u>Employment</u>. Worker's compensation coverage in the limits required by state law, employer's liability insurance in the amount of Five Hundred Thousand Dollars ($500,000) per accident shall be carried on all of Franchisee's employees, and crime and employee dishonesty in the minimum amount of Twenty-Five Thousand Dollars ($25,000), as well as such other insurance as may be required

by statute or rule of the state in which the Franchised Business is located and operated;

15.1.3 <u>Property</u>. Fire, vandalism, windstorm and hail, and extended coverage insurance for property damage with primary and excess limits of not less than the full replacement value of the leasehold improvements, equipment, furniture, fixtures, and inventory, or the amount required by the lease for the Franchised Business premises, whichever is greater.

15.1.4 <u>Business</u>. Business interruption insurance for a minimum of twelve (12) months, in an amount necessary to satisfy Franchisee's obligations under this Agreement and the lease for the Franchised Business outlet.

15.1.5 <u>Automobile Insurance</u>. Prior to operation of any vehicle on behalf of the Franchised Business, Franchisee must obtain comprehensive automobile liability insurance in the amount of at least a combined single limit for bodily injury and property damage of One Million Dollars ($1,000,000).

15.1.6 <u>Electronic Data Processing</u>. Coverage for damage or loss of electronic and computer equipment, media and data in an amount of not less than Ten Thousand Dollars ($10,000); and

15.1.7 <u>Identity Theft, Forgery or Alteration</u>. Coverage for identity forgery, alteration or theft in an amount of at least Two Thousand Five Hundred Dollars ($2,500) per loss and Five Thousand Dollars ($5,000) for expenses.

15.2 <u>Evidence of Insurance</u>. Franchisee shall deliver to, and maintain at all times with Franchisor, current Certificates of Insurance evidencing the existence and continuation of the required coverages. Franchisee shall deliver the initial Certificate of Insurance no later than ten (10) days before Franchisee opens the Franchised Business. In addition, if requested by Franchisor, Franchisee shall deliver to Franchisor a copy of the insurance policy or policies required hereunder.

15.3 <u>Failure to Procure</u>. If, for any reason, Franchisee should fail to procure or maintain the insurance required by this Agreement as revised from time to time for all franchisees by the Manual or otherwise in writing, Franchisor shall have the right and authority (without, however, any obligation) to immediately procure such insurance and to charge Franchisee for the cost thereof together with an administrative fee of ten percent (10%) of the cost for Franchisor's expenses in so acting, including all attorneys' fees. Franchisee shall pay Franchisor immediately upon notice by Franchisor to Franchisee that Franchisor has undertaken such action and the cost thereof.

15.4 <u>Increase in Coverage</u>. The levels and types of insurance stated herein are minimum requirements. Franchisor reserves the right to raise the required minimum requirements for any type of insurance or add additional types of insurance requirements as Franchisor deems reasonably prudent to require. Within thirty (30) days of any such required new limits or types of coverage, Franchisee must submit proof to Franchisor of Franchisee's coverage pursuant to Franchisor's requirements.

15.5 <u>Additional Insured</u>. All required insurance policies shall name Franchisor and their affiliates and their members, officers, agents and employees as additional insureds as their interests may appear. All public liability policies shall contain a provision that the additional insureds, although named as insureds, shall nevertheless be entitled to recover under such policies on any loss caused by Franchisee or Franchisee's servants, agents or employees, and all required insurance policies shall contain a waiver of subrogation in favor of the additional insureds.

15.6 <u>Indemnification</u>. TO THE FULLEST EXTENT PERMITTED BY LAW, FRANCHISEE

DocuSign Envelope ID: 6C9B1631-8644-48D8-A239-29BB12667B3D

AGREES TO EXONERATE AND INDEMNIFY AND HOLD HARMLESS MAGNOLIA SOAP AND BATH CO. FRCH, LLC, MAGNOLIA SOAP & BATH HOLDING CO., LLC AND ANY OF EITHER'S PARENT COMPANY, SUBSIDIARIES, DIVISIONS, AFFILIATES, SUCCESSORS, ASSIGNS AND DESIGNEES, AS WELL AS THEIR DIRECTORS, OFFICERS, EMPLOYEES, AGENTS, SHAREHOLDERS, SUCCESSORS, DESIGNEES AND REPRESENTATIVES (COLLECTIVELY REFERRED TO AS THE "MAGNOLIA INDEMNITEES"), FROM ALL CLAIMS BASED UPON, ARISING OUT OF, OR IN ANY WAY RELATED TO THE OPERATION, CONDITION, OR ANY PART OF FRANCHISEE'S MAGNOLIA SOAP AND BATH CO FRANCHISE, THE FRANCHISED BUSINESS, THE PRODUCTS, THE PREMISES, OR ANY ASPECT OF THE REAL ESTATE CONNECTED TO FRANCHISEE'S FRANCHISED BUSINESS, WHETHER CAUSED BY FRANCHISEE, FRANCHISEE'S AGENTS OR EMPLOYEES, OR ARISING FROM FRANCHISEE'S ADVERTISING OR BUSINESS PRACTICES. FRANCHISEE AGREES TO PAY FOR ALL THE MAGNOLIA INDEMNITEES' LOSSES, EXPENSES (INCLUDING, BUT NOT LIMITED TO ATTORNEYS' FEES) OR CONCURRENT OR CONTRIBUTING LIABILITY INCURRED IN CONNECTION WITH ANY ACTION, SUIT, PROCEEDING, INQUIRY (REGARDLESS OF WHETHER THE SAME IS REDUCED TO JUDGMENT OR DETERMINATION), OR ANY SETTLEMENT THEREOF FOR THE INDEMNIFICATION GRANTED BY FRANCHISEE HEREUNDER. THE MAGNOLIA INDEMNITEES SHALL HAVE THE RIGHT TO SELECT AND APPOINT INDEPENDENT COUNSEL TO REPRESENT ANY OF THE MAGNOLIA INDEMNITEES IN ANY ACTION OR PROCEEDING COVERED BY THIS INDEMNITY. FRANCHISEE AGREES THAT TO HOLD THE MAGNOLIA INDEMNITEES HARMLESS, FRANCHSIEE WILL REIMBURSE THE MAGNOLIA INDEMNITEES AS THE COSTS AND EXPENSES ARE INCURRED BY THE MAGNOLIA INDEMNITEES.



Initial

## 16. TRANSFERS

16.1 <u>Transfers by Franchisor.</u>

16.1.1 Franchisor shall have the right to assign this Agreement, and all of Franchisor's rights and privileges hereunder, to any person, firm, corporation or other entity, without Franchisee's permission or prior knowledge, provided that, with respect to any assignment resulting in the subsequent performance by the assignee of Franchisor's obligations, the assignee shall expressly assume and agree to perform Franchisor's obligations hereunder. Specifically, and without limitation to the foregoing, Franchisee expressly affirms and agrees that Franchisor may: (i) sell Franchisor's assets and Franchisor's rights to the Marks and the System outright to a third party; (ii) engage in a public or private placement of some or all of Franchisor's securities; (iii) merge, acquire other corporations, or be acquired by another corporation, including competitors; (iv) undertake a refinancing, recapitalization, leveraged buy-out or other economic or financial restructuring; and (v) with regard to any or all of the above sales, assignments and dispositions, Franchisee expressly and specifically waives any claims, demands or damages arising from or relating to the loss of association with or identification of Franchisor. Nothing contained in this Agreement shall require Franchisor to remain in the business franchised herein or to offer the same products and services, whether or not bearing the Marks, in the event that Franchisor exercises its prerogative hereunder to assign Franchisor's rights in this Agreement.

16.1.2 Franchisee agrees that Franchisor has the right, now or in the future, to purchase, merge, acquire or affiliate with an existing competitive or non-competitive franchise network, chain or any other business regardless of the location of that chain's or business' facilities, and to operate, franchise or

DocuSign Envelope ID: 6C9B1631-8644-4DD8-A239-29BB12667B3D

license those businesses and/or facilities operating under the Marks or any other marks following Franchisor's purchase, merger, acquisition or affiliation, regardless of the location of the facilities (which Franchisee acknowledges may be within the Territory, proximate thereto, or proximate to any of Franchisee's locations). However, Franchisor represents that it will not convert any such acquired facilities that are operating within the Territory to a Magnolia Soap and Bath Co franchise outlet during the Term of this Agreement.

16.1.3  If Franchisor assigns its rights in this Agreement, nothing herein shall be deemed to require Franchisor to remain in the soap and bath business or to offer or sell any products or services to Franchisee.

16.2    Restrictions on Transfers by Franchisee.  Franchisee's rights and duties under this Agreement are personal to Franchisee as it is organized and with the Principals of the business as they exist on the date of execution of this Agreement, and Franchisor has made this Agreement with Franchisee in reliance on Franchisor's perceptions of the individual and collective character, skill, aptitude, attitude, business ability, and financial capacity of Franchisee.  Thus, no transfer, as hereafter defined, may be made without Franchisor's prior written approval.  Franchisor may void any transfer made without such approval.

16.3    Transfers by Franchisee.  Neither Franchisee nor any Principal(s) shall directly or indirectly sell, assign, transfer, give, devise, convey or encumber this Agreement or any right or interest herein or hereunder (a "Transfer"), the Franchise, the Franchised Business or any assets thereof (except in the ordinary course of business) or suffer or permit any such assignment, transfer, or encumbrance to occur by operation of law, unless Franchisee or Principal(s) first obtains the written consent of Franchisor.  A transfer of any stock in the Franchisee if it is a corporation or a transfer of any ownership rights in Franchisee if it is a partnership, a limited liability company or limited partnership shall be considered a Transfer restricted hereunder.  If Franchisee and Principal(s) have complied fully with this Agreement and subject to Franchisor's Right of First Refusal set forth in Section 16.6, Franchisor will not unreasonably withhold its consent of a Transfer that meets the following requirements:

16.3.1  The proposed transferee and all its principals must have the demeanor and be individuals of good character and otherwise meet Franchisor's then-applicable standards for franchisees.

16.3.2  The transferee must have sufficient business experience, aptitude and financial resources to operate the Franchised Business and to comply with this Agreement;

16.3.3  The transferee has agreed to complete Franchisor's Initial Management Training Program to Franchisor's satisfaction;

16.3.4  Franchisee has paid all amounts owed to Franchisor and third-party creditors;

16.3.5  The transferee has executed Franchisor's then-standard form of Franchise Agreement, which may have terms and conditions different from this Agreement, except that the transferee shall not be required to pay the initial franchise fee;

16.3.6  Franchisee and the transferee and each of Franchisee's and the transferee's Principals shall have executed a general release, in a form satisfactory to Franchisor, of any and all claims against Franchisor and Franchisor's officers, directors, shareholders, members and employees in their corporate and individual capacities, including, without limitation, claims arising under federal, state, and local laws, rules and ordinances.  Franchisee will agree to subordinate any claims Franchisee may have against the transferee to Franchisor, and indemnify Franchisor against any claims by the transferee relating

DocuSign Envelope ID: 6C9B1631-8644-4BD8-A339-29BB12667B3D

to misrepresentations in the transfer process, specifically excluding those representations made by Franchisor in the Franchise Disclosure Document given to the transferee;

      16.3.7  Franchisor has granted written approval of the material terms and conditions of the Transfer, including, without limitation, that the price and terms of payment will not adversely affect the Franchised Business's operation. However, Franchisor's approval of a Transfer is not in any way a representation or warranty of the transferee's success or the soundness of transferee's decision to purchase the Franchise on such terms and conditions. Franchisee shall provide Franchisor all proposed transfer documents for Franchisor's review at least thirty (30) days prior to a closing of the proposed Transfer;

      16.3.8  If Franchisee or any Principal finances any part of the sale price of the Transfer, Franchisee or its Principal have agreed that all obligations of the transferee under any notes, agreements or security interests to Franchisee or its Principal will be subordinate to the transferee's obligations to Franchisor; and

      16.3.9  If consent is required, the lessor of the Franchised Business's premises consents to the assignment or further sublet of the premises to the transferee.

    16.4    As a condition to any Transfer, Franchisee shall pay Franchisor a transfer fee equal to seventy-five percent (75%) of the then-current initial franchise fee; provided however, (i) for transfers to an existing franchisee in good standing with Franchisor, the transfer fee is fifty percent (50%) of the then-current initial franchise fee, (ii) for transfers of ownership interest among existing principals, shareholders or members, or to add a business entity or new shareholder or member of the Franchisee entity and such transfer does not change management control of the Franchise, the transfer fee is One Thousand Five Hundred Dollars ($1,500), and (iii) for a transfer to a spouse, parent or child upon death or permanent disability of Franchisee or Franchise's Principal, as the case may be, the transfer fee is Three Thousand Five Hundred Dollars ($3,500).

    16.5    <u>Entity Formation Documents</u>. The By-Laws of a corporation or Operating Agreement of a limited liability company of a Franchisee that is an entity must state that (i) the issuance and assignment of any interest in Franchisee are restricted by this Article 16; (ii) Franchisee may conduct no business except the operation of a Franchised Business pursuant to the terms of this Agreement; (iii) transfers of interests in Franchisee are subject to the terms of this Agreement governing transfers; and (iv) stock or member certificates will contain a legend so indicating.

    16.6    <u>Franchisor 's Right of First Refusal</u>.

      16.6.1  If Franchisee wishes to transfer all or part of its interest in the Franchised Business or this Agreement or if a Principal wishes to transfer any ownership interest in Franchisee, pursuant to any bona fide offer to purchase such interest, then Franchisee or such Principal shall promptly notify Franchisor in writing of each such offer, and shall provide such information and documentation relating to the offer as Franchisor may require.

      16.6.2  Franchisor has the right, exercisable by written notice to Franchisee within thirty (30) days after receipt of written notification and copies of all documentation required by Franchisor describing such offer, to buy the interest in this Agreement and the Franchised Business or the Principal's interest in Franchisee for the price and on the terms and conditions contained in the offer, subject to Section 16.6.3.

      16.6.3  Franchisee further agrees, in the event Franchisor exercises its right of first refusal, notwithstanding anything to the contrary contained in the offer, that (i) Franchisor may substitute cash for

DocuSign Envelope ID: 6C9B1631-8644-4BD8-A239-29BB12667B3D

any other form of consideration contained in the offer; (ii) at Franchisor 's option, Franchisor may pay the entire purchase price at closing; (iii) Franchisor 's credit will be deemed equal to the credit of any proposed transferee; (vi) Franchisor will have at least sixty (60) days to close the purchase; and (v) Franchisor will be entitled to receive from the Franchisee all customary representations and warranties given by a seller of the assets of a business or equity interest in an entity, as applicable.

16.6.4  If Franchisor does not exercise its right to buy within thirty (30) days, Franchisee may thereafter transfer the interest to the transferee on terms no more favorable than those disclosed to Franchisor, provided that such transfer is subject to Franchisor's prior written approval pursuant to Section 16.3 hereof.  However, if (i) the sale to the transferee is not completed within one hundred twenty (120) days after the offer is given to Franchisor or (ii) there is any material change in the terms of the offer, the offer will again be subject to Franchisor's right of first refusal.

16.7    Death or Permanent Disability.  The grant of rights under this Agreement is personal to Franchisee, and on the death or permanent disability of Franchisee or any of Franchisee's Principals, the executor, administrator, conservator, or other personal representative of Franchisee or Principal, as the case may be, shall be required to transfer Franchisee's or Principal's interest in this Agreement within six (6) months from the date of death or permanent disability to a third party approved by Franchisor.  Failure to transfer in accordance with the forgoing will constitute a material default and the Franchise granted by this Agreement will terminate.  A transfer under this Section 16.7, including without limitation, transfer by devise or inheritance, is subject to the conditions for Transfers in this Article 16 and unless transferred by gift, devise or inheritance, subject to the terms of Section 16.6 above.  For purposes of this Agreement, the term "permanent disability" means a mental or physical disability, impairment or condition that is reasonably expected to prevent or actually does prevent such person from providing continuous and material supervision of the operation of Franchisee's Franchised Business during the six (6)-month period from its onset.

Immediately after the death or permanent disability of such person, or while the Franchise is owned by an executor, administrator, guardian, personal representative or trustee of that person, the Franchised Business shall be supervised by an interim successor manager satisfactory to Franchisor, or Franchisor, in its sole discretion, may provide interim management at Franchisor's then-current interim management support fee, plus any and all costs of travel, lodging, meals and other expenses reasonably incurred by Franchisor, pending transfer of the Franchise to the deceased or disabled individual's lawful heirs or successors.

16.8    Effect of Consent to Transfer.  Franchisor's consent to a Transfer will not waive any claims Franchisor may have against the Franchisee or any Franchisee's Principals nor waive its right to demand that the transferee comply strictly with this Agreement.

16.9    Security Interests to Lender.  If Franchisee is in full compliance with this Agreement, Franchisee may pledge or give a security interest in Franchisee's interest in the Assets and the Franchised Business to a lender of the funds needed by Franchisee for Franchisee's initial investment, provided that provided that  Franchisor's rights to use or purchase the Assets as set forth in Sections 11.3.3, 16.6, 16.7, 17.4.2 and 18.2 are not impaired, that a foreclosure on such a pledge or security interest and/or any Transfer resulting from such a foreclosure shall be subject to all provisions of this Agreement, and that Franchisee obtains from the lender a written acknowledgement to Franchisor of these restrictions.  Notwithstanding the foregoing, in the event Franchisee obtains financing whereby funding is provided with the assistance of the United States Small Business Administration ("SBA Financing"), Franchisee shall be permitted to grant the lender of such SBA Financing a senior lien on any Uniform Commercial Code collateral Franchisee uses to secure the SBA Financing, and Franchisor agrees to (i) subordinate its interest in any lien on

Franchisee's Uniform Commercial Code collateral to that of the lender of the SBA Financing and (ii) waive the requirement of the written acknowledgment referenced in this Section.

## 17. DEFAULTS

17.1  <u>Default and Automatic Termination</u>.  Franchisee shall be deemed to be in material default under this Agreement, and all rights granted herein shall automatically terminate without notice to Franchisee, if Franchisee shall become insolvent or makes a general assignment for the benefit of creditors; or if Franchisee files a voluntary petition under any section or chapter of federal bankruptcy law or under any similar law or statute of the United States or any state thereof, or admits in writing its inability to pay its debts when due; or if Franchisee is adjudicated a bankrupt or insolvent in proceedings filed against Franchisee under any section or chapter of federal bankruptcy laws or under any similar law or statute of the United States or any state; or if a bill in equity or other proceeding for the appointment of a receiver of Franchisee or other custodian for Franchisee's business or assets is filed and consented to by Franchisee; or if a receiver or other custodian (permanent or temporary) of Franchisee's assets or property, or any part thereof, is appointed by any court of competent jurisdiction; or if proceedings for a composition with creditors under any state or federal law should be instituted by or against Franchisee; or if a final judgment remains unsatisfied or of record for thirty (30) days or longer (unless supersedeas bond is filed); or if Franchisee is dissolved; or if execution is levied against Franchisee's business or property; or if suit to foreclose any lien or mortgage against the Franchised Business premises or equipment is instituted against Franchisee and not dismissed within thirty (30) days.

17.2  <u>Defaults with No Opportunity to Cure</u>.  Franchisee shall be deemed to be in material default and Franchisor may, at its option, terminate this Agreement and all rights granted hereunder, without affording Franchisee any opportunity to cure the default, effective immediately upon notice to Franchisee, if Franchisee, or any Principal, as the case may be:

17.2.1  fails to acquire a site for the Franchised Business, complete construction of the Franchised Business, obtain all licenses and permits before opening, or open the Franchised Business within the time and in the manner specified in Article 8.

17.2.2  falsifies any report required to be furnished Franchisor hereunder;

17.2.3  ceases to operate the Franchised Business for a period of five (5) days or more; provided, however, that this provision shall not apply if through no fault of Franchisee, the premises are damaged or destroyed by a casualty and Franchisee applies within thirty (30) days after such event, for Franchisor's approval to relocate or reconstruct the premises (which approval shall not be unreasonably withheld) and Franchisee diligently pursues such reconstruction or relocation.

17.2.4  loses for any cause whatsoever the right of possession of the real property on which the Franchised Business is located; provided, however, that this provision shall not apply if through no fault of Franchisee, Franchisee loses right of possession and Franchisee applies within thirty (30) days after such event, for Franchisor's approval to relocate the Franchised Business (which approval shall not be unreasonably withheld) and Franchisee diligently pursues such relocation in accordance with Section 8.5.

17.2.5  fails to restore the Franchised Business location to full operation within a reasonable period time but not more than one hundred twenty (120) days from the date the Franchised Business location is rendered inoperable by any casualty or closed due to an order issued by a local authority having jurisdiction over the Franchised Business location;

DocuSign Envelope ID: 6C9B1631-8644-4BD8-A239-29BB J2667B3D

17.2.6 fails to comply with any federal, state or local law, rule or regulation, applicable to the operation of the Franchised Business, including, but not limited to, the failure to pay taxes;

17.2.7 defaults under any lease or sublease of the real property on which the Franchised Business is located;

17.2.8 understates Gross Sales on two (2) occasions or more, whether or not cured on any or all of those occasions;

17.2.9 fails to comply with the covenants in Article 15;

17.2.10 permits a Transfer in violation of the provisions of Article 16 of this Agreement;

17.2.11 fails, or Franchisee's legal representative fails, to transfer the interests in this Franchise Agreement and the Franchised Business upon death or permanent disability of Franchisee or any Principal of Franchisee as required by Section 16.7.

17.2.12 has misrepresented or omitted material facts in applying for, or in operating, the Franchise;

17.2.13 is convicted of, or pleads no contest to, a felony or to a crime that could damage the goodwill associated with the Marks; or does anything (whether criminal or otherwise) to harm the reputation of the System or the goodwill associated with the Marks;

17.2.14 receives an adverse judgment or a consent decree in any case or proceeding involving allegations of fraud, racketeering, unfair or improper trade practices or similar claim which is likely to have an adverse effect on the System, or the Marks, the goodwill associated therewith or Franchisor's interest therein, in Franchisor's sole opinion;

17.2.15 conceals revenues, knowingly maintains false books or records, or knowingly submits any false reports;

17.2.16 creates a threat or danger to public health or safety from the construction, maintenance or operation of the Franchised Business;

17.2.17 refuses to permit Franchisor to inspect or audit Franchisee's books or records;

17.2.18 makes any unauthorized use of the Marks or copyrighted material or any unauthorized use or disclosure of Confidential Information (as defined in Section 19.2);

17.2.19 fails to comply with the non-competition covenants in Section 19.5;

17.2.20 defaults in the performance of Franchisee's obligations under this Agreement three (3) or more times during the term of this Agreement or has been given at least two (2) notices of default in any consecutive twelve (12)–month period, whether or not the defaults have been corrected;

17.2.21 has insufficient funds to honor a check or electronic funds transfer two (2) or more times within any consecutive twelve (12)-month period;

17.2.22 defaults, or an affiliate of Franchisee defaults, under any other agreement, including any other franchise agreement, with Franchisor or any of its affiliates, suppliers or landlord and does not cure such default within the time period provided in such other agreement; or

17.2.23 terminates this Agreement, including by ceasing to operate the Franchised Business, without cause.

17.3    Curable Defaults.  Franchisee shall be deemed to be in material default and Franchisor may, at its option, terminate this Agreement and all rights granted hereunder, if Franchisee fails to cure the default within the time period set forth in this Section 17.3, effective immediately upon notice to Franchisee, if Franchisee, or any Principal, as the case may be:

17.3.1    fails to pay when due any amounts due to Franchisor under this Agreement or any related agreement and does not correct the failure within five (5) days after written notice; provided, however, Franchisor has no obligation to give written notice of a late payment more than two (2) times in any twelve (12)–month period, and the third such late payment in any twelve (12)–month period shall be a non-curable default under Sections 17.2.20 and/or 17.2.21;

17.3.2    fails to perform any non-monetary obligation imposed by this Agreement (excepting those defaults of obligations set forth in Sections 17.1 and 17.2 for which there is no opportunity to cure) and such default shall continue for five (5) days after Franchisor has given written notice of such default, or if the default cannot be reasonably corrected within said five (5)-day period, then if it is not corrected within such additional time as may be reasonably required assuming Franchisee proceeds diligently to cure; provided, however, Franchisor has no obligation to give written notice of a non-monetary default more than two (2) times in any twelve (12)–month period, and the third such default, whether monetary or non-monetary, in any twelve (12) – month period shall be a non-curable default under Section 17.2.20.

17.4    Franchisor's Cure of Franchisee's Defaults.  In the event of a default by Franchisee, in addition to Franchisor's right to terminate the Franchise Agreement, and not in lieu thereof, Franchisor may, but has no obligation to:

17.4.1    effect a cure on Franchisee's behalf and at Franchisee's expense, and Franchisee shall immediately pay Franchisor the costs incurred by Franchisor upon demand; or

17.4.2    enter upon the Franchised Business location and exercise complete authority with respect to the operation thereof until such time as Franchisor determines that the default of Franchisee has been cured and that Franchisee is complying with the requirements of this Agreement.  Franchisee specifically agrees that a designated representative of Franchisor may take over, control and operate the Franchised Business.  In addition to all other fees paid under this Agreement, Franchisee shall pay Franchisor the then-current interim management support fee, plus any and all costs of travel, lodging, meals and other expenses reasonably incurred by Franchisor during Franchisor's operation thereof as compensation therefor.  Further, Franchisee shall reimburse Franchisor for the full compensation paid to such representative including the cost of all fringe benefits plus all travel expenses, lodging, meals and other expenses reasonably incurred by such representative until the default has been cured and Franchisee is complying with the terms of this Agreement.

17.5    Notice to Suppliers.  In the event of a default by Franchisee, in addition to Franchisor's right to terminate the Franchise Agreement, and not in lieu thereof, Franchisor reserves the right with five (5) days' prior written notice to Franchisee to direct suppliers to stop furnishing any and all products and supplies until such time as Franchisee's default is cured.  In no event shall Franchisee have recourse against

DocuSign Envelope ID: 6C9B1631-8644-4BD8-A239-29BB12667B3D

Franchisor for loss of revenue, customer goodwill, profits or other business arising from Franchisor's actions and the actions of suppliers.

17.6    Reimbursement of Costs.  Franchisee shall reimburse Franchisor all costs and expenses, including but not limited to attorneys' fees, incurred by Franchisor as a result of Franchisee's default, including costs in connection with collection of any amounts owed to Franchisor and/or enforcement of Franchisor's rights under this Agreement.

## 18.    POST-TERMINATION

18.1    Franchisee's Obligations.  Upon termination or expiration of this Agreement, all rights and licenses granted hereunder to Franchisee shall immediately terminate and Franchisee and each Principal, if any, shall:

18.1.1   immediately cease to operate the Franchised Business, and shall not thereafter, directly or indirectly identify himself, herself or itself as a current Magnolia Soap and Bath Co owner, franchisee or licensee;

18.1.2   immediately and permanently cease to use the Marks, any imitation of any Mark, logos, copyrighted material or other intellectual property, confidential or proprietary material or indicia of a Magnolia Soap and Bath Co outlet, or use any trade name, trade or service mark or other commercial symbol that suggests a current or past association with Franchisor, Franchisor's affiliates, or the System. In particular, Franchisee shall cease to use, without limitation, all signs, billboards, advertising materials, displays, stationery, forms and any other articles, which display the Marks;

18.1.3   take such action as may be necessary to cancel any assumed name or equivalent registration that contains the Mark or any other service mark or trademark of Franchisor, and Franchisee shall furnish Franchisor with evidence of compliance with this obligation which is satisfactory to Franchisor, within five (5) days after termination or expiration of this Agreement;

18.1.4   promptly pay all sums owing to Franchisor and its affiliates.  Such sums shall include all damages, costs and expenses, including reasonable attorneys' fees, incurred by Franchisor as a result of any default by Franchisee. The payment obligation herein shall give rise to and remain, until paid in full, a lien in favor of Franchisor against any and all of the personal property, furnishings, equipment, fixtures, and inventory owned by Franchisee and located at the Franchised Business outlet at the time of default;

18.1.5   pay to Franchisor all damages, costs and expenses, including reasonable attorneys' fees, incurred by Franchisor in connection with obtaining any remedy available to Franchisor for any violation of this Agreement and, subsequent to the termination or expiration of this Agreement, in obtaining injunctive or other relief for the enforcement of any provisions of this Agreement that survive its termination;

18.1.6   immediately deliver at Franchisee's sole cost and expense, to Franchisor the Manual and all records, files, instructions, correspondence, invoices, agreements, all confidential, proprietary and copyrighted material and all other materials related to operation of the Franchised Business, including but not limited to customer lists and records, (all of which are acknowledged to be Franchisor's property), delete all electronic copies and retain no copy or record of any of the foregoing, except Franchisee's copy of this Agreement and of any correspondence between the parties and any other documents that Franchisee reasonably needs for compliance with any provision of law;

DocuSign Envelope ID: 6C9B1631-8644-48D8-A239-29BB72667B3D

18.1.7 comply with the non-disclosure and non-competition covenants contained in Article 19; and

18.1.8 in the event this Agreement is terminated due to Franchisee's default, pay Franchisor a lump sum payment (as liquidated damages and not as a penalty) in an amount equal to: (a) the average monthly Royalty Fee and Brand Fund Contribution payable by Franchisee over the twelve (12) month period immediately prior to the date of termination (or such shorter time period if the Franchised Business has been open less than twelve (12) months); (b) multiplied by the lesser of (i) twenty-four (24) months or (ii) the number of months then remaining in the then-current term of this Agreement. Franchisee acknowledges that a precise calculation of the full extent of the damages Franchisor will incur in the event of termination of this Agreement as a result of Franchisee's default is difficult to determine and that this lump sum payment is reasonable in light thereof. The liquidated damages payable by Franchisee pursuant to this Section 18.1.8 shall be in addition to all other amounts payable under this Agreement and shall not affect Franchisor's right to obtain appropriate injunctive relief and remedies pursuant to any other provision of this Agreement.

18.2    Right to Purchase.

18.2.1  Franchisor shall have the option, to be exercised within thirty (30) days after Franchisee has provided an itemization and valuation of assets, to purchase from Franchisee any or all of the furnishings, equipment (including any point-of-sale system), signs, fixtures, advertising materials, supplies, and inventory of Franchisee related to the operation of the Franchised Business, at Franchisee's cost or fair market value, whichever is less.  Franchisor shall purchase Franchisee's assets free and clear of any liens, charges, encumbrances or security interests and Franchisor shall assume no liabilities whatsoever, unless otherwise agreed to in writing by the parties.  If the parties cannot agree on the fair market value within thirty (30) days of Franchisor's exercise of its option, fair market value shall be determined by two (2) appraisers, with each party selecting one (1) appraiser, and the average of their determinations shall be binding.  In the event of such appraisal, each party shall bear its own legal and other costs and shall split the appraisal fees equally.  If Franchisor elects to exercise its option to purchase herein provided, it shall have the right to set off (i) all fees for any such independent appraiser due from Franchisee, (ii) all amounts due from Franchisee to Franchisor or any of its affiliates and (iii) any costs incurred in connection with any escrow arrangement (including reasonable legal fees), against any payment therefor and shall pay the remaining amount in cash.  Closing of the purchase shall take place no later than thirty (30) days after Franchisor notifies Franchisee that Franchisor exercises its option to purchase the assets.

18.2.2  With respect to the options described in Sections 18.2.1, Franchisee shall deliver to Franchisor in a form satisfactory to Franchisor, such warranties, releases of lien, bills of sale, assignments and such other documents and instruments that Franchisor deems necessary in order to perfect Franchisor's title and possession in and to the assets being purchased or assigned and to meet the requirements of all tax and government authorities.  If, at the time of closing, Franchisee has not obtained all of these certificates and other documents, Franchisor may, in its sole discretion, place the purchase price in escrow pending issuance of any required certificates or documents.

18.2.3  Franchisor shall be entitled to assign any and all of its option in Section 18.2.1 to any other party, without the consent of Franchisee.

18.3    Assignment of Communications.  Franchisee, at the option of Franchisor, shall assign to Franchisor all rights to the telephone numbers of the Franchised Business and any related public directory listing or other business listings and execute all forms and documents required by Franchisor and any telephone company at any time, to transfer such service and numbers to Franchisor.  Further, Franchisee shall assign to Franchisor any and all social media and internet listings, domain names, internet advertising,

websites, listings with search engines, electronic mail addresses or any other similar listing or usage related to the Franchised Business. Notwithstanding any forms and documents that may have been executed by Franchisee under Section 11.7, Franchisee shall provide Franchisor with all passwords and administrative rights, and hereby appoints Franchisor its true and lawful agent and attorney-in-fact with full power and authority, for the sole purpose of taking such action as is necessary to complete such assignment. This power of attorney shall survive the expiration or termination of this Agreement. Franchisee shall thereafter use different telephone numbers, electronic mail addresses or other listings or usages at or in connection with any subsequent business conducted by Franchisee.

18.4    Survival. The rights and obligations of the parties contained in this Article 18 shall survive the expiration or sooner termination of this Agreement.

## 19.    NON-DISCLOSURE AND NON-COMPETITION COVENANTS

19.1    Operations Manual.

19.1.1    Franchisor has provided to Franchisee, on loan, a current copy of the Manual. The Manual may be in hard copy or made available to Franchisee in digital, electronic or computerized form or in some other form now existing or hereafter developed that would allow Franchisee to view the contents thereof. If the Manual (or any changes thereto) are provided in a form other than physical copy, Franchisee shall pay any and all costs to retrieve, review, use or access the Manual. To protect the reputation and goodwill of Franchisor and to maintain high standards of operation under Franchisor's Marks, Franchisee shall operate all aspects of the Franchised Business in accordance with the Manual, as they may from time to time be modified by Franchisor, other written directives that Franchisor may issue to Franchisee from time to time, whether or not such directives are included in the Manual, and any other manual and materials created or approved for use in the operation of the Franchised Business.

19.1.2    Franchisee and any and all Principals shall at all times treat the Manual, written directives, and other materials and any other confidential communications or materials, and the information contained therein, as confidential and shall maintain such information as trade secret and confidential in accordance with this Article and this Agreement. Franchisee and Franchisee's Principals, if any, shall not divulge and make such materials available to anyone other than those of Franchisee's employees who require the information contained therein to operate the Franchised Business. Franchisee shall, prior to disclosure, fully train and inform its employees on all the restrictions, terms and conditions under which it is permitted to use Franchisor's intellectual, proprietary and confidential information; and shall ensure its employees' compliance with such restrictions, terms and conditions. Franchisee, Franchisee's Principals, and any person working with Franchisee shall agree not, at any time to use, copy, duplicate, record or otherwise reproduce these materials, in whole or in part, or otherwise make the same available to any person other than those authorized above, without Franchisor's prior written consent.

19.1.3    The Manual, written directives, and other materials and any other confidential communications provided or approved by Franchisor shall at all times remain the sole property of Franchisor. Franchisee shall maintain the Manual and all Franchisor's confidential and proprietary materials at all times in a safe and secure location, shall take all reasonable measures to prevent unauthorized access thereto, whether any attempted unauthorized access takes the form of physical access or access via computer or telecommunications networks or otherwise, and shall report the theft or loss of the Manual, or any portion thereof, immediately to Franchisor. At a minimum, Franchisee shall, in the case of computer and telecommunications networks, use the latest available firewall, encryption and similar technology to prevent unauthorized access. Franchisee shall delete all electronic copies and return and cease using any physical copy of the Manual and other confidential and proprietary materials to Franchisor immediately upon request or upon transfer, termination or expiration of this Agreement.

DocuSign Envelope ID: 6C9B1631-8644-4BD8-A239-29BB12267B3D

19.1.4   Franchisor may from time to time revise the contents of the Manual and other materials created or approved for use in the operation of the Franchised Business.  Franchisee expressly agrees to comply with each new or changed policy, standard or directive. In the event of any dispute as to the contents of the Manual, the terms of the master copy of the Manual maintained by Franchisor shall control.

19.2   <u>Confidential Information</u>.  Franchisee along with its Principals acknowledge and accept that during the term of this Agreement Franchisee and any Principal will have access to Franchisor's trade secrets, including, but not limited to, product recipes, methods, processes, customer lists, vendor partnerships and/or relationships, sales and technical information, financial information, costs, product prices and names, software tools and applications, website and/or email design, products, services, equipment, technologies and procedures relating to the operation of the Franchised Business; the Manual; methods of advertising and promotion; instructional materials; any other information which Franchisor may or may not specifically designate as "confidential" or "proprietary"; and the components of the System, whether or not such information is protected or protectable by patent, copyright, trade secret or other proprietary rights (collectively referred to herein as the "Confidential Information").  Neither Franchisee nor any Principal shall, during the term of this Agreement and thereafter, communicate or divulge to, or use for the benefit of, any other person or entity, and, following the expiration or termination of this Agreement, shall not use for their own benefit, any Confidential Information that may be communicated to Franchisee or any Principal or of which Franchisee or any Principal may be apprised in connection with the operation of the Franchised Business under the terms of this Agreement.  Franchisee and any Principal shall not divulge and make any Confidential Information available to anyone other than those of Franchisee's employees who require the Confidential Information to operate the Franchised Business and who have themselves entered into confidentiality and non-compete agreements containing the same provisions as contained in this Agreement, in accordance with Section 19.10 hereof. Franchisee and any Principal shall not at any time copy, duplicate, record or otherwise reproduce any Confidential Information, in whole or in part, or otherwise make the same available to any person other than those authorized above, without Franchisor's prior written consent.   The covenant in this Section 19.2 shall survive the expiration, termination or transfer of this Agreement or any interest herein and shall be perpetually binding upon Franchisee and each Principal.

19.3   <u>Protection of Information</u>.  Franchisee shall take all steps necessary, at Franchisee's own expense, to protect the Confidential Information and shall immediately notify Franchisor if Franchisee finds that any Confidential Information has been divulged in violation of this Agreement.

19.4   <u>New Concepts</u>.  If Franchisee or any Principal develops any new concept, process, product, recipe, or improvement in the operation or promotion of the Franchised Business ("Improvements"), Franchisee is required to promptly notify Franchisor and provide Franchisor with all related information, processes, products, recipe or other improvements, and sign any and all forms, documents and/or papers necessary for Franchisor to obtain full proprietary rights to such Improvements, without compensation and without any claim of ownership or proprietary rights to such Improvements.  Franchisee and any Principal acknowledge that any such Improvements will become the property of Franchisor, and Franchisor may use or disclose such information to other franchisees as it determines to be appropriate.

19.5   <u>Noncompetition Covenants</u>.    Franchisee and each Principal, if any, specifically acknowledge that, pursuant to this Agreement, Franchisee and each Principal, if any, will receive valuable training, trade secrets and Confidential Information of the System that are beyond the present knowledge, training and experience of Franchisee, each Principal and Franchisee's managers and employees. Franchisee and each Principal, if any, acknowledge that such specialized training, trade secrets and Confidential Information provide a competitive advantage and will be valuable to them in the development

and operation of the Franchised Business, and that gaining access to such specialized training, trade secrets and Confidential Information is, therefore, a primary reason why Franchisee and each Principal, if any, are entering into this Agreement. In consideration for such specialized training, trade secrets, Confidential Information and rights, Franchisee and each Principal, if any, covenant that, except as otherwise approved in writing by Franchisor:

19.5.1   During the term of this Agreement, Franchisee and each Principal, if any, shall not, either directly or indirectly, for themselves or through, on behalf of, or in conjunction with, any person or entity (i) divert, or attempt to divert, any business or customer of the Franchised Business or of other franchisees in the System to any competitor, by direct or indirect inducement or otherwise; (ii) participate as an owner, partner, director, officer, employee, consultant or agent or serve in any other capacity in any soap and bath products business similar to the System; (iii) do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with the Marks and the System; or (iv) in any manner interfere with, disturb, disrupt, decrease or otherwise jeopardize the business of the Franchisor or any Magnolia Soap and Bath Co franchisees or Franchisor-affiliated outlets.

19.5.2   Upon the expiration or earlier termination of this Agreement or upon a Transfer and continuing for twenty-four (24) months thereafter, Franchisee and Principals, if any, shall not, either directly or indirectly, for themselves or through, on behalf of or in conjunction with any person or entity (i) divert, or attempt to divert, any business or customer of the Franchised Business or of other franchisees in the System to any competitor, by direct or indirect inducement or otherwise; or (ii) participate as an owner, partner, director, officer, employee, consultant or agent or serve in any other capacity in any soap and bath products business within ten (10) miles of the Territory or any Magnolia Soap and Bath Co outlet location; or (iii) do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with the Marks and the System; or (iv) in any manner interfere with, disturb, disrupt, decrease or otherwise jeopardize the business of the Franchisor or any Magnolia Soap and Bath Co franchisees.

19.6     Reasonableness of Restrictions. Franchisee and each Principal, if any, acknowledges and agrees that the covenants not to compete set forth in this Agreement are fair and reasonable and will not impose any undue hardship on Franchisee or Principals, if any, since Franchisee or Principals, as the case may be, have other considerable skills, experience and education which afford Franchisee or Principals, as the case may be, the opportunity to derive income from other endeavors.

19.7     Reduction of Time or Scope. If the period of time or the geographic scope specified above, should be adjudged unreasonable in any proceeding, then the period of time will be reduced by such number of months or the geographic scope will be reduced by the elimination of such portion thereof, or both, so that such restrictions may be enforced for such time and scope as are adjudged to be reasonable. In addition, Franchisor shall have the right, in its sole discretion, to reduce the scope of any covenant set forth in this Paragraph 19 or any portion thereof, without Franchisee's consent, effective immediately upon receipt by Franchisee of written notice thereof, and Franchisee agrees to forthwith comply with any covenant as so modified.

19.8     Injunctive Relief. Franchisee and each Principal, if any, acknowledges that a violation of the covenants not to compete contained in this Agreement would result in immediate and irreparable injury to Franchisor for which no adequate remedy at law will be available. Accordingly, Franchisee and each Principal, if any, hereby consents to the entry of an injunction prohibiting any conduct by Franchisee or any Principal in violation of the terms of the covenants not to compete set forth in this Agreement.

19.9     No Defense. Franchisee and each Principal, if any, expressly agree that the existence of any claims they may have against Franchisor, whether or not arising from this Agreement, shall not constitute a defense to the enforcement by Franchisor of the covenants in this Section.

19.10   Covenants of Employees, Agents and Third Persons.  Franchisee shall require and obtain execution of covenants similar to those set forth in this Section (including covenants applicable upon the termination of a person's employment with Franchisee) from all employees, contractors or third persons who will have access to Franchisor's confidential and proprietary information.  Such covenants shall be substantially in the form set forth in Attachment 10 as revised and updated from time to time and contained in the Manual.

## 20.   DISPUTE RESOLUTION

20.1   Internal Dispute Resolution.  Franchisee shall first bring any claim, controversy or dispute arising out of or relating to this Agreement, the Attachments hereto or the relationship created by this Agreement to Franchisor's president and/or chief executive officer for resolution.  After providing notice as set forth in Section 21.7 below. Franchisee must exhaust this internal dispute resolution procedure before Franchisee may bring Franchisee's dispute before a third party. This agreement to first attempt resolution of disputes internally shall survive termination or expiration of this Agreement.

20.2   Mediation.  At Franchisor's option, any claim, controversy or dispute that is not resolved pursuant to Section 20.1 hereof shall be submitted to non-binding mediation.  Franchisee shall provide Franchisor with written notice of Franchisee's intent to pursue any unresolved claim, controversy or dispute, specifying in sufficient detail the nature thereof, prior to commencing any legal action. Franchisor shall have thirty (30) days following receipt of Franchisee's notice to exercise Franchisor's option to submit such claim, controversy or dispute to mediation. Mediation shall be conducted through a mediator or mediators in accordance with the American Arbitration Association Commercial Mediation Rules. Such mediation shall take place in the then-current location of Franchisor's corporate headquarters.  The costs and expenses of mediation, including compensation and expenses of the mediator (and except for the attorney's fees incurred by either party), shall be borne by the parties equally.  Franchisor may specifically enforce Franchisor's rights to mediation, as set forth herein.

20.3   Governing Law and Venue.  This Agreement is made in, and shall be substantially performed in, the State of Mississippi.  Any claims, controversies, disputes or actions arising out of this Agreement shall be governed, enforced and interpreted pursuant to the laws of the State of Mississippi. Franchisee and its Principals, except where specifically prohibited by law, hereby irrevocably submit themselves to the sole and exclusive jurisdiction of the state and federal courts in Mississippi.  Franchisee and its Principals hereby waive all questions of personal jurisdiction for the purpose of carrying out this provision.

20.4   Mutual Benefit.  Franchisee, each Principal, if any, and Franchisor acknowledge that the parties' agreement regarding applicable state law and forum set forth in Section 20.3 provide each of the parties with the mutual benefit of uniform interpretation of this Agreement and any dispute arising hereunder. Each of Franchisee, its Principals, if any, and Franchisor further acknowledge the receipt and sufficiency of mutual consideration for such benefit and that each party's agreement regarding applicable state law and choice of forum have been negotiated in good faith and are part of the benefit of the bargain reflected by this Agreement.

20.5   Waiver of Certain Damages.  Franchisee and each Principal, if any, hereby waive, to the fullest extent permitted by law, any right to or claim for any punitive, exemplary, incidental, indirect, special, consequential or other damages (including, without limitation, loss of profits) against Franchisor, its affiliates, and their respective officers, directors, shareholders, partners, agents, representatives, independent contractors, servants and employees, in their corporate and individual capacities, arising out of any cause whatsoever.  Each of Franchisee and Principals, if any, agree that in the event of a dispute,

Franchisee and each Principal shall be limited to the recovery of any actual direct compensatory damages sustained.

20.6   <u>Injunctive Relief.</u>   Nothing herein contained (including, without limitation, Sections 20.1 through 20.3 above) shall bar Franchisor from the right to obtain immediate injunctive relief from any court of competent jurisdiction against threatened conduct by Franchisee that may cause Franchisor loss or damage, under the usual equity rules, including the applicable rules for obtaining specific performance, restraining orders, and preliminary injunctions.

20.7   <u>Limitations of Claims.</u>   Any and all claims asserted by Franchisee arising out of or relating to this Agreement or the relationship with Franchisor will be barred unless a proceeding for relief is commenced within one (1) year from the date on which Franchisee knew or should have known of the facts giving rise to such claims.

20.8   <u>Attorney's Fees.</u>   In the event of any action in law or equity by and between Franchisor and Franchisee concerning the operation, enforcement, construction or interpretation of this Agreement, the prevailing party in such action shall be entitled to recover reasonable attorney's fees and court costs incurred.

## 21.   GENERAL

21.1   <u>Relationship of the Parties.</u>

21.1.1   <u>Independent Licensee.</u>   Franchisee is and shall be an independent licensee under this Agreement, and no partnership shall exist between Franchisee and Franchisor. This Agreement does not constitute Franchisee as an agent, legal representative, or employee of Franchisor for any purpose whatsoever, and Franchisee is not granted any right or authority to assume or create any obligation for or on behalf of, or in the name of, or in any way to bind Franchisor. Franchisee agrees not to incur or contract any debt or obligation on behalf of Franchisor or commit any act, make any representation, or advertise in any manner which may adversely affect any right of Franchisor or be detrimental to Franchisor or other franchisees of Franchisor. Franchisor does not assume any liability, and will not be considered liable, for any agreements, representations, or warranties made by you which are not expressly authorized under this Agreement. Franchisor will not be obligated for any damages to any person or property which directly or indirectly arise from or relate to your operation of the Franchised Business. Pursuant to the above, Franchisee agrees to indemnify Franchisor and hold Franchisor harmless from any and all liability, loss, attorneys' fees, or damage Franchisor may suffer as a result of claims, demands, taxes, costs, or judgments against Franchisor arising out of any allegation of an agent, partner, or employment relationship.

21.1.2   <u>No Relationship.</u>   Franchisee acknowledges and agrees that Franchisee alone exercises day-to-day control over all operations, activities, and elements of the Franchised Business, and that under no circumstance shall Franchisor do so or be deemed to do so. Franchisee further acknowledges and agrees, and will never claim otherwise, that the various restrictions, prohibitions, specifications, and procedures of the System which Franchisee is required to comply with under this Agreement, whether set forth in Franchisor's Operations Manual or otherwise, does not directly or indirectly constitute, suggest, infer or imply that Franchisor controls any aspect or element of the day-to-day operations of the Franchised Business, which Franchisee alone controls, but only constitute standards Franchisee must adhere to when exercising control of the day-to-day operations of the Franchised Business.

21.1.3   <u>Franchisee's Employees.</u>   Franchisee acknowledges and agrees that any training Franchisor provides for Franchisee's employees is geared to impart to those employees, with Franchisee's ultimate authority, the various procedures, protocols, systems, and operations of an outlet pursuant to the

System and in no fashion reflects any employment relationship between Franchisor and such employees. If ever it is asserted that Franchisor is the employer, joint employer or co-employer of any of Franchisee's employees in any private or government investigation, action, proceeding, arbitration or other setting, Franchisee irrevocably agree to assist Franchisor in defending said allegation, appearing at any venue requested by Franchisor to testify on Franchisor's behalf participate in depositions, other appearances or preparing affidavits rejecting any assertion that Franchisor is the employer, joint employer or co-employer of any of Franchisee's employees.

21.2    Successors.  This Agreement shall bind and inure to the benefit of the successors and assigns of Franchisor and shall be personally binding on and inure to the benefit of Franchisee (including the individuals executing this Agreement on behalf of the Franchisee entity) and its or their respective heirs, executors, administrators and successors or assigns; provided, however, the foregoing provision shall not be construed to allow a transfer of any interest of Franchisee or Principals, if any, in this Agreement or the Franchised Business, except in accordance with Article 16 hereof.

21.3    Invalidity of Part of Agreement.  Should any provisions in this Agreement, for any reason, be declared invalid, then such provision shall be invalid only to the extent of the prohibition without in any way invalidating or altering any other provision of this Agreement.

21.4    Entire Agreement.  This Agreement, including all attachments, is the entire agreement of the parties, superseding all prior written or oral agreements of the parties concerning the same subject matter, and superseding all prior written or oral representations made to Franchisee, provided that nothing in this Agreement is intended to disclaim the representations made to Franchisee in Franchisor's Franchise Disclosure Document.  No agreement of any kind relating to the matters covered by this Agreement and no amendment of the provisions hereof shall be binding upon either party unless and until the same has been made in writing and executed by all interested parties.

21.5    Construction.  All terms and words used in this Agreement, regardless of the number and gender in which they are used, shall be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine or neuter, as the context or sense of this Agreement or any provision herein may require, as if such words had been fully and properly written in the appropriate number and gender.  All covenants, agreements and obligations assumed herein by Franchisee and any Principals shall be deemed to be joint and several covenants, agreements and obligations of each of the persons named as Franchisee, if more than one person is so named.

21.6    Captions.  Captions and section headings are used herein for convenience only.  They are not part of this Agreement and shall not be used in construing it.

21.7    Notices.  Whenever notice is required or permitted to be given under the terms of this Agreement, it shall be given in writing, and be delivered personally or by certified mail or courier, postage prepaid, addressed to the party for whom intended, and shall be deemed given on the date of delivery or delivery is refused.  All such notices shall be addressed to the party to be notified at their respective addresses as set forth in the introductory paragraph of this Agreement, or at such other address or addresses as the parties may from time to time designate in writing.

21.8    Effect of Waivers.  No waiver, delay, omission or forbearance on the part of Franchisor to exercise any right, option, duty or power arising from any default or breach by Franchisee shall affect or impair the rights of Franchisor with respect to any subsequent default of the same or of a different kind. Any use by Franchisee of the System or any part thereof at any place other than at the Franchised Business outlet approved by Franchisor shall not give Franchisee any rights not specifically granted hereunder.

DocuSign Envelope ID: 6C9B1631-8644-4BD8-A339-29BB12667B3D

Failure to take action to stop such use shall not in any event be considered a waiver of the rights of Franchisor at any time to require Franchisee to restrict said use to the approved Franchised Business outlet.

21.9 <u>Remedies Cumulative</u>. All rights and remedies of the parties to this Agreement shall be cumulative and not alternative, in addition to and not exclusive of any other rights or remedies that are provided for herein or that may be available at law or in equity in case of any breach, failure or default or threatened breach, failure or default of any term, provision or condition of this Agreement or any other agreement between Franchisee or any of its affiliates and Franchisor or any of its affiliates. The rights and remedies of the parties to this Agreement shall be continuing and shall not be exhausted by any one or more uses thereof, and may be exercised at any time or from time to time as often as may be expedient; and any option or election to enforce any such right or remedy may be exercised or taken at any time and from time to time. The expiration, earlier termination or exercise of Franchisor's rights pursuant to Article 17 shall not discharge or release Franchisee or any Principal from any liability or obligation then accrued, or any liability or obligation continuing beyond, or arising out of, the expiration, the earlier termination or the exercise of such rights under this Agreement.

21.10 <u>Consent to Do Business Electronically</u>. The parties to the Franchise Agreement hereby consent to do business electronically. Pursuant to the Uniform Electronic Transactions Act as adopted by the State of Mississippi, the parties hereby affirm to each other that they agree with the terms of the Franchise Agreement and its Attachments, and by attaching their signature electronically to the Franchise Agreement, they are executing the document and intending to attach their electronic signature to it. Furthermore, the parties acknowledge that the other parties to the Franchise Agreement can rely on an electronic signature as the respective party's signature.

21.11 <u>Counterparts</u>. This Agreement may be executed in multiple counterparts, each of which when so executed shall be an original, and all of which shall constitute one and the same instrument.

21.12 <u>Survival</u>. Any obligation of Franchisee or any Principal that contemplates performance of such obligation after termination or expiration of this Agreement or the transfer of any interest of Franchisee or any Principal therein shall be deemed to survive such termination, expiration or transfer.

## 22. ACKNOWLEDGEMENTS

Franchisee shall acknowledge the truthfulness of the statements contained in Attachment 1 hereto. Franchisee's acknowledgements are an inducement for us to enter into this Agreement. Franchisee shall immediately notify us, prior to acknowledgment, if any statement in Attachment 1 is incomplete or incorrect.

*-Remainder of page intentionally left blank-*

The parties hereto have executed this Franchise Agreement on the day and year first above written.

FRANCHISEE:                                        FRANCHISOR:
ARRAY OF SOAP LLC                                  MAGNOLIA SOAP AND BATH CO. FRCH, LLC

By: _____                      By: _____
Name:  Lindsay Array Williams                       Name:  Magen Bynum
Title: Owner                                        Title:  Founder & CEO

PRINCIPAL:

By: _____
Name:  Lindsay Array Williams

**ATTACHMENT 1**

**ACKNOWLEDGEMENTS**

Franchisee hereby acknowledges the following:

1.  Franchisee has conducted an independent investigation of all aspects relating to the financial, operational and other aspects of the business of operating the Franchised Business. Franchisee further acknowledges that, except as may be set forth in Franchisor's Disclosure Document, no representations of performance (financial or otherwise) for the Franchised Business provided for in this Agreement has been made to Franchisee by Franchisor and Franchisee and any and all Principals hereby waive any claim against Franchisor for any business failure Franchisee may experience as a franchisee under this Agreement.


Initial

2.  Franchisee has conducted an independent investigation of the business contemplated by this Agreement and understands and acknowledges that the business contemplated by this Agreement involves business risks making the success of the venture largely dependent upon the business abilities and participation of Franchisee and its efforts as an independent business operation.


Initial

3.  Franchisee agrees that no claims of success or failure have been made to it or him or her prior to signing the Franchise Agreement and that it/she/he understands all the terms and conditions of the Franchise Agreement. Franchisee further acknowledges that the Franchise Agreement contains all oral and written agreements, representations and arrangements between the parties hereto, and any rights which the respective parties hereto may have had under any other previous contracts are hereby cancelled and terminated, and that this Agreement cannot be changed or terminated orally.


Initial

4.  Franchisee has no knowledge of any representations by Franchisor or its officers, directors, shareholders, employees, sales representatives, agents or servants, about the business contemplated by the Franchise Agreement that are contrary to the terms of the Franchise Agreement or the documents incorporated herein. Franchisee acknowledges that no representations or warranties are made or implied, except as specifically set forth in the Franchise Agreement. Franchisee represents, as an inducement to Franchisor's entry into this Agreement, that it has made no misrepresentations in obtaining the Franchise Agreement.


Initial

5. Franchisor expressly disclaims the making of, and Franchisee acknowledges that it has not received or relied upon, any warranty or guarantee, express or implied, as to the potential volume, profits or success of the business venture contemplated by the Franchise Agreement.



Initial

6. Franchisee acknowledges that Franchisor's approval or acceptance of Franchisee's Business location does not constitute a warranty, recommendation or endorsement of the location for the Franchised Business, nor any assurance by Franchisor that the operation of the Franchised Business at the premises will be successful or profitable.



Initial

7. Franchisee acknowledges that it has received the Magnolia Soap and Bath Co. FRCH, LLC, Franchise Disclosure Document with a complete copy of the Franchise Agreement and all related Attachments and agreements at least fourteen (14) calendar days prior to the date on which the Franchise Agreement was executed. Franchisee further acknowledges that Franchisee has read such Franchise Disclosure Document and understands its contents.



Initial

8. Franchisee acknowledges that it has had ample opportunity to consult with its own attorneys, accountants and other advisors and that the attorneys for Franchisor have not advised or represented Franchisee with respect to the Franchise Agreement or the relationship thereby created.



Initial

9. Franchisee, together with Franchisee's advisers, has sufficient knowledge and experience in financial and business matters to make an informed investment decision with respect to the Franchise granted by the Franchise Agreement.



Initial

10. Franchisee is aware of the fact that other present or future franchisees of Franchisor may operate under different forms of agreement(s), and consequently that Franchisor's obligations and rights with respect to its various franchisees may differ materially in certain circumstances.



Initial

11. It is recognized by the parties that Franchisor is also (or may become) a manufacturer or distributor of certain products under the Marks licensed herein; and it is understood that Franchisor does not warrant that such products will not be sold within the Franchisee's Territory by others who may have purchased such products from Franchisor.



Initial

12. BY EXECUTING THE FRANCHISE AGREEMENT, FRANCHISEE AND ANY PRINCIPAL, INDIVIDUALLY AND ON BEHALF OF FRANCHISEE'S AND SUCH PRINCIPAL'S HEIRS, LEGAL REPRESENTATIVES, SUCCESSORS AND ASSIGNS, HEREBY FOREVER RELEASE AND DISCHARGE MAGNOLIA SOAP AND BATH CO. FRCH, LLC, MAGNOLIA SOAP & BATH HOLDING CO., LLC AND ANY OF EITHER'S PARENT COMPANY, SUBSIDIARIES, DIVISIONS, AFFILIATES, SUCCESSORS, ASSIGNS AND DESIGNEES, AS WELL AS THEIR DIRECTORS, OFFICERS, EMPLOYEES, AGENTS, AND SHAREHOLDERS FROM ANY AND ALL CLAIMS, DEMANDS AND JUDGMENTS RELATING TO OR ARISING UNDER THE STATEMENTS, CONDUCT, CLAIMS OR ANY OTHER AGREEMENT BETWEEN THE PARTIES EXECUTED PRIOR TO THE DATE OF THE FRANCHISE AGREEMENT, INCLUDING, BUT NOT LIMITED TO, ANY AND ALL CLAIMS, WHETHER PRESENTLY KNOWN OR UNKNOWN, SUSPECTED OR UNSUSPECTED, ARISING UNDER THE FRANCHISE, SECURITIES, TAX OR ANTITRUST LAWS OF THE UNITED STATES OR OF ANY STATE OR TERRITORY THEREOF. THIS RELEASE SHALL NOT APPLY TO ANY CLAIMS ARISING FROM REPRESENTATIONS MADE BY FRANCHISOR IN FRANCHISOR'S FRANCHISE DISCLOSURE DOCUMENT RECEIVED BY FRANCHISEE.

Initial

FRANCHISEE:
ARRAY OF SOAP LLC

By: _____
Name: Lindsay Array Williams
Title: Owner
Date: April 28, 2023 | 5:07 PM PDT

PRINCIPAL:

_____
Name: Lindsay Array Williams
Date: April 28, 2023 | 5:07 PM PDT

**ATTACHMENT 2**

**<u>TRADEMARKS</u>**

Service Marks –



## ATTACHMENT 3

### TERRITORY

**TERRITORY AND ADDRESS TO BE DETERMINED AND INSERTED AFTER THE MAGNOLIA SOPA AND BATH CO PREMISES IS IDENTIFIED BY FRANCHISEE AND APPROVED BY FRANCHISOR, IN ACCORDANCE WITH SECTION 8.1 OF THE FRANCHISE AGREEMENT, IN THE SITE SEACH AREA OF _____ LANCASTER, OHIO _____.

Territory (insert map and/or define by zip codes):

_____

_____

_____

_____

Franchised Business Address:

_____

_____

DocuSign Envelope ID: 6C9B1631-8644-4CD8-A239-29BB12667B3D

# ATTACHMENT 4

## RELEASE

_____ ("Franchisee") and its Principal(s):

_____

_____

_____

_____

(collectively, "Franchisee's Principal(s)"), on behalf of themselves and their respective officers, directors, employees, successors, assigns, heirs, personal representatives, and all other persons acting on their behalf or claiming under them (collectively, the "Franchisee Releasors"), hereby release, discharge and hold harmless _____ Magnolia Soap and Bath Co. FRCH, LLC ("Franchisor"), Magnolia Soap & Bath Holding Co., LLC, , their parents, subsidiaries, affiliates, and each of their respective officers, directors, shareholders, employees, agents, attorneys, successors, and assigns (collectively, the "Franchisor Releasees") from any suits, claims, controversies, rights, promises, debts, liabilities, demands, obligations, costs, expenses, actions, and causes of action of every nature, character and description, in law or in equity, whether presently known or unknown, vested or contingent, suspected or unsuspected arising under, relating to, or in connection with the Franchise Agreement dated _____ _____ between Franchisee and Franchisor and any related agreements and the relationship created thereby, or the Franchised Business operated under the Franchise Agreement, or any claims or representations made relative to the sale of the franchise to operate such Franchised Business or under any federal or state franchise or unfair or deceptive trade practice laws, which any of the Franchisee Releasors now own or hold or have at any time heretofore owned or held against the Franchisor Releasees (collectively, the "Franchisee Released Claims").

FRANCHISEE AND FRANCHISEE'S PRINCIPAL(S) ON BEHALF OF THEMSELVES AND THE FRANCHISEE RELEASORS WAIVE ANY RIGHTS AND BENEFITS CONFERRED BY ANY APPLICABLE PROVISION OF LAW EXISTING UNDER ANY FEDERAL, STATE OR POLITICAL SUBDIVISION THEREOF WHICH WOULD INVALIDATE ALL OR ANY PORTION OF THE RELEASE CONTAINED HEREIN BECAUSE SUCH RELEASE MAY EXTEND TO CLAIMS WHICH THE FRANCHISEE RELEASORS DO NOT KNOW OR SUSPECT TO EXIST IN THEIR FAVOR AT THE TIME OF EXECUTION OF THIS AGREEMENT. The Franchisee Releasors also covenant not to bring any suit, action, or proceeding, or make any demand or claim of any type, against any Franchisor Releasees with respect to any Franchisee Released Claim, and Franchisee and Franchisee's Principal(s) shall defend, indemnify and hold harmless each of Franchisor Releasees against same.

Executed as of _____, 20___.

FRANCHISEE:

Attest: _____    By:_____

DocuSign Envelope ID: 6C9B1631-8644-46D8-A239-29BB12667B3D

_____   _____,_____
   (Name)              (Name, Title)

                 FRANCHISEES'S PRINCIPAL:


_____   _____
Witness Name:_____   Print Name: _____


_____   _____
Witness Name:_____   Print Name: _____


_____   _____
Witness Name:_____   Print Name: _____


_____   _____
Witness Name:_____   Print Name: _____

DocuSign Envelope ID: 6C9B1631-8644-4BD8-A239-29BB12267B3D

**ATTACHMENT 5**

**ACH AUTHORIZATION**

Franchisor Name: **Magnolia Soap and Bath Co. FRCH, LLC**

I (We) hereby authorize Magnolia Soap and Bath Co. FRCH, LLC, hereinafter called Franchisor, to initiate debit entries to my (our) Checking Account/Savings Account (Select One) indicated below at the depository financial institution named below, and to debit the same to such account. I (We) acknowledge that the origination of ACH transactions to my (our) account must comply with the provisions of U.S. Law, and that I will be responsible for any banking fees that my institution charges.

Financial Institution Name:_____Branch: _____

City:_____State:_____Zip:_____Phone: _____

ACH/Routing Number:_____Account Number:_____
                                                                                      (Nine Digits)

This authorization is to remain in full force and effect until Franchisor has received a written replacement ACH Withdrawal Form notification from me. I (We) understand that revocation of this Authorization Agreement by me (us) may constitute an event of Default under the Franchise Agreement.

I (We) understand that the amount to be withdrawn by Franchisor will not be the same each month and I (We) therefore authorize all monetary transfers pursuant to Articles 6 and 18 of the Franchise Agreement.

_____            _____
Print Franchisee / Account Holder Name                  Print Franchisee/Co-Account Holder Name

_____            _____
Franchisee/ Account Holder Signature-Date                  Franchisee/Co-Account Holder
Signature-Date

_____            _____
Daytime Phone Number                                              Email Address

**PLEASE ATTACH A VOIDED CHECK TO THIS FORM**
**Please Return Form to:**

Magnolia Soap and Bath Co. FRCH, LLC
119 West Bankhead Street
New Albany, Mississippi 38652

## ATTACHMENT 6

## COLLATERAL ASSIGNMENT OF LEASE

**FOR VALUE RECEIVED**, the undersigned _____ ("Assignor") hereby assigns and transfers to Magnolia Soap and Bath Co. FRCH, LLC, a Mississippi limited liability company with a notice address of 119 West Bankhead Street, New Albany, Mississippi, 38652 ("Assignee"), all of Assignor's right, title and interest as tenant in, to and under that certain lease, a copy of which shall be attached hereto (the "Lease") respecting premises commonly known as _____. This Assignment is for collateral purposes only and except as specified herein, Assignee shall have no liability or obligation of any kind whatsoever arising from or in connection with this Assignment or the Lease unless Assignee takes possession of the premises demised by the Lease pursuant to the terms hereof and assumes the obligations of Assignor thereunder.

Assignor represents and warrants to Assignee that Assignor has full power and authority to so assign the Lease and Assignor's interest therein and that Assignor has not previously assigned or transferred, and is not obligated to assign or transfer, any of Assignor's interest in the Lease or the premises demised thereby.

Upon a default by Assignor under the Lease or under the franchise agreement for a Magnolia Soap and Bath Co outlet between Assignee and Assignor (the "Franchise Agreement"), or in the event of a default by Assignor under any document or instrument securing the Franchise Agreement, Assignee shall have the right and is hereby empowered to take possession of the Premises demised by the Lease, expel Assignor therefrom, and, in such event, Assignor shall have no further right, title or interest in the Lease.

Assignor agrees that it will not suffer or permit any surrender, termination, amendment or modification of the Lease without the prior written consent of Assignee. Throughout the term of the Franchise Agreement and any successor terms thereof, Assignor agrees that it shall elect and exercise all options to extend the term of or renew the Lease not less than thirty (30) days prior to the last day that the option must be exercised, unless Assignee otherwise agrees in writing. If Assignee does not otherwise agree in writing, and upon failure of Assignor to so elect to extend or renew the Lease as aforesaid, Assignor hereby appoints Assignee as its true and lawful attorney-in-fact to exercise such extension or renewal options in the name, place and stead of Assignor for the purpose of effecting such extension or renewal.

ASSIGNOR:

DATED: _____        By:_____

                           _____,_____
                           (Print Name, Title)

DATED: _____        _____

DATED: _____        _____

DocuSign Envelope ID: 6C9B1631-8644-4CD8-A239-29BB12667B3D

## CONSENT AND AGREEMENT OF LANDLORD

to that Conditional Assignment of Lease from _____ (Assignor) to Magnolia Soap and Bath Co. FRCH, LLC (Assignee) dated _____ for the property known as _____ _____.

The undersigned Landlord under the aforedescribed Lease further hereby:

(a)     Agrees to notify Assignee in writing of and upon the failure of Assignor to cure any default by Assignor under the Lease;

(b)     Agrees that Assignee shall have the right, but shall not be obligated, to cure any default by Assignor under the Lease within thirty (30) days after delivery by Landlord of notice thereof in accordance with paragraph (a) above;

(c)     Consents to the foregoing Conditional Assignment and agrees that if Assignee takes possession of the Premises demised by the Lease and confirms to Landlord the assumption of the Lease by Assignee as tenant thereunder, Landlord shall recognize Assignee as tenant under the Lease, provided that Assignee cures within the thirty (30)-day period the non-monetary defaults, if any, of Assignor under the Lease;

(d)     Agrees that Assignee may further assign the Lease to a person, firm or corporation who shall agree to assume the tenant's obligations under the Lease and who is reasonably acceptable to Landlord and upon such assignment Assignee shall have no further liability or obligation under the Lease as assignee, tenant or otherwise.

(e)     Permits Assignee to enter upon the Premises without being guilty of trespass or any other crime or tort to de-identify the Premises as a Magnolia Soap and Bath Co outlet if Tenant fails to do so following termination of the Franchise Agreement or Lease, provided that Assignee shall repair any damage caused thereby.

DATED: _____          LANDLORD:

_____

_____

DocuSign Envelope ID: 6C9B1631-8644-49D8-A239-29BB12267B3D

**ATTACHMENT 7**

**STATEMENT OF OWNERSHIP INTERESTS IN FRANCHISEE**

| **Name** | **Percentage of Ownership** |
|---|---|
| Lindsay Array Williams | 100% |

DocuSign Envelope ID: 6C9B1631-8644-49D8-A239-29BB12667B3D

## ATTACHMENT 8

## SPOUSAL GUARANTY

This Guaranty and Covenant (this "Guaranty") is given by the undersigned ("Guarantor") on _____ April 28, 2023 | 7:20 PM PDT _____, (the "Effective Date") to Magnolia Soap and Bath Co. FRCH, LLC, a Mississippi limited liability company ("Franchisor"), in order to induce Franchisor to enter into that certain Franchise Agreement dated on or about the Effective Date hereof (the "Franchisee Agreement") with Array of Soap LLC, an Ohio limited liability company, and Lindsay Williams (jointly, "Franchisee").

Guarantor acknowledges that Guarantor is the spouse of Franchisee's Principal, as that term is used in the Franchise Agreement.

Guarantor acknowledges that Guarantor has read the terms and conditions of the Franchise Agreement and acknowledges that the execution of this Guaranty is in partial consideration for, and a condition to the granting of, the rights granted in the Franchise Agreement to Franchisee, and that Franchisor would not have granted these rights without the execution of this Guaranty by Guarantor.

Guarantor hereby individually makes, agrees to be bound by, and agrees to perform, all of the monetary obligations and non-competition covenants and agreements of the Franchisee as set forth in the Franchise Agreement, including but not limited to, the covenants set forth in Sections 19.2, 19.5, 19.6, 19.8 and 19.9 of the Franchise Agreement ("Guaranteed Obligations"). Guarantor shall perform and/or make punctual payment to Franchisor of the Guaranteed Obligations in accordance with the terms of the Franchise Agreement or other applicable document forthwith upon demand by Franchisor.

This Guaranty is an absolute and unconditional continuing guaranty of payment and performance of the Guaranteed Obligations. This Guaranty shall not be discharged by renewal of any obligations guaranteed by this instrument, change in ownership or control of the Franchisee entity, transfer of the Franchise Agreement, the suffering of any indulgence to any debtor, extension of time of payment thereof, nor the discharge of Franchisee by bankruptcy, operation of law or otherwise. Presentment, demand, protest, notice of protest and dishonor, notice of default or nonpayment and diligence in collecting any obligation under any agreement between Franchisee and Franchisor are each and all waived by Guarantor and/or acknowledged as inapplicable. Guarantor waives notice of amendment of any agreement between Franchisee and Franchisor and notice of demand for payment by Franchisee. Guarantor further agrees to be bound by any and all amendments and changes to any agreement between Franchisee and Franchisor.

Franchisor may pursue its rights against Guarantor without first exhausting its remedies against Franchisee and without joining any other guarantor hereto and no delay on the part of Franchisor in the exercise of any right or remedy shall operate as a waiver of such right or remedy, and no single or partial exercise by Franchisor of any right or remedy shall preclude the further exercise of such right or remedy.

If other guarantors have guaranteed any and or all of the Guaranteed Obligations, their liability shall be joint and several to that of Guarantor.

Until all of the Guaranteed Obligations have been paid in full and/or performed in full, Guarantor shall not have any right of subrogation, unless expressly given to Guarantor in writing by Franchisor.

All Franchisor's rights, powers and remedies hereunder and under any other agreement now or at any time hereafter in force between Franchisor and Guarantor shall be cumulative and not alternative and shall be in addition to all rights, powers and remedies given to Franchisor by law.

Should any one or more provisions of this Guaranty be determined to be illegal or unenforceable, all other provisions nevertheless shall remain effective.

This Guaranty shall extend to and inure to the benefit of Franchisor and its successors and assigns and shall be binding on Guarantor and its successors and assigns.

Guarantor has signed this Guaranty as of the date set forth above.

GUARANTOR - SPOUSE OF FRANCHISEE'S PRINCIPAL:

_____
*Signature*
Name: Benjamin Williams
Address: 2493 Long Bow Avenue
　　　　 Lancaster, Ohio 43130

DocuSign Envelope ID: 6C9B1631-8644-40D8-A339-29BB12667B3D

**ATTACHMENT 9**

**INTERNET ADVERTISING, SOCIAL MEDIA, SOFTWARE, AND TELEPHONE LISTING AGREEMENT**

**THIS INTERNET ADVERTISING, SOCIAL MEDIA, SOFTWARE, AND TELEPHONE LISTING AGREEMENT** (the "Agreement") is made and entered into this day of April 29, 2023 | 10:07 AM PDT (the "Effective Date"), by and between Magnolia Soap and Bath Co. FRCH, LLC, a Mississippi limited liability company, with its principal place of business at 119 West Bankhead Street, New Albany, Mississippi, 38652 (the "Franchisor"), and Array of Soap LLC, an Ohio limited liability company, with its principal place of business located at 2493 Long Bow Avenue, Lancaster, Ohio, 43130, and Array of Soap LLC's principal, Lindsay Array Williams, an individual, residing at 2493 Long Bow Avenue, Lancaster, Ohio, 43130 ("Principal"). Array of Soap LLC and Principal shall be jointly referred to in this Agreement as the "Franchisee".

**WHEREAS**, Franchisee desires to enter into a franchise agreement with Franchisor for a Magnolia Soap and Bath Co retail business ("Franchise Agreement") which will allow Franchisee to conduct internet-based advertising, maintain social media accounts, use software, and use telephone listings linked to the Magnolia Soap and Bath Co brand.

**WHEREAS**, Franchisor would not enter into the Franchise Agreement without Franchisee's agreement to enter into, comply with, and be bound by all the terms and provisions of this Agreement;

**NOW, THEREFORE**, for and in consideration of the foregoing and the mutual promises and covenants contained herein, and in further consideration of the Franchise Agreement and the mutual promises and covenants contained therein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. **Definitions**

   All terms used but not otherwise defined in this Agreement shall have the meanings set forth in the Franchise Agreement. "Termination" of the Franchise Agreement shall include, but shall not be limited to, the voluntary termination, involuntary termination, or natural expiration thereof.

2. **Internet Advertising and Telephone Listings**

   2.1 <u>Interest in Websites, Social Media Accounts, Other Electronic Listings and Software</u>. Franchisee may acquire (whether in accordance with or in violation of the Franchise Agreement) during the term of Franchise Agreement, certain right, title, or interest in and to certain domain names, social media accounts, hypertext markup language, uniform resource locator addresses, access to corresponding internet websites, the right to hyperlink to certain websites and listings on various internet search engines, and the right to use certain software (collectively, "Electronic Advertising and Software") related to the Franchised Business or the Marks.

   2.2 <u>Interest in Telephone Numbers and Listings</u>. Franchisee has or will acquire during the term of the Franchise Agreement, certain right, title, and interest in and to those certain telephone numbers and regular, classified, internet page, and other telephone directory listings (collectively, the "Telephone Listings") related to the Franchised Business or the Marks.

   2.3 <u>Transfer</u>. On Termination of the Franchise Agreement, or on periodic request of Franchisor, Franchisee will immediately:

DocuSign Envelope ID: 6C9B1631-8644-4DD8-A239-29BB12667B3D

    2.3.1 direct all internet service providers, domain name registries, internet search engines, other listing agencies and software companies (collectively, the "Internet and Software Companies") with which Franchisee has Electronic Advertising and Software: (i) to transfer all of Franchisee's interest in such Electronic Advertising and Software to Franchisor; and (ii) to execute such documents and take such actions as may be necessary to effectuate such transfer.  In the event Franchisor does not desire to accept any or all such Electronic Advertising and Software, Franchisee will immediately direct the Internet and Software Companies to terminate such Electronic Advertising and Software or will take such other actions with respect to the Electronic Advertising and Software as Franchisor directs; and

    2.3.2 direct all telephone companies, telephone directory publishers, and telephone directory listing agencies (collectively, the "Telephone Companies") with which Franchisee has Telephone Listings: (i) to transfer all Franchisee's interest in such Telephone Listings to Franchisor; and (ii) to execute such documents and take such actions as may be necessary to effectuate such transfer.  In the event Franchisor does not desire to accept any or all such Telephone Listings, Franchisee will immediately direct the Telephone Companies to terminate such Telephone Listings or will take such other actions with respect to the Telephone Listings as Franchisor directs.

   2.4 <u>Appointment; Power of Attorney</u>.  Franchisee hereby constitutes and appoints Franchisor and any officer or agent of Franchisor, for Franchisor's benefit under the Franchise Agreement and this Agreement or otherwise, with full power of substitution, as Franchisee's true and lawful attorney-in-fact with full power and authority in Franchisee's place and stead, and in Franchisee's name or the name of any affiliated person or affiliated company of Franchisee, to take any and all appropriate action and to execute and deliver any and all documents that may be necessary or desirable to accomplish the purposes of this Agreement.  Franchisee further agrees that this appointment constitutes a power coupled with an interest and is irrevocable until Franchisee has satisfied all of its obligations under the Franchise Agreement and any and all other agreements to which Franchisee and any of its affiliates on the one hand, and Franchisor and any of its affiliates on the other, are parties, including without limitation this Agreement.  Without limiting the generality of the foregoing, Franchisee hereby grants to Franchisor the power and right to do the following:

    2.4.1 Direct the Internet and Software Companies to transfer all Franchisee's interest in and to the Electronic Advertising and Software to Franchisor, or alternatively, to direct the Internet and Software Companies to terminate any or all of the Electronic Advertising and Software;

    2.4.2 Direct the Telephone Companies to transfer all Franchisee's interest in and to the Telephone Listings to Franchisor, or alternatively, to direct the Telephone Companies to terminate any or all of the Telephone Listings; and

    2.4.3 Execute such standard assignment forms or other documents as the Internet and Software Companies and/or Telephone Companies may require in order to affect such transfers or terminations of Franchisee's interest.

   2.5 <u>Certification of Termination</u>.  Franchisee hereby directs the Internet and Software Companies and Telephone Companies to accept, as conclusive proof of Termination of the Franchise Agreement, Franchisor's written statement, signed by an officer or agent of Franchisor, that the Franchise Agreement has terminated.

   2.6 <u>Cessation of Obligations</u>.  After the Internet and Software Companies and the Telephone Companies have duly transferred all Franchisee's interests as described in paragraph 2.3 above to Franchisor, as between Franchisee and Franchisor, Franchisee will have no further interest in, or obligations

with respect to the particular Electronic Advertising and Software and/or Telephone Listings. Notwithstanding the foregoing, Franchisee will remain liable to each and all of the Internet and Software Companies and Telephone Companies for the respective sums Franchisee is obligated to pay to them for obligations Franchisee incurred before the date Franchisor duly accepted the transfer of such interests, or for any other obligations not subject to the Franchise Agreement or this Agreement.

3.    **Miscellaneous**

3.1    Release.  Franchisee hereby releases, remises, acquits, and forever discharges each and all of the Internet and Software Companies and/or Telephone Companies and each and all of their parent corporations, subsidiaries, affiliates, directors, officers, stockholders, employees, and agents, and the successors and assigns of any of them, from any and all rights, demands, claims, damage, losses, costs, expenses, actions, and causes of action whatsoever, whether in tort or in contract, at law or in equity, known or unknown, contingent or fixed, suspected or unsuspected, arising out of, asserted in, assertible in, or in any way related to this Agreement.

3.2    Indemnification.  Franchisee is solely responsible for all costs and expenses related to its performance, its nonperformance, and Franchisor's enforcement of this Agreement, which costs and expenses Franchisee will pay Franchisor in full, without defense or setoff, on demand.  Franchisee agrees that it will indemnify, defend, and hold harmless Franchisor and its affiliates, and its and their directors, officers, shareholders, partners, members, employees, agents, and attorneys, and the successors and assigns of any and all of them, from and against, and will reimburse Franchisor and any and all of them for, any and all loss, losses, damage, damages, debts, claims, demands, or obligations that are related to or are based on this Agreement.

3.3    No Duty.  The powers conferred on Franchisor hereunder are solely to protect Franchisor's interests and shall not impose any duty on Franchisor to exercise any such powers.  Franchisee expressly agrees that in no event shall Franchisor be obligated to accept the transfer of any or all of Franchisee's interest in any matter hereunder.

3.4    Further Assurances.  Franchisee agrees that at any time after the date of this Agreement, Franchisee will perform such acts and execute and deliver such documents as may be necessary to assist in or accomplish the purposes of this Agreement.

3.5    Successors, Assigns, and Affiliates.  All Franchisor's rights and powers, and all Franchisee's obligations, under this Agreement shall be binding on Franchisee's successors, assigns, and affiliated persons or entities as if they had duly executed this Agreement.

3.6    Effect on Other Agreements.  Except as otherwise provided in this Agreement, all provisions of the Franchise Agreement and attachments and schedules thereto shall remain in effect as set forth therein.

3.7    Survival.  This Agreement shall survive the Termination of the Franchise Agreement.

3.8    Governing Law.  This Agreement shall be governed by and construed under the laws of the State of Mississippi, without regard to the application of Mississippi conflict of law rules.

*-Remainder of page intentionally left blank-*

DocuSign Envelope ID: 6C9B1631-8644-46D8-A239-29BB12267B3D

The undersigned have executed or caused their duly authorized representatives to execute this Internet Advertising, Social Media and Telephone Account Agreement as of the Effective Date.

FRANCHISEE:                                           FRANCHISOR:
ARRAY OF SOAP LLC                                     MAGNOLIA SOAP AND BATH CO. FRCH, LLC

By: _____                        By: _____
Name:  Lindsay Array Williams                         Name:  Magen Bynum
Title:  Owner                                         Title:  Founder & CEO

PRINCIPAL:

By: _____
Name:  Lindsay Array Williams

DocuSign Envelope ID: 6C9B1631-8644-4DD8-A339-29BB12667B3D

**ATTACHMENT 10**

**CONFIDENTIALITY AND NON-COMPETE AGREEMENT**

This Confidentiality and Non-Compete Agreement (the "Agreement") is made and entered into this _____ day of _____, by _____, a(n) ____ _____ ("Franchisee"), a franchisee of Magnolia Soap and Bath Co. FRCH, LLC, a Mississippi limited liability company ("Franchisor"), and _____ _____, an individual ("Covenantor"), in connection with a Franchise Agreement.

April 29, 2023 | 10:07 AM

**WHEREAS,** Franchisee and Franchisor are parties to a franchise agreement dated _____ _____ (the "Franchise Agreement"), whereby Franchisor has granted Franchisee the right to use certain trademarks, including, the trademark "Magnolia Soap and Bath Co" and design, and certain proprietary products, services, promotions and methods (the "System") for the establishment and operation of Magnolia Soap and Bath Co outlets;

**WHEREAS**, in connection with his or her duties, it will be necessary for Covenantor to have access to some or all of the confidential information, knowledge, know-how, techniques, contents of the Magnolia Soap and Bath Co operations manual and other materials used in or related to the System and/or concerning the methods of operation of the System (collectively referred to as "Confidential Information");

**WHEREAS**, the Confidential Information provides economic advantages to Franchisor and licensed users of the System, including Franchisee;

**WHEREAS**, Franchisee has acknowledged the importance of restricting the use, access and dissemination of the Confidential Information, and Franchisee therefore has agreed to obtain from Covenantor a written agreement protecting the Confidential Information and further protecting the System against unfair competition; and

**WHEREAS**, Covenantor acknowledges that receipt of and the right to use the Confidential Information constitutes independent valuable consideration for the representations, promises and covenants made by Covenantor herein.

**NOW, THEREFORE**, in consideration of the mutual covenants and obligations contained herein, the parties agree as follows:

1. **Confidentiality Agreement.**

   **a.** Covenantor shall, at all times, maintain the confidentiality of the Confidential Information and shall use such Confidential Information only in the course of his or her employment by or association with Franchisee in connection with the operation of a Franchised Business under the Franchise Agreement.

   **b.** Covenantor shall not at any time make copies of any documents or compilations containing some or all of the Confidential Information without Franchisor's express written permission.

   **c.** Covenantor shall not at any time disclose or permit the disclosure of the Confidential Information except, and only then to the limited extent necessary, to those employees of Franchisee for training and assisting such employees in the operation of the Franchised Business.

**d.** Covenantor shall surrender any material containing some or all of the Confidential Information to Franchisee or Franchisor, upon request, or upon termination of employment or association with Franchisee.

**e.** Covenantor shall not at any time, directly or indirectly, do any act or omit to do any act that would or would likely be injurious or prejudicial to the goodwill associated with the System.

**f.** Covenantor agrees that no Confidential Information may be reproduced, in whole or in part, without written consent.

**2.** **Covenants Not to Compete.**

**a.** In order to protect the goodwill and unique qualities of the System, and in consideration for the disclosure to Covenantor of the Confidential Information, Covenantor further agrees and covenants that during Covenantor's employment or association with Franchisee, Covenantor shall not, for Covenantor or through, on behalf of or in conjunction with any person or entity:

(i) divert, or attempt to divert, any business or customer of the Magnolia Soap and Bath Co outlet or of other franchisees in the System to any competitor, by direct or indirect inducement or otherwise, or

(ii) participate as an owner, partner, director, officer, employee, consultant or agent or serve in any other capacity in any soap and bath products business substantially similar to the System.

**b.** In further consideration for the disclosure to Covenantor of the Confidential Information and to protect the goodwill and unique qualities of the System, Covenantor further agrees and covenants that, upon the termination of Covenantor's employment or association with Franchisee and continuing for twenty-four (24) months thereafter, Covenantor shall not, for Covenantor or through, on behalf of or in conjunction with any person or entity:

(i) divert, or attempt to divert, any business or customer of the Franchised Business or of other franchisees in the Magnolia Soap and Bath Co System to any competitor, by direct or indirect inducement or otherwise, or

(ii) participate as an owner, partner, director, officer, employee, or consultant or serve in any other managerial, operational, or supervisory capacity in any soap and bath products business within the within ten (10) miles of Franchisee's Territory or any Magnolia Soap and Bath Co location.

**c.** The parties acknowledge and agree that each of the covenants contained herein are reasonable limitations as to time, geographical area, and scope of activity to be restrained and do not impose a greater restraint than is necessary to protect the goodwill or other business interests of Franchisor.

**d.** If the period of time or the geographic scope specified Section 2.b. above, should be adjudged unreasonable in any proceeding, then the period of time will be reduced by such number of months or the geographic scope will be reduced by the elimination of such portion thereof, or both, so that such restrictions may be enforced for such time and scope as are adjudged to be reasonable. In addition, Franchisor shall have the right, in its sole discretion, to reduce the scope of any covenant set forth in this Agreement or any portion thereof, without Covenantor's or Franchisee's consent, effective immediately

DocuSign Envelope ID: 6C9B1631-8644-48D8-A239-29BB12667B3D

upon receipt by Covenantor of written notice thereof, and Covenantor agrees to forthwith comply with any covenant as so modified.

**3.      General.**

     **a.**      Franchisee shall take full responsibility for ensuring that Covenantor acts as required by this Agreement.

     **b.**      Covenantor agrees that in the event of a breach of this Agreement, Franchisor would be irreparably injured and be without an adequate remedy at law.  Therefore, in the event of such a breach, or threatened or attempted breach of any of the provisions hereof, Franchisee is obligated to enforce the provisions of this Agreement and shall be entitled, in addition to any other remedies that are made available to it at law or in equity, to a temporary and/or permanent injunction and a decree for the specific performance of the terms of this Agreement, without the necessity of showing actual or threatened harm and without being required to furnish a bond or other security.

     **c.**      Covenantor agrees to pay all expenses (including court costs and reasonable attorneys' fees) incurred by Franchisor and Franchisee in enforcing this Agreement.

     **d.**      Any failure by Franchisee to object to or take action with respect to any breach of any provision of this Agreement by Covenantor shall not operate or be construed as a waiver of or consent to that breach or any subsequent breach by Covenantor.

     **e.**      THIS AGREEMENT SHALL BE INTERPRETED BY AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF MISSISSIPPI, WITHOUT REFERENCE TO MISSISSIPPI CHOICE OF LAW PRINCIPLES.  COVENANTOR HEREBY IRREVOCABLY SUBMITS HIMSELF OR HERSELF TO THE JURISDICTION OF THE STATE AND FEDERAL COURTS OF THE STATE OF MISSISSIPPI.  COVENANTOR HEREBY WAIVES ALL QUESTIONS OF PERSONAL JURISDICTION OR VENUE FOR THE PURPOSE OF CARRYING OUT THIS PROVISION.  COVENANTOR HEREBY AGREES THAT SERVICE OF PROCESS MAY BE MADE UPON COVENANTOR IN ANY PROCEEDING RELATING TO OR ARISING UNDER THIS AGREEMENT OR THE RELATIONSHIP CREATED BY THIS AGREEMENT BY ANY MEANS ALLOWED BY MISSISSIPPI OR FEDERAL LAW.  COVENANTOR FURTHER AGREES THAT VENUE FOR ANY PROCEEDING RELATING TO OR ARISING OUT OF THIS AGREEMENT SHALL BE IN MISSISSIPPI; PROVIDED, HOWEVER, WITH RESPECT TO ANY ACTION THAT INCLUDES INJUNCTIVE RELIEF OR OTHER EXTRAORDINARY RELIEF, FRANCHISOR OR FRANCHISEE MAY BRING SUCH ACTION IN ANY COURT IN ANY STATE THAT HAS JURISDICTION.

     **f.**      The parties agree that each of the foregoing covenants contained herein shall be construed as independent of any other covenant or provision of this Agreement.

     **g.**      Covenantor acknowledges and agrees that each of the covenants contained herein will not impose any undue hardship on Covenantor since Covenantor has other considerable skills, experience and education which affords Covenantor the opportunity to derive income from other endeavors.

     **h.**      This Agreement contains the entire agreement of the parties regarding the subject matter hereof.  This Agreement may be modified only by a duly authorized writing executed by all parties.

     **i.**      All notices and demands required to be given hereunder shall be in writing, and shall be delivered personally or by certified or registered mail, postage prepaid, addressed to the party for whom

intended, and shall be deemed given on the date of delivery or the date delivery is refused. All such notices shall be addressed to the party to be notified at the following addresses:

     If directed to Franchisee:

     _____

     _____

     If directed to Covenantor:

     _____

     _____

     Any change in the foregoing addresses shall be effected by giving written notice of such change to the other parties.

     **j.**     Franchisor is an intended third-party beneficiary of this Agreement, and Franchisor may take whatever action it deems necessary to enforce Covenantor's obligations hereunder. The rights and remedies of Franchisor under this Agreement are fully assignable and transferable and shall inure to the benefit of its respective affiliates, successors and assigns.

     **k.**     The respective obligations of Franchisee and Covenantor hereunder may not be assigned by Franchisee or Covenantor, without the prior written consent of Franchisor.

     The undersigned have entered into this Confidentiality and Non-Compete Agreement as witnessed by their signatures below.

                     FRANCHISEE:

                     _____

                     By: _____
                     Name: _____
                     Title: _____

                     COVENANTOR:

                     _____

                     Name: _____