**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**ARRAY OF SOAP, LLC,**

**Plaintiff,**

**v.**

**MAGNOLIA SOAP AND BATH CO. FRCH, LLC, et al.,**

**Defendants.**

**Case No. 2:25-cv-339**

**JUDGE DOUGLAS R. COLE**
**Magistrate Judge Vascura**

## OPINION AND ORDER

This is a franchise dispute. Defendants, the franchisor and two of its employees, have moved for various alternate forms of relief. First, they ask that the Court dismiss this matter because the parties' Franchise Agreement requires franchisees to seek mediation before suing. But the Court **DENIES** that request because Magnolia failed to timely invoke its right to mediate. In the alternative, Defendants ask the Court to transfer the matter to federal court in Mississippi. The Court also **DENIES** that request, as Ohio public policy requires the case to remain here. Finally, Defendants ask the Court to dismiss all claims against Defendant Magen Bynum, and to dismiss Plaintiff's Lanham Act and Ohio Deceptive Trade Practices Act claims. The Court **GRANTS** that request as to the former, but not the latter. In sum, the Court **GRANTS IN PART** the Motion to Dismiss (Doc. 42), dismissing all claims against Magen Bynum, but **DENIES** the rest.

## BACKGROUND[1]

Plaintiff Array of Soap, LLC, operates a Magnolia Soap & Bath Co. franchise in Lancaster, Ohio. (Doc. 41, #1850). Defendant Magnolia Soap and Bath Co. FRCH, LLC, owns the Magnolia brand. (*Id.*). The other two named defendants are Magnolia employees, with Defendant Bynum also being the founder and owner. (*Id.*). Suffice to say, Array has some gripes with its franchisor. In short, Array alleges that Defendants induced it to enter a franchise agreement through fraudulent misrepresentations and have now broken other promises made in that agreement.

The Magnolia brand offers various home products including soaps, laundry detergent, and face, body, and haircare products. (*Id.*). According to Bynum, Magnolia was founded on the premise of creating safer alternatives for sensitive skin by using plant-based, domestically sourced ingredients and phthalate-free fragrances, and by avoiding harsh chemicals. (*Id.* at #1851). That origin story intrigued Mrs. Williams[2] (the owner of Array), and so she contacted Magnolia in December 2022 to inquire about franchising opportunities. (*Id.*).

The next month, Magnolia made its pitch to Williams by providing a Franchise Disclosure Document (FDD) containing various representations about Magnolia's franchisee businesses. (*Id.*; Doc. 41-1 (attaching FDD)). That document also laid out the relationship between Magnolia and its various franchise locations. For example,

[1] Because this matter comes before the Court on various motions to dismiss under Rule 12(b)(6) and Rule 12(b)(1), the Court must accept the well-pleaded allegations in the complaint as true. *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). But the Court reminds the reader that they are just that—allegations.

[2] The complaint refers to her only as "Mrs. Williams," but the franchise agreement shows that her name is Lindsay Array Williams. (Doc. 8-1, #596).

the FDD explained that individual shops, like the one Array would be opening, must purchase "all proprietary ingredients and raw materials, facial products, packaging and supplies" through the Franchisor, but that the "[Franchisor] did not earn revenue on the sale of these items to [the] franchisees." (Doc. 41, #1851). It also estimated that those purchases would constitute approximately 25% of costs for a franchisee operation. (*Id.*).

Importantly, the FDD also represented the revenue received by each corporate and licensed outlet that operated throughout 2021—with $218,035 as the low end and $758,037 as the high end. (*Id.* at #1852). Finally, the FDD stated that before a franchisee opens its doors, Magnolia provides a trainer to give two days of on-site assistance and creates a grand opening advertising campaign. (*Id.*).

As part of the pitch, Defendant Emily Burriss, Magnolia's franchise director, held a video conference with Williams and her husband, Ben. (*Id.*). During that call, Magnolia represented that the net profits for the locations listed in the FDD were between 30–40%. (*Id.*). A few weeks later Burriss followed up with an email to Ben, where she represented potential expenses by using a particular store as an example. (*Id.*; Doc. 41-2, #2001). There, she represented the cost of goods sold as follows: "Ceiling of 30% as it fluctuates with national and global supply chain, inflation, etc., currently 25%, but working on getting it to 20%." (Doc. 41, #1852 (quoting Doc. 41-2, #2001)).[3]

[3] Cost of goods sold (or COGS) is not typically expressed as a proportion. Rather, in the retail setting, it simply refers to the dollar amount that the retailer pays the wholesaler for the goods. Perhaps, though, the parties were intending to discuss a COGS ratio, which is the cost

Just over three months later, on April 29, 2023, Array entered into the Franchise Agreement with Magnolia. (*Id.* at #1853; Doc. 41-3 (attaching agreement)). There, Array agreed to pay Magnolia an initial franchise fee of $49,500. (Doc. 41, #1853). Array also agreed to pay a monthly royalty fee equal to 6% of gross sales and make a brand fund contribution equal to 2% of gross sales. (*Id.*). Of course, payments to Magnolia were only part of the expenses Array incurred in setting up shop. For example, Array entered a commercial lease, and it also paid to renovate and furnish the premises. (*Id.*).

On September 28, 2023, Array opened the doors of its Magnolia franchise. (*Id.*). But its relationship with Magnolia soured from the get-go—Magnolia did not provide the promised two days of on-site training, nor did it create a grand opening advertising campaign, both of which the Franchise Agreement required. (*Id.*). Soon thereafter, Array learned that Magnolia, in its role as its franchisees' exclusive supplier, was severely up-charging (anywhere from 8% to 402%) for ingredients and materials. (*Id.*). Array offers some examples:

> Magnolia charges Array $9.75/lb. for arrowroot whereas retailers[4] charge $3.13/lb.; Magnolia charges Array $19.00/lb. for white mica whereas retailers charge $8.75/lb.; Magnolia charges Array $8.00/oz. for Vitamin E oil whereas retailers charge $1.99/oz; and Magnolia charges Array $40.00/lb. for menthol crystals whereas retailers charge $15.50/lb.

---

of goods sold divided by the net sales. In a sense, the COGS ratio is a measure of a retailer's gross margin. *See* Mike McCracken, *Cost of Goods Sold (COGS): The Formula and Why it Matters*, McCracken, https://www.mccrackenalliance.com/blog/cost-of-goods-sold-cogs-the-formula-and-why-it-matters [https://perma.cc/UL7F-FAVK].

[4] The Court understands "retailers" to refer to other sources from which Array could have purchased the component.

(*Id.* at #1854). In practice, Array's purchase of goods from Magnolia costs "approximately 39% of its revenues," substantially higher than the 30% (and dropping) cost of goods sold ratio that Magnolia allegedly promised. (*Id.* at #1852, 1854).

Aside from the price markups, Magnolia was also a poor supplier. Some 90% of the orders Array received from Magnolia were missing products, contained incorrect quantities, or included products Array did not order. (*Id.* at #1854). And when a product was out of stock, or an order otherwise could not be fulfilled, Magnolia did not inform Array, meaning Array did not learn that it was missing ingredients until after delivery. (*Id.*). Indeed, some of the brand's core items—e.g., shampoo and conditioner bars, charcoal masks, exfoliating face scrub and Vitamin C—are regularly out of stock in Magnolia's warehouse. (*Id.*). The shortages included ingredients: e.g., white mica, a necessary ingredient for the soap-making process, was out of stock for weeks at a time. (*Id.*). And dryer balls, a product that should be readily procurable from multiple sources, were out of stock for 3–4 months during the 2023 holiday season. (*Id.*). These delivery issues and product shortages severely impact profit margins. (*Id.*). Array communicated its concerns to Magnolia about both cost and availability issues on many occasions, but Magnolia remained "unrelenting" in requiring Array to procure all raw ingredients, products, and supplies directly from Magnolia. (*Id.*).

Since opening a franchise, Array also learned that the revenue and profit figures disclosed in the FDD were false and misleading for a host of reasons. (*Id.* at

#1855). For one, Array has since learned that the revenue reported for the two highest performing stores included online revenue, even though the FDD expressly represented that online sales were excluded from revenue totals. (*Id.*). Array also believes that Magnolia included collected sales tax, as well as revenue from "wholesale purchases,"[5] in those figures to inflate the totals. (*Id.*). Array also says that the revenue figures created a false impression of the potential earnings of a franchise by including figures for corporate and licensed outlets, which are not franchises. (*Id.*). The FDD failed to disclose whether those types of stores had to pay the same fees or royalties to Magnolia that a franchisee would, thereby potentially inflating their reported profitability. (*Id.*). Additionally, Magnolia disclosed on its website that that its top 20% of franchise owners make $615,252 in revenue. (*Id.*). But Array has learned that this is not true. (*Id.*). In fact, Magnolia reported to Array in a town hall presentation that its top three stores earned revenues of $646,940.18, $601,187.96 and $586,750.84, making the reported top 20% figure mathematically impossible. (*Id.* at #1856). That is, if the calculated average for *the top 3* stores is $611,626.33, how could Magnolia's reported average for *the top 20%* (which includes more stores) be higher? All told, Array was misled into believing that franchises were more profitable and more sustainable than they truly are. (*Id.* at #1855–56).

Further, while Magnolia makes representations in the FDD regarding its assets, liabilities, profits, and losses, Array discovered that Bynum and Magnolia failed to maintain proper bookkeeping procedures—presumably raising questions

[5] The complaint does not explain how or why franchisees (who are typically retailers) were generating revenue from wholesale purchases.

about the veracity of those figures. (*Id.* at #1855). In fact, Bynum used Magnolia to pay personal expenses and commingled assets, distorting any financial representations that Magnolia made to Array. (*Id.*).

Finally, Array learned that Magnolia is also making misrepresentations about its products and ingredients. (*Id.* at #1856). Defendants have consistently represented that Magnolia's products are domestically sourced and phthalate-free. (*Id.*). Indeed, Magnolia's packaging, marketing, and website all represent as much. (*Id.*). Relying on that, Array advertises and informs its own customers that its products are domestically sourced and phthalate-free. (*Id.*). But Magnolia has since disclosed to Array that many of its fragrances do in fact contain phthalates and that some of its ingredients are not domestically sourced. (*Id.*).

Due to those various misrepresentations, some fifteen months after Array opened its franchise store, Array decided to pursue claims against Magnolia. (*Id.*). To that end, on December 11, 2024, Array sent written notice of its claims to Bynum via certified mail at the address specified in the introductory paragraph of the Franchise Agreement. (*Id.*; Doc. 41-4 (attaching demand letter)). A return receipt from the United States Postal Service confirmed that the demand letter was delivered on December 13. (Doc. 41, #1856; Doc. 41-5 (attaching return receipt)).

Those dates matter because, under the Franchise Agreement, Magnolia had thirty days after it received notice to submit Array's claims to mandatory mediation. (Doc. 41, #1857; Doc. 41-3, #2038). Having received no response by January 2, 2025, Array sent a second copy of its demand letter to a different address, a location that

Array understood to be Magnolia's corporate office. (Doc. 41, #1857; Doc. 41-6 (attaching demand letter)). USPS left a notice of delivery of the second letter at the address on January 6. (Doc. 41, #1857; Doc. 41-7 (attaching USPS tracking information)). The thirty-day deadline for the first demand letter, January 12, 2025, came and went, and Magnolia failed to submit Array's claims to mediation. (*Id.*).

After that deadline passed, presumably because Magnolia had still not responded, Array sent its demand letter (for a third time) to four new locations: Bynum's residential address, two Magnolia stores operated by Bynum, and a Magnolia warehouse. (*Id.*; Doc. 41-8). Defendants never provided a counteroffer to Array's demands. (Doc. 41, #1857). Based on the above, Array says it has satisfied the conditions set forth in the Franchise Agreement required to proceed to litigation. (*Id.*).

In its complaint, Array asserts six claims against Defendants: (1) a violation of the Ohio Business Opportunity Plans Act, Ohio Rev. Code Ann. § 1334.01 et seq. (West 2012), (2) fraud, (3) breach of contract, (4) unjust enrichment, (5) a violation of the Lanham Act, 15 U.S.C. § 1125, and (6) a violation of the Ohio Deceptive Trade Practices Act, Ohio Rev. Code Ann. § 4165.01 et seq. (West 2025) (Doc. 41, #1858–65).

Defendants now collectively move to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (Doc. 42, #2088). First, Defendants argue that the Franchise Agreement requires that Array mediate its disputes with Magnolia, in Mississippi, before bringing suit, which Array did not do. (*Id.*). In the alternative, Defendants ask the Court to transfer this matter to the United States District Court

for the Northern District of Mississippi under 28 U.S.C. § 1404(a) based on a mandatory forum selection clause in the Franchise Agreement. (*Id.*). Finally, if the Court declines to dismiss or transfer the case, the Defendants ask the Court to dismiss Bynum as a defendant and to dismiss the Lanham Act and Ohio Deceptive Trade Practices Act claims for failure to state a claim. (*Id.* at #2089).

Array responded, (Doc. 46), and Defendants replied, (Doc. 49), so the motion is now ripe.

## LEGAL STANDARD

Defendants move to dismiss this action. While they style their motion as brought first under Federal Rule of Civil Procedure 12(b)(1) and, in the alternative, Rule 12(b)(6), that framing does not quite capture the full picture. (*See* Doc. 42, #2088). To start, their claim that the Court should dismiss because Array failed to first mediate the dispute is brought under *both* Rule 12(b)(1) and Rule 12(b)(6). (*Id.* at #2096). Then their argument in the alternative—that the Court should transfer the case under 28 U.S.C. § 1404(a) because of the Franchise Agreement's forum selection clause—is not a 12(b) motion at all. (*Id.* at #2098). So it is only Defendants' remaining arguments—that the claims against Bynum, as well as the Lanham Act and Ohio Deceptive Trade Practices Act claims, should be dismissed—that are traditional Rule 12(b)(6) arguments. (*Id.* at #2105–09).

But before the Court lays out the legal standards for each of those various motions, it must determine whether Rule 12(b)(1) or 12(b)(6) is the proper route for a party to enforce a pre-suit alternative dispute provision. That is because while the

standard the Court employs to analyze each is "similar," they are separate inquiries—a Rule 12(b)(1) factual challenge to subject-matter jurisdiction does not require a court to take the complaint's factual allegations as true. *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990). Here, Defendants simply cite both rules, presumably in an effort to cover all their bases. (Doc. 42, #2096). Notably, courts in this District have taken both approaches. *See, e.g.*, *Brave Optical, Inc. v. Luxottica of America, Inc.*, No. 1:23-cv-793, 2024 WL 3173504, at *3–6 (S.D. Ohio June 26, 2024) (applying 12(b)(6)); *Gate Precast Co. v. Kenwood Towne Place, LLC*, No. l:09-cv-00113, 2009 WL 3614931, at *1–2 (S.D. Ohio Oct. 28, 2009) (applying 12(b)(1)). Ultimately, the Court finds Rule 12(b)(6) to be a better fit. That is because parties contracting to a condition precedent to suit "has no relevance to the question of whether a given case satisfies constitutional definitions of jurisdiction." *City of Benkelman v. Baseline Eng'g Corp.*, 867 F.3d 875, 880–81 (8th Cir. 2017). So the Court will assess the mediation issue under Rule 12(b)(6), meaning that is the standard that applies to all arguments aside from the 28 U.S.C. § 1404(a) motion to transfer venue.

To survive a motion to dismiss under Rule 12(b)(6), Plaintiffs must allege "sufficient factual matter … to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation modified). While a "plausible" claim for relief does not require a showing of *probable* liability, it requires more than "a sheer possibility that a defendant has acted unlawfully." *Id.* (citation omitted). The Amended Complaint must allege sufficient facts that allow the Court to "draw the

reasonable inference that the defendant is liable." *Id.* And at the motion-to-dismiss stage, the Court accepts the facts of the complaint as true. *Id.*

But that does not mean the Court must take everything Plaintiffs allege as gospel, no matter how far-fetched. The Court may disregard "naked assertions" of fact or "formulaic recitations of the elements of a cause of action." *Id.* (citations modified). Additionally, the Court may grant a motion to dismiss "on the basis of a dispositive issue of law." *Neitzke v. Williams*, 490 U.S. 319, 326 (1989) (citations omitted). In the context of Defendants' argument relating to pre-suit mediation then, Array must plausibly allege facts that allow this Court to reasonably infer that the Franchise Agreement does not bar this suit.

A court analyzing a motion to dismiss under Rule 12(b)(6) generally must confine its review to the pleadings. *Armengau v. Cline*, 7 F. App'x 336, 343 (6th Cir. 2001). That said, the Sixth Circuit has "taken a liberal view of what matters fall within the pleadings for purposes of Rule 12(b)(6). If referred to in a complaint and central to the claim, documents attached to a motion to dismiss form part of the pleadings." *Id.* at 344.

Turning to the standard for motion to transfer venue, 28 U.S.C. § 1404(a) provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." Deciding whether transfer under § 1404 is appropriate involves a two-step inquiry. First, as the statutory text suggests, the Court must determine whether the action "might have been brought" in the transferee court. *See*

*Sky Tech. Partners, LLC v. Midwest Rsch. Inst.*, 125 F. Supp. 2d 286, 291 (S.D. Ohio 2000). Second, the Court must decide whether the circumstances "weigh heavily in favor of the transfer." *Kuvedina, LLC v. Cognizant Tech. Sols.*, 946 F. Supp. 2d 749, 761 (S.D. Ohio 2013) (citing *Van Dusen v. Barrack*, 376 U.S. 612, 645–46, (1964)). The second step is met where transfer would "prevent wastes of time, energy and money, as well as ... protect the litigants, witnesses and the public against unnecessary inconvenience and expense." *Zimmer Enters., Inc. v. Atlandia Imps., Inc.*, 478 F. Supp. 2d 983, 990 (S.D. Ohio 2007) (citing *Van Dusen v. Barrack*, 376 U.S. 612 (1964)).

The party seeking transfer under § 1404(a) bears the burden of showing that the relevant factors weigh "strongly in favor of" transfer. *Boyajyan v. Columbus Fin. Grp., Inc.*, 2007 WL 4410242, at *1 (S.D. Ohio Dec. 13, 2007). That is because generally, "unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Reese v. CNH Am. LLC*, 574 F.3d 315, 320 (6th Cir. 2009) (citation omitted). Ultimately, the district court has "broad discretion to grant or deny a motion to transfer." *Phelps v. McClellan*, 30 F.3d 658, 663 (6th Cir. 1994) (citation omitted).

## LAW AND ANALYSIS

The Court tackles Defendants' arguments in order: (1) the motion to dismiss for failure to mediate, (2) the motion to transfer venue to Mississippi, (3) the motion to dismiss claims against Bynum as an individual, and (4) the motion to dismiss Array's state and federal false advertising claims. Ultimately, the Court grants the motion as to the claims against Bynum, but denies the rest.

### A. The Court Declines to Dismiss the Matter Based on the Franchise Agreement's Dispute Resolution Provision Because Array Satisfied the Provision's Conditions.

Defendants' threshold argument seeks dismissal on the grounds that Array failed to mediate[6] its dispute before bringing this suit. (Doc. 42, #2096; *see* Doc. 41-3, #2038). Under the Franchise Agreement, if a dispute arises, the parties must first attempt to resolve disputes among themselves. (Doc. 41-3, #2038). And, if those informal attempts at resolution fail, Array must provide Magnolia with written notice of any intent to pursue a claim before filing suit. (*Id.*). After receiving that notice, Magnolia has thirty days to submit the dispute to non-binding mediation, which takes place at Magnolia's corporate headquarters. (*Id.*). Here Magnolia maintains that, while it elected to mediate this matter, Array filed suit before any mediation occurred. (Doc. 42, #2096–97). So, Magnolia asks the Court to dismiss the suit to allow the parties to mediate Array's claims. (*Id.* at #2098).

That argument has some purchase. A party's non-compliance with a mandatory mediation provision can require dismissal. *See Gate Precast Co.*, 2009 WL 3614931, at *3–4; *see also Bill Call Ford, Inc. v. Ford Motor Co.*, 830 F. Supp. 1045, 1053 (N.D. Ohio 1993) (granting summary judgment where plaintiff failed to satisfy contract requirement to mediate before filing suit).

Indeed, if the contract provision does in fact apply here, allowing the case to go forward would "go against federal courts' well-established policy of encouraging

[6] While not relevant to the Court's holding today, the Court pauses to note that the parties did eventually participate in court-ordered mediation on July 22, 2025, which was unsuccessful. (Doc. 41, #1857).

nonjudicial dispute resolution." *Brave Optical*, 2024 WL 3173504, at *5 (citations omitted).

But Defendants also potentially have a problem. Array says that *Defendants* are the ones that failed to follow the Franchise Agreement's procedures. (Doc. 46, #2147–48). According to Array, it sent a demand letter, (Doc. 41-4), which was received on December 13, 2024, (Doc. 41-5), and Magnolia failed to exercise its right to mediation within the thirty-day-window, (Doc. 46, #2147–48).

Ultimately, the Court agrees with Array. According to Defendants' own averments, they first requested mediation on February 14, 2025, some sixty-three days after the December 13, 2024, delivery date noted above. (Doc. 42, #2114; Doc. 41, #1856).

True, Defendants swear that they never actually *received* that demand letter. (Doc. 42, #2114). But, per the terms of the Franchise Agreement, the thirty-day-clock started as soon as Magnolia received "notice" as the agreement defines that term. (*See* Doc. 41-3, #2038, 2040). And the contractual definition of that term is pretty straightforward. The Franchise Agreement requires notice to be in writing, delivered personally or by certified mail, postage prepaid, addressed to the party for whom intended, and "shall be deemed given on the date of delivery or delivery is refused." (*Id.* at #2040). Further, the Franchise Agreement sets out the address to which Array must send notice—119 West Bankhead Street, New Albany, Mississippi, 38652. (*Id.* at #2004, 2040). The record evidence shows that is where Array sent the first demand letter, and that it did so by certified mail. (Doc. 41, #1856; Doc. 41-5, #2070). And the

certified mail receipt shows that someone signed for it there. (Doc. 41-5, #2070). So, under the Franchise Agreement's plain language, Array gave notice on December 13, 2024, which in turn means that Magnolia had until January 12, 2025, to submit Array's claims to mediation.

Array plausibly alleges facts showing that it complied with all the requirements set forth in the Franchise Agreement to allow Magnolia to demand mediation if it wished. And under the plain language of that agreement, Bynum's averment that she never received the initial demand letter simply does not matter. (Doc. 42, #2114). Rather, according to the bargained-for terms of the contract that Defendants are now seeking to enforce, notice is "deemed given" when sent in the appropriate fashion, whether Magnolia, or Bynum, actually received the demand or not.

### B. The Court Declines to Transfer the Case Under 28 U.S.C. § 1404(a) at This Stage Because the Record Is Insufficient to Determine Whether the Franchise Agreement's Forum-Selection Clause Is Enforceable Under Ohio Law.

Next, Defendants argue that the Court should transfer the entire matter to federal court[7] in Mississippi under 28 U.S.C. § 1404(a). (Doc. 42, #2098). Once again, they base their argument on a section of the Franchise Agreement. Section 20.3 of the Franchise Agreement provides that, unless prohibited by law, all disputes must

[7] Because Defendants seek to move the case to another *federal* forum, § 1404(a), rather than a forum non conveniens motion, is the right vehicle. *Atl. Marine Constr. Co., Inc. v. U.S. Dist. Ct. for the W. Dist. of Tex.*, 571 U.S. 49, 59 (2013).

be litigated in Mississippi state or federal courts, and under Mississippi law. (Doc. 41-3, #2038).

"In the typical case not involving a forum-selection clause, a district court considering a § 1404(a) motion (or a *forum non conveniens* motion) must evaluate both the convenience of the parties and various public-interest considerations." *Atlantic Marine*, 571 U.S. at 62. "The calculus changes, however, when the parties' contract contains a valid forum-selection clause, which 'represents the parties' agreement as to the most proper forum.'" *Id.* at 63 (quoting *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 31 (1988)). For that reason, the Supreme Court has held that a forum-selection clause should be given "controlling weight in all but the most exceptional cases." *Id.*

But that controlling weight only comes into play if the forum-selection clause is applicable, mandatory, valid, and enforceable.[8] *Lakeside Surfaces, Inc. v. Cambria Co., LLC*, 16 F.4th 209, 215 (6th Cir. 2021). Here, the parties only dispute the clause's enforceability.

Generally, there is a "strong presumption in favor of enforceability," but it can be overcome by showing one of four things: (1) the clause was obtained by fraud, duress, or other unconscionable means; (2) the designated forum would ineffectively or unfairly handle the suit; (3) the designated forum would be so seriously

---

[8] While *Lakeside* is discussing a forum-non-conveniens analysis, *Atlantic Marine* instructs that Courts should evaluate them largely the same. 571 U.S. at 61 ("[C]ourts should evaluate a forum-selection clause pointing to a nonfederal forum in the same way that they evaluate a forum-selection clause pointing to a federal forum.").

inconvenient that requiring the plaintiff to bring suit there would be unjust; or (4) enforcing the forum selection clause would contravene a strong public policy of the forum state. *Id.* at 219–20 (citations omitted). Once again, Array keeps its arguments narrow, invoking only the fourth basis. (Doc. 46, #2156). In that regard, Array points to the Ohio Business Opportunity Plans Act (OBOPA), Ohio Rev. Code Ann. § 1334 et seq. (Doc. 46, #2139). That statute renders "void" any provision in a franchise agreement "restricting jurisdiction or venue to a forum outside of this state, or requiring the application of laws of another state." *Id.* § 1334.06(E).

In the end, that argument hits its mark, at least for now. In *Lakeside*, the Sixth Circuit considered an analogous situation. There, a Michigan-based franchisee sued its Minnesota-based franchisor in Michigan federal court, despite the parties' agreement containing a choice-of-law provision and forum-selection clause requiring both Minnesota law and venue. *Id.* at 212–14. Like this case, the plaintiff argued that the clause was unenforceable under the public policy exception, pointing to a Michigan law that purported to "render[] 'void and unenforceable' any provision in a franchise agreement 'requiring that … litigation be conducted outside this state.'" *Id.* at 220 (quoting Mich. Comp. Laws. § 445.1527(f)). The Sixth Circuit agreed and found that prohibition to represent "a strong Michigan public policy" that made the forum-selection clause unenforceable. *Id.* at 220–21.

Just like the Michigan law in *Lakeside*, the OBOPA states that "any provision in an agreement restricting jurisdiction or venue to a forum outside of this state, or requiring the application of laws of another state, is void with respect to a claim

otherwise enforceable under [the OBOPA].” Ohio Rev. Code Ann. § 1334.06(E). And elsewhere in the OBOPA, the Ohio legislature declares that the act itself “represents a fundamental public policy” of the state. *Id.* § 1334.15(A). And once again for good measure, it states that any “venue or choice of law provision that deprives a [franchisee] who is an Ohio resident of the benefit[s] of [the OBOPA] is contrary to public policy and is void and unenforceable.” *Id.* § 1334.15(B). Those provisions make clear that Ohio has a strong public policy of prohibiting forum-selection clauses of the exact type found in the Franchise Agreement.

Indeed, after it received a franchisee-franchisor dispute via a 28 U.S.C. § 1404(a) transfer, an Arizona District Court interpreted the above provisions and found choice of law and venue provisions in a franchise agreement to be invalid under Ohio law and sent the case back to Ohio. *Zounds Hearing Franchising, LLC v. Bower*, No. cv-16-1462, 2017 WL 4399487, at *8–9, 12 (D. Ariz. Sep. 19, 2017). Also of note, the Franchise Agreement in this matter itself states that it does not apply where it is “specifically prohibited by law.” (Doc. 41-3, #2038). So that would seem to put an end to Magnolia’s request.

But not so fast, Magnolia says. OBOPA exempts from its coverage “[a]ny transaction that complies in all material respects with the trade regulation rule of the federal trade commission, ‘disclosure requirements and prohibitions concerning franchising’” as set out in 16 C.F.R. § 436.1 et seq. Ohio Rev. Code. Ann. § 1334.13(A). And Magnolia says it complied with that FTC rule by providing Array with its most recent FDD before the parties entered into the Franchise Agreement, meaning

OBOPA does not apply. (Doc. 42, #2103). But the problem with that argument is that it intertwines the forum selection issue with the merits. After all, the complaint explicitly alleges that Magnolia did "not comply in all material respects with the federal disclosure requirements found in 16 C.F.R. § 436.1 et seq." (Doc. 41, #1859 (listing five examples where Magnolia misrepresented material details in the FDD)). And at this point, Magnolia offers no argument why those allegations fail as a matter of law.

The limited record prevents the Court from resolving this merits dispute at this early stage. Meaning, as things stand, the forum-selection clause is unenforceable. So the Court must deny the § 1404(a) motion. If, at a later stage in the litigation, Defendants can demonstrate that Magnolia did comply with the FTC rule in all material respects, they are free to renew their motion to transfer.

### C. The Court Grants Defendants' Motion to Dismiss the Claims Against Bynum Because Array Fails to Plausibly Allege a Basis for Piercing the Corporate Veil.

Defendant Bynum owns Magnolia Bath & Soap. So, according to Array, Bynum should be liable under each count it brings as "Magnolia is her alter ego." (Doc. 41, #1860). That assertion runs contrary to a strong presumption that underlies corporate law—"'normally, shareholders, officers, and directors are not liable for the debts of the corporation' they represent." *Peopletec, Inc. v. Sols. Through Innovative Techs., Inc.*, No. 3:25-cv-362, 2026 WL 1074112, at *4 (S.D. Ohio Apr. 21, 2026) (quoting *Belvedere Condo. Unit Owners' Ass'n. v. R.E. Roark Cos., Inc.*, 617 N.E.2d 1075, 1085 (Ohio 1993)). So the Court must determine whether Array has plausibly

alleged a basis for ignoring that rule, thereby allowing Array to pierce the corporate veil.

As a first step in that analysis, the Court must decide which state's law to apply. And remember that, above, the Court found the Franchise Agreement's choice of law provision unenforceable under the OBOPA, *supra* Part B, which complicates the question somewhat. Still, most courts seem to agree that a federal court should apply the state law of incorporation when ruling on veil-piercing questions. *MA Equipment Leasing I LLC v. Tilton*, No. 2:09-cv-880, 2010 WL 11538520, at * 8 (S.D. Ohio Aug. 19, 2010) (collecting cases). Magnolia is a Mississippi LLC. (Doc. 41, #1850). So the Court applies Mississippi law. (*Id.*).

Under Mississippi law, for a court to disregard the LLC structure and hold an owner liable, the complaining party must show credible evidence of three things: "(a) some frustration of contractual expectations regarding the party to whom he looked for performance; (b) the flagrant disregard of corporate formalities by the defendant corporation and its principals; [and] (c) a demonstration of fraud or other equivalent misfeasance on the part of the corporate shareholder." *Gecko Outdoor Prods. Corp. v. Casablanca Constr. Inc.*, 250 So.3d 508, 513 (Miss. Ct. App. 2018) (quoting *Gray v. Edgewater Landing Inc.*, 541 So.2d 1044, 1047 (Miss. 1989)). Mississippi, like most jurisdictions, "disfavors piercing the corporate veil except in clearly extraordinary situations." *Id.* (citation omitted).

Array has not plausibly alleged that this is one of those situations. Sure, Array alleges that Bynum participated in the alleged unlawful activity, including the claim

for fraud, by preparing the FDD. (Doc. 41, #1851). But even if the Court credits Plaintiff as demonstrating the third element, the first two remain unmet. As to the first, the complaint offers no facts supporting any inference that Array thought it was contracting with Bynum, rather than Magnolia, the business entity. *See Gray*, 541 So.2d at 1047. As to the second, Array attempts to assert, for example, that "Bynum dominates and controls Magnolia to the extent that Magnolia has no separate mind, will, or existence of its own" and that she exercised that control "to commit fraud and other unlawful conduct." (Doc. 42, #1850). But the problem is that those are bare legal conclusions couched as factual allegations—exactly the kind of allegations that the Supreme Court has instructed lower courts to ignore. *See Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Array must instead plead *facts* that allow the Court to reasonably infer that Bynum flagrantly disregarded corporate formalities.

The closest Array comes to pleading actual facts is its allegation that it discovered that "Bynum and Magnolia failed to maintain separate bank accounts and proper books and records, and failed to observe corporate formalities." (Doc. 41, #1855). Specifically, "Bynum used Magnolia to pay her personal expenses and commingle assets." (*Id.*). While this makes things perhaps a closer call, these allegations ultimately still lack any specifics from which the Court could infer a "flagrant disregard of corporate formalities." *Gecko*, 250 So.3d at 513. For example, what expenses were allegedly paid and what assets were commingled? Again, under Mississippi law, piercing the corporate veil is an extraordinary remedy, and corporate

identity should "be maintained unless to do so would subvert the ends of justice." *Johnson & Higgins v. Comm'r of Ins. of Miss.*, 321 So.2d 281, 284 (Miss. 1975). Array has not plausibly alleged a factual basis that clears that high hurdle here, so the Court dismisses the claims against Defendant Bynum.

### D. The Court Denies Defendants' Motion to Dismiss Array's Lanham Act and Ohio Deceptive Trade Practices Act Claims.

Array brings claims under the Lanham Act and Ohio Deceptive Trade Practices Act (ODTPA). (Doc. 41, #1863–64). Both claims are essentially false advertising claims. Specifically, Array alleges that Defendants made false and misleading statements regarding Magnolia's finances and products deceiving franchisees and consumers alike—including deceiving Array into entering the Franchise Agreement. (*Id.*). Defendants seek to dismiss those claims based on another contract provision: the Franchise Agreement's integration clause. (Doc. 42, #2108; Doc. 41-3, #2040 ("Entire Agreement" clause at 21.4)). In short, Defendants argue that any representations they allegedly made (presumably except those in the FDD and Franchise Agreement) are "supersed[ed]" by the later agreement. (Doc. 42, #2107). In support, Defendants also point to certain acknowledgments, attached to the Franchise Agreement and signed by Plaintiff, that attest that "no representations or warranties are made or implied, except as specifically set forth in the Franchise Agreement" and FDD. (*Id.* at #2108 (quoting Doc. 41-3, #2043–44)).

The Court notes at the outset that a Lanham Act claim (and its Ohio equivalent) is a poor fit for some of Array's allegations. The Lanham Act is designed to prevent competitive injury resulting from false advertising. *Lexmark Int'l, Inc. v.*

*Static Control Components, Inc.*, 572 U.S. 118, 131 (2014). The paradigmatic example is when Competitor A makes false statements to the market about a competitor's product that drive consumers to purchase Competitor A's product rather than Competitor B's product, or that damage Customer B's standing in the marketplace. *Id.* at 137–38. That contextual understanding imposes at least two limitations that might be relevant here. First, the statute's reach is limited to false statements made "in commercial advertising or promotion." 15 U.S.C. § 1125(a)(1)(B). And second, not all injuries "count" for Lanham Act purposes. Rather, as the Sixth Circuit explained, "a plaintiff suing under § 1125(a) of the Lanham Act must allege a commercial—not a consumer—injury." *Lewis v. Acuity Real Est. Servs., LLC*, 63 F.4th 1114, 1118 (6th Cir. 2023). So, for example, "the Lanham Act … does not cover parties who are 'hoodwinked into purchasing a disappointing product.'" *Id.* at 1119 (quoting *Lexmark*, 572 U.S. at 132).

Considering those limitations, one could argue that at least some of the alleged misstatements here—those which were apparently included only in the FDD—do not constitute "commercial advertising or promotion." 15 U.S.C. § 1125(a)(1)(B). In a similar vein, one might argue that, where a representation appears in an FDD, FTC regulations, not the Lanham Act, provide the source of any remedy. Or, alternatively, one might claim that Array's core complaint is that it was "hoodwinked into purchasing a disappointing [franchise]," *Lexmark*, 572 U.S. at 132, which is a consumer injury rather than a commercial injury.

But, whatever the merits of those arguments may be, Defendants make none of them. Rather, they rely solely on the integration clause in the Franchise Agreement, coupled with the parol evidence rule. (Doc. 42, #2107–09). Based on that, they say that Array cannot rely on any statements "that contradict or fall outside" of the four corners of the contract, which, Defendants appear to assume, are the only statements supporting Array's Lanham Act claims. (*Id.* (arguing that Array's allegations of fraudulent statements "are barred by the parol evidence rule")).

The Court is not convinced. First, Defendants' theory turns on Array's Lanham Act claims being based exclusively on alleged misrepresentations to Array that are outside of, or that contradict, the Franchise Agreement. (*See id.*). Sure, the complaint could do a better job pleading exactly which representations supposedly violated the Lanham Act, but from what the Court can tell (and as Array points out in response), at least some of the misrepresentations appear to come from the Franchise Agreement and the FDD themselves. (*See* Doc. 41, #1855; *see also* Doc. 46, #2154 ("[M]any of Defendants' misrepresentations under Plaintiff's Lanham Act and ODTPA claims are made in the FDD or Franchise Agreement.")). True, for the reasons discussed above Array may encounter various hurdles in relying on such statements for purposes of a Lanham Act claim, but the parol evidence rule is not one of them. And the party-presentation principle forecloses the Court from delving more deeply into those other arguments here.

Nor is the Court convinced that the integration clause bars such claims even if Array does entirely rely on misrepresentations not in the contract. *See, e.g.*, *Pierre,*

*Inc. v. Anspach Meeks Ellenberger, LLP*, No. 23-3423, 2024 WL 1856677, at *7 (6th Cir. Apr. 29, 2024) (citing *Galmish v. Cicchini*, 734 N.E.2d 782, 789 (Ohio 2000)) (explaining that "an integration clause does not automatically bar claims related to fraud"). Here, those external representations appear to include Defendant Burriss's alleged statements to Array about other franchisees' costs, profits, and revenues; Magnolia's online representations about franchise revenue; and Magnolia's various public representations about the ingredients in their products. (Doc. 41, #1852, 1855–56).

In the Court's view, the integration clause, by its own terms, does not bar all potential liability connected to such representations. (Doc. 41-3, #2040). Rather, that clause merely lays out what agreements and representations are part of the "agreement of the parties,"—i.e., the contract's terms. (*Id.*). So Array could not sue *under contract law* based on such misrepresentations. But that does not necessarily preclude reliance on them for Lanham Act purposes.[9] Again, claims based on those misrepresentations may have a host of *other* problems—e.g., is the alleged injury a consumer injury rather than a commercial injury? But the integration clause is not the magic bullet that Defendants contend. And as that is the only argument Defendants advance to support dismissing the Lanham Act (and accompanying Ohio state law) claim, the Court denies their motion on that front.

---

[9] Indeed, it would be an odd outcome if an integration clause barred *all claims* based upon representations not contained in the parties' contract, including those made to the public. For example, if in response to this litigation, Magnolia began maliciously disseminating false rumors about Array, that theory might bar Array from pursuing a claim for defamation.

## CONCLUSION

For the reasons discussed above, the Court **GRANTS IN PART** the Motion to Dismiss (Doc. 42) in a rather limited fashion, dismissing Defendant Magen Bynum from the case. The Motion to Dismiss is **DENIED** in all other aspects.

**SO ORDERED.**

September 25, 2026
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**